# EXHIBIT A

## PIERCE COUNTY SUPERIOR COURT / CASE COVER SHEET

| | |
|---|---|
| Case Number | 24 2 05626 8 |
| Case Title | DLI v. GEO Secure Services, LLC |
| Attorney Name | Anastasia Sandstrom |
| Street Address | 800 Fifth Avenue, Suite 2000 |
| City Seattle | State WA    Zip 98104 |
| Bar # 24163   Phone#( 206 )   464-6993 | |

Please check one category that best describes this case for indexing purposes.
**Presumed tracks are listed next to the cause codes. (Non PCLR indicates no Track Assignment Request is required.)**

*If you cannot determine the appropriate category, please describe the cause of action below. This will create a AMiscellaneous≅ cause which is not subject to PCLR 1, and does not require a Track Assignment Request Form.*

**APPEAL / REVIEW**
\_\_\_ Administrative Law Review (ALR 2) *Non PCLR*
\_\_\_ Civil, Non-Traffic (LCA 2) *Non PCLR*
\_\_\_ Civil, Traffic (LCI 2) *Non PCLR*
**CONTRACT / COMMERCIAL**
\_\_\_ Breach of Contract (COM 2) *EXPEDITED*
\_\_\_ Commercial Contract (COM 2) *EXPEDITED*
\_\_\_ Commercial Non-Contract (COL 2) *EXPEDITED*
\_\_\_ Third Party Collection (COL 2) *EXPEDITED*

**DOMESTIC RELATIONS**
\_\_\_ Annulment/ Invalidity  (INV 3) *DISSOLUTION*
\_\_\_ Child Custody (CUS 3) *DISSOLUTION*
\_\_\_ Dissolution with children (DIC 3) *DISSOLUTION*
\_\_\_ Dissolution without children (DIN 3) *DISSOLUTION*
\_\_\_ Foreign Judgment (FJU 3) *Non PCLR*
\_\_\_ Legal Separation (SEP 3) *DISSOLUTION*
\_\_\_ Mandatory Wage Assignment (MWA 3) *Non PCLR*
\_\_\_ Meretricious Relationship (MER 2) *Non PCLR*
\_\_\_ Modification (MOD 3) *Non PCLR*
\_\_\_ Out-of-State Custody (OSC 3) *DISSOLUTION*
\_\_\_ Reciprocal, Respondent in county (RIC 3) *Non PCLR*
\_\_\_ Reciprocal, Respondent out of county (ROC 3) *Non PCLR*
\_\_\_ Residential Schedule/Parenting Plan (PPS 3) *Non PCLR*
**JUDGMENT**
\_\_\_ Abstract Only (ABJ 2) *Non PCLR*
\_\_\_ Foreign Judgment (FJU 2) *Non PCLR*
\_\_\_ Judgment, Another County (ABJ 2) *Non PCLR*
\_\_\_ Judgment, Another State (FJU 2) *Non PCLR*
\_\_\_ Tax Warrant (TAX 2) *Non PCLR*
\_\_\_ Transcript of Judgment (TRJ 2) *Non PCLR*
**OTHER COMPLAINT OR PETITION**
\_\_\_ Compel/Confirm Binding Arbitration (MSC 2) *Non PCLR*
\_\_\_ Change of  Name (CHN 2) *Non PCLR*
\_\_\_ Deposit of Surplus Funds (MSC 2) *Non PCLR*
\_\_\_ Emancipation of a Minor (EOM 2) *Non PCLR*
XX Injunction (INJ 2) *Non PCLR*
\_\_\_ Interpleader (MSC 2) *Non PCLR*
\_\_\_ Malicious Harassment (MHA 2) *Non PCLR*
\_\_\_ Minor Settlement /No Guardianship (MST 2) *Non PCLR*
\_\_\_ Petition for Civil Commit/Sexual Predator (PCC 2) *Non PCLR*
\_\_\_ Seizure of Property from Comm of Crime (SPC 2) *Non PCLR*
\_\_\_ Seizure of Property Resulting from Crime (SPR 2) *Non PCLR*
\_\_\_ Subpoenas (MSC 2) *Non PCLR*

**ADOPTION / PATERNITY**
\_\_\_ Adoption (ADP 5) *Non PCLR*
\_\_\_ Confidential Intermediary (MSC 5) *Non PCLR*
\_\_\_ Initial Pre-Placement Rpt (PPR 5) *Non PCLR*
\_\_\_ Modification (MOD 5) *Non PCLR*
\_\_\_ Paternity (PAT 5) *Non PCLR*
\_\_\_ Paternity/URESA/UIFSA (PUR 5) *Non PCLR*
\_\_\_ Relinquishment (REL 5) *Non PCLR*
\_\_\_ Terminate of Parent-Child Relation (TER 5) *Non PCLR*
\_\_\_ Rescission of Paternity Affidavit (MSC 5) *Non PCLR*
**PROBATE / GUARDIANSHIP**
\_\_\_ Absentee (ABS 4) *Non PCLR*
\_\_\_ Disclaimer (DIS 4) *Non PCLR*
\_\_\_ Estate (EST 4) *Non PCLR*
\_\_\_ Foreign Will (FNW 4) *Non PCLR*
\_\_\_ Guardianship (GDN 4) *Non PCLR*
\_\_\_ Guardianship / Estate (G/E 4) *Non PCLR*
\_\_\_ Limited Guardianship (LGD 4) *Non PCLR*
\_\_\_ Minor Settlement /With Guardianship (MST 4)*Non PCLR*
\_\_\_ Non-Probate Notice to Creditors (NNC 4) *Non PCLR*
\_\_\_ Will Only (WLL 4) *Non PCLR*
**PROPERTY RIGHTS**
\_\_\_ Condemnation (CON 2) *STANDARD*
\_\_\_ Foreclosure (FOR 2) *STANDARD*
\_\_\_ Property Fairness (PFA 2 ) *STANDARD*
\_\_\_ Quiet Title (QTI 2) *STANDARD*
\_\_\_ Unlawful Detainer/Eviction (UND 2) *Non PCLR*
**TORT / MEDICAL MALPRACTICE**
\_\_\_ Hospital (MED 2) *COMPLEX*
\_\_\_ Medical Doctor (MED 2) *COMPLEX*
\_\_\_ Other Health Care Professional (MED 2) *COMPLEX*
**TORT / MOTOR VEHICLE**
\_\_\_ Death (TMV 2) *STANDARD*
\_\_\_ Non-Death Injuries (TMV 2) *STANDARD*
\_\_\_ Property Damage Only (TMV 2) *STANDARD*
**TORT / NON MOTOR VEHICLE**
\_\_\_ Asbestos (PIN 2) *STANDARD*
\_\_\_ Other Malpractice (MAL 2) *COMPLEX*
\_\_\_ Personal Injury (PIN 2) *STANDARD*
\_\_\_ Products Liability (PIN 2) *STANDARD*
\_\_\_ Property Damage (PRP 2) *STANDARD*
\_\_\_ Wrongful Death (WDE 2) *STANDARD*
**WRIT**
\_\_\_ Habeas Corpus (WHC 2) *Non PCLR*
\_\_\_ Mandamus (WRM 2) *Non PCLR*
\_\_\_ Review (WRV 2) *Non PCLR*

MISCELLANEOUS_____

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

January 30 2024 10:29 AM

CONSTANCE R. WHITE
COUNTY CLERK

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR PIERCE COUNTY

NO.  **24-2-05626-8**

**ORDER ASSIGNING CASE TO JUDICIAL
DEPARTMENT AND SETTING REVIEW
HEARING DATE(PCLR3/PCLR40)**

Judges: **Timothy L. Ashcraft**
Department: **02**
Docket Code: **ORACD**

**Notice to Plaintiff/Petitioner(s):**
* Case filed, then served: Plaintiff(s)/Petitioner(s) shall serve a copy of this Order Assigning Case to Judicial Department
   on the Defendant(s)/Respondent(s) along with a copy of the Summons and Complaint.
* Case served, then filed: Plaintiff(s)/Petitioner(s) shall serve a copy of this Order Assigning Case to Judicial Department
within five (5)
   court days of filing.
* Service by publication pursuant to court order: Plaintiff(s)/Petitioner(s) shall serve a copy of this Order Assigning Case to Judicial
   Department within five (5) court days of the Defendant(s)/Respondent(s) first response or appearance.

**Trial Date:**
A trial date may be obtained by filing a 'Note of Issue' for assignment of a trial date at least seven (7) court days prior to the
date fixed for the mandatory hearing date set out below.

> If a trial date is NOT obtained, failure to appear on the date below may result in dismissal of the case by the Court.
> Further, if the case has been fully resolved and all final papers have been entered by the Court, no appearance is
> required.
>
> **Mandatory Hearing Date: May 24, 2024 at 9:00 AM**
>
> At the time of this mandatory hearing , the Court may provide you with a Case Schedule which may include the trial date,
> if necessary. Failure to appear on this date may result in dismissal of the case by the Court.

**Cases Agreed or by Default:**
If you settle your case by entry of an order of default or agreement and all of the appropriate time requirements have been
met, you may file a 'Note for Commissioner's Calendar to appear before a Court Commissioner for entry of all final papers
unless presentation is allowed in the Commissioner's Ex Parte Department.

A FREE LINX account is required in order to access electronic services (including e-filing, e-service, order submissions,
etc). You can setup your free LINX account here: **https://www.piercecountywa.gov/374/E-Filing**

January 30, 2024
_____
Date

Timothy L. Ashcraft
Department 02

linxcrt/supAdmin/oracd.rptdesign

GEO_000002

FILED
IN COUNTY CLERK'S OFFICE

JAN 30 2024

PIERCE COUNTY, WASHINGTON
CONSTANCE R. WHITE, County Clerk
BY_____ DEPUTY

**PIERCE COUNTY SUPERIOR COURT**
**STATE OF WASHINGTON**

| | |
|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, | No.   24 2 05626 8 |
| Plaintiff, | SUMMONS |
| v. | |
| GEO SECURE SERVICES, LLC, | |
| Defendant. | |

TO DEFENDANT:

A lawsuit has been started against you in the above-entitled court by Plaintiff, Department of Labor and Industries of the State of Washington. Plaintiff's claim is stated in the written Complaint, a copy of which is served upon you with this Summons.

In order to defend against this lawsuit, you must respond to the complaint by stating your defense in writing, and serve a copy upon the undersigned attorneys for Plaintiff within 20 days after the service of this summons, excluding the day of service, or a default judgment may be entered against you without notice. A default judgment is where Plaintiff is entitled to what they ask for because you have not responded. If you serve a notice of appearance on the undersigned person, you are entitled to notice before a default judgment may be entered.

You may demand that Plaintiff file this lawsuit with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, Plaintiff must file this lawsuit with the court, or the service on you of this summons and complaint will be void.

SUMMONS                                         1

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000003

1    If you wish to seek the advice of an attorney in this matter, you should do so promptly so

2  that your written response, if any, may be served on time.

3    THIS SUMMONS is issued pursuant to Rule 4 of the Superior Court Rules of the State of

4  Washington.

5    DATED this 30th day of January, 2024.

6

7                                ROBERT FERGUSON
                                Attorney General

8

9                                ANASTASIA SANDSTROM
                                Senior Counsel

10                               WSBA No. 24163

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

SUMMONS                              2                    ATTORNEY GENERAL OF WASHINGTON
                                                          LABOR & INDUSTRIES DIVISION
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA  98104-3188
                                                          (206) 464-7740

FILED
IN COUNTY CLERK'S OFFICE

JAN 30 2024

PIERCE COUNTY, WASHINGTON
CONSTANCE R. WHITE, County Clerk
BY_____ DEPUTY

**PIERCE COUNTY SUPERIOR COURT**
**STATE OF WASHINGTON**

| | |
|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON, | No.   24 2 05626 8 |
| Plaintiff, | COMPLAINT |
| v. | |
| GEO SECURE SERVICES, LLC, | |
| Defendant. | |

The Plaintiff, Department of Labor and Industries of the State of Washington (L&I) by and through Robert Ferguson, Attorney General, and Anastasia Sandstrom, Senior Counsel, brings the following allegations, claims, and prayers for relief under RCW 49.17.075 and RCW 7.21.030.

## I.   PARTIES

1. L&I is a public agency responsible for the administration and enforcement of the Washington Industrial Safety and Health Act, RCW 49.17, and WAC 296. Under this authority, L&I has the authority to inspect workplaces to enforce workplace safety statutes and regulations.

2. Defendant, GEO Secure Services, LLC, (GEO) does business in Pierce County. It contracts with the U.S. Immigration and Customs Enforcement (ICE) to provide

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6993

GEO_000005

1   detention management services at its Tacoma facility. The facility is called the

2   Northwest ICE Processing Center (NWIPC).

## II.     JURISDICTION AND VENUE

3.  Venue is proper in Pierce County because L&I obtained the warrant in Pierce County

    Superior Court for GEO's business operation in Pierce County.

4.   Jurisdiction is proper under RCW 49.17.075 and RCW 7.21.030.

## III.     FACTUAL ALLEGATIONS

5.  There are approximately 300,000 employers in Washington. L&I cannot inspect all

    employers and must make decisions about what employers to inspect. Hence it uses the

    technique of unannounced visits. WISHA provides that L&I doesn't need to give

    advance notice to inspect a worksite. RCW 49.17.070(5). The right to unannounced

    entry furthers important safety purposes. There is evidence that regulatory interventions

    can improve occupational health and safety outcomes. The results of pooled analysis by

    researchers provide strong evidence that L&I's Division of Occupational Health and

    Safety inspection activities make a significant contribution to reducing claims rates and

    costs in the period following the visit. Unannounced visits show the real working

    conditions at a workplace. If an employer has a warning about the inspection, they may

    create artificial conditions to hid misfeasance and then return to dangerous practices

    after the inspectors leave.

6.  The federal Occupational Safety and Health Act (OSH Act) sets occupational standards

    for the country. 29 U.S.C. § 651. And states may only act under the authority of the

    Occupational Health and Safety Administration (OSHA). 29 U.S.C. § 667(b).

7.  L&I has adopted workplace standards and entry procedures under the authority of the

    OSH Act. 29 U.S.C. § 667(b). The OSH Act authorizes states to administer their own

    state safety plan if the standards meet or exceed federal standards. 29 U.S.C. § 667(b);

    RCW 49.17.010. Washington has such a State Plan. RCW 49.17.010. The OSH Act's

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6993

GEO_000006

1  delegation requires inspecting federal contractors, specifically GEO. In 2013, GEO

2  settled with the Secretary of Labor to require state inspections in State Plan states of its

3  facilities, including Washington.

4  8.  GEO employees engage in a wide range of duties, including security guard and

5  janitorial work.

6  9.  L&I has routinely inspected GEO's workplace at the NWIPC. Unannounced

7  inspections were performed in 2009, 2010, 2014, twice in 2020, 2021, and 2022. L&I

8  has found safety violations on several occasions.

9  10.  GEO allows other public entities to inspect its workplace. Tacoma-Pierce County

10  Health Department (TPCHD) is a combined county-city health department that operates

11  under RCW 70.05 and RCW 70.08. The TPCHD Communicable Disease Control

12  division's principal responsibility is to prevent and control the spread of diseases in

13  Pierce County. This work includes ensuring food in restaurants, schools, and other

14  institutions in Pierce County is safe to eat. At the request of the GEO Group, TPCHD

15  conducts food safety inspections at the Northwest Detention Facility in Tacoma and has

16  done so since 2004." TPCHD conducts these inspections under WAC 246-215. When

17  TPCHD staff conducts a food safety inspection at the NWIPC they do not call ahead or

18  make appointments. It requires unannounced inspections. When food safety inspectors

19  arrive, they provide their ID to facility staff, sign into a logbook, receive a badge to go

20  through the metal detector, their bags are searched, and they receive a UV stamp on

21  their wrist. Facility staff call the GEO kitchen manager, who escorts TPCHC staff

22  throughout the facility. As of January 19, 2024, GEO has never required TPCHD staff

23  to undergo a background check before entering the building.

24  11.  In December 2023, L&I decided to investigate GEO's workplace as an unannounced

25  programmed inspection for a hazardous workplace.

26

COMPLAINT                                    3                    ATTORNEY GENERAL OF WASHINGTON
                                                                                            LABOR & INDUSTRIES DIVISION
                                                                                            800 Fifth Avenue, Suite 2000
                                                                                            Seattle, WA 98104
                                                                                            (206) 464-6993

GEO_000007

12. On December 27, 2023, two Department inspectors sought entry to GEO's workplace. These inspectors had background checks. GEO denied the inspectors entry. GEO claimed that ICE told them not to allow L&I's inspection.

13. After GEO's refusal to allow L&I to inspect its workplace, L&I successfully sought a warrant for entry from the Pierce County Superior Court on December 29, 2023. The warrant is attached as Ex. 1. The warrant relied on the authority of RCW 70.395, RCW 49.17, and WAC 296. L&I now only pursues its authority under RCW 49.17 and WAC 296. Despite the warrant, GEO again denied L&I entry.

14. On January 4, 2024, the inspectors returned to the Pierce County Superior Court and obtained a warrant number for the warrant upon return.

15. Washington has a State Plan allowing it to enforce workplace safety regulations under the Occupational Health and Safety Act. 29 U.S.C. § 667(b); RCW 49.17.010.

16. In 2013, GEO settled with the U.S. Secretary of Labor to allow state plan states, including Washington, to enforce state workplace safety laws.

17. As of 2015, GEO's contract with ICE with respect to construction, operation, and maintenance required GEO follow applicable federal, state, and local laws, regulations, codes, guidelines, and policies. In the event of a conflict between federal, state, or local codes, regulations or requirements, the most stringent shall apply. In the event there is more than one reference to a safety, health, or environmental requirement in an applicable law, standard, code, regulation or Government policy, the most stringent requirement shall apply. The contract also provides that "[t]he Contractor shall comply with the requirements of the Occupational Safety and Health Act of 1970." This provision requires compliance with the State Plan settlement directing inspections of GEO's workplace in Washington by L&I. *See* 29 U.S.C. § 667(b).

18. In 2013, GEO settled with OSHA to provide for State Plan enforcement by Washington of the NWIPC.

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6993

GEO_000008

## IV.   FIRST CLAIM FOR RELIEF

19. L&I realleges and incorporates by reference each and every allegation set for in the
    preceding paragraphs.

20. GEO is required to follow RCW 49.17.060. An employer owes to its employees a duty
    to provide a safe place to work. *LaRose v. King Cnty.*, 8 Wn. App. 2d 90, 123, 437 P.3d
    701 (2019). WISHA requires an employer to "furnish to each of his or her employees a
    place of employment free from recognized hazards that are causing or likely to cause
    serious injury or death to his or her employees." RCW 49.17.060(1). The duty to
    provide a safe workplace is non-delegable. *Ward v. Ceco Corp.*, 40 Wn. App. 619, 628-
    29, 699 P.2d 814 (1985).

21. As part of its non-delegable duty, GEO was required to further access to its workplace
    under RCW 49.17.070.

22. GEO did not further access to its workplace.

23. RCW 49.17.075 allows L&I to obtain a warrant to further access to a workplace.

24. L&I obtained a warrant on December 29, 2024.

25. GEO refused to comply with the warrant on the same date.

26. L&I is entitled to an order of contempt issued against GEO to allow entry and to
    cooperate with L&I regarding L&I's inspection.

27. L&I is also entitled to injunctive relief to ensure entry and/or to cooperate with further
    unannounced inspections.

## V.   SECOND CLAIM FOR RELIEF

28. L&I realleges and incorporates by reference each and every allegation set for in the
    preceding paragraphs.

29. RCW 7.21.030 allows the superior court to issue an order of contempt to enforce its
    warrant order.

30. L&I is alternatively entitled to relief under RCW 70.395.

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6993

GEO_000009

## VI.    PRAYER FOR RELIEF

1. L&I makes this claim against GEO, and prays for relief as follows:

2. For enforcement of the warrant.

3. For a contempt order against GEO requiring GEO to allow entry and/or to cooperate with L&I regarding L&I's inspection.

4. For sanctions, attorney fees and costs to be assessed against GEO.

5. For an injunctive order requiring GEO to comply with RCW 49.17, WAC 296, and RCW 70.395.

6. For such further and other relief the Court shall deem just and proper.

DATED this 30th day of January, 2024 by:

ROBERT FERGUSON
Attorney General

ANASTASIA SANDSTROM
Senior Counsel
WSBA No. 24163

COMPLAINT

6

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-6993

GEO_000010

<pre>
                                              FILED
                                     IN COUNTY CLERK'S OFFICE

                                         JAN 0 4 2024

                                     PIERCE COUNTY, WASHINGTON
                                     CONSTANCE R. WHITE, County Clerk
                                     BY_____ DEPUTY
</pre>

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF PIERCE**

In Re:

WASHINGTON STATE
DEPARTMENT OF LABOR &
INDUSTRIES
950 Broadway, Suite 200, Tacoma, WA
98402

NO 24 1 50028

WISHA SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

TO:        GEO Secure Services LLC; it's Principals, Manager, Operator, or Agent in charge;

AND TO:    _

WHEREAS, the Director of the Department of Labor and Industries of the State of Washington (Department), by and through its designated representative, compliance industrial safety and health investigator (CISHI) Eric Smith, has applied for a safety and health inspection entry warrant authorizing him or his authorized representative(s) to conduct a safety and health inspection of the workplace of GEO Secure Services LLC, located at 1623 East J Street, Tacoma, WA 98421; and

WHEREAS, it appearing that probable cause exists for the issuance of said warrant;

WISHA SAFETY AND HEALTH                    1          WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                              LABOR & INDUSTRIES
                                                      950 Broadway Suite 200
                                                      Tacoma, WA 98402
                                                      253-596-3878

**Exhibit 1, Page 1 of 4**

1   NOW THEREFORE, by the authority of this Court of the State of Washington, you are

2   hereby commanded to allow entry into the workplace of GEO Secure Services LLC specified

3   above, during regular working hours, or at other reasonable times, to allow the conducting

4   therein of a safety and health inspection for the purpose of ascertaining and causing to be

5   corrected any conditions presenting safety or health hazards to employees of GEO Secure

6   Services LLC, under chapter 49.17 Revised Code of Washington (RCW), chapter 70.395 RCW

7   and Title 296 of the Washington Administrative Code (WAC).

8   Specifically, you are commanded to allow the Director or his/her authorized

9   representative to perform the following functions:

10   1. Inspect, survey and investigate all pertinent conditions, structures, machines,

11       apparatus, devices, equipment, and materials.

12   2. To privately question any employer, owner, operator, agent, or employee for the

13       purpose of obtaining data necessary to determine compliance with chapter 49.17

14       RCW, chapter 70.395 RCW, and Title 296 WAC.

15   3. Take photographs, video tapes, audio tapes, samples and any other tests necessary to

16       record or evaluate the safety and health conditions at the workplace.

17   4. Obtain copies of all pertinent documentation, including, but not limited to: accident

18       prevention program, hazard communication program, personal protective equipment

19       (PPE) hazard assessment, safety committee meeting records, and employee training

20       records.

21   5. [Identify any other pertinent or necessary inspection activities here]

22   The Director of the Department, or his/her representative, shall execute this warrant

23   within ten (10) days from the date issued and shall promptly return this warrant to the issuing

24   court.

25

WISHA SAFETY AND HEALTH            2            WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                         LABOR & INDUSTRIES
                                                 950 Broadway Suite 200
                                                 Tacoma, WA 98402
                                                 253-596-3878

**Exhibit 1, Page 2 of 4**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Director, or his/her representative, shall serve a copy of this warrant at the time of authorized entry, upon an owner, agent, or representative of GEO Secure Services LLC.

//

//

//

//

//

WISHA SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

3

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway Suite 200
Tacoma, WA 98402
253-596-3878

**Exhibit 1, Page 3 of 4**

1

        THIS SAFETY AND HEALTH ENTRY WARRANT IS AN ORDER OF THE COURT.

2

FAILURE TO HONOR THIS WARRANT MAY RESULT IN PUNISHMENT FOR

3

CONTEMPT OF COURT.

4

5

6

7

     12-29-2023

8

DATE                                JUDGE'S SIGNATURE

9

10

     9:20 AM                          GRADY E. JOHNSON

11

TIME ISSUED (A.M.)(P.M.)           Type or Print Judge's Name

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WISHA SAFETY AND HEALTH            4          WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                         LABOR & INDUSTRIES
                                           950 Broadway Suite 200
                                         Tacoma, WA 98402
                                         253-596-3878

**Exhibit 1, Page 4 of 4**

GEO_000014

**IN THE SUPERIOR COURT OF WASHINGTON, COUNTY OF PIERCE**

Department of Labor and Industries of the State of WA
_____

Plaintiff(s)/Petitioner,

vs.

GEO Secure Services, LLC
_____

Defendant(s)/Respondent.

Cause No: 24-2-05626-8

**NOTE FOR JUDGES MOTION DOCKET**

**(NTMT)**

**TO THE CLERK OF THE SUPERIOR COURT AND TO OPPOSING PARTY (IES):**

NAME: GEO Secure Services, LLC

WSBA#:_____

Phone: 253-396-1611

ADDRESS: GEO Secure Services, LLC

1623 E. J Street

Tacoma, WA 98421

Self-Represented or

ATTORNEY FOR: GEO Secure Services LLC

(Please note additional attorneys on an attached page)

Please take notice that an issue of law in this case will be heard on the date below and the clerk is directed to note this on the appropriate calendar:

**Pierce County Superior Court, County-City Building – 930 Tacoma Ave. S – Tacoma, WA 98402**

**JUDGE:** Timothy L. Ashcraft

**CALENDAR DATE:** February 9, 2024          TIME: 9:00 am

**Proceeding Type:** Civil Motion, Oral Argument

**NATURE OF HEARING (MUST CHOOSE ONE OR MORE):**

☐ Adjust Trial Date   ☐ Amend   ☐ Appoint GAL/PI   ☐ Compel   ☐ Consolidate
☐ Disburse Funds      ☐ Dismiss ☐ Extend GAL/PI Times and Fees ☐ In Limine
☐ Parenting Plans     ☐ Presentation ☐ Other Motion for Contempt

**WORKING COPIES SHALL BE DELIVERED TO THE COURT PURSUANT TO PCLR 7 (a) (7)**

**PARTY SETTING HEARING SHALL CONFIRM BY NOON, THREE (3) <u>COURT WORKING</u> DAYS**

**PRIOR TO HEARING OR HEARING WILL BE CANCELLED**

Submitted by:

DATED: 1/31/2024                         Signed: *A. Sandstrom*

NAME: Anastasia Sandstrom         Phone: 206-464-6993

ADDRESS: Attorney Generals Office    WSBA# 24163

800 Fifth Avenue, Suite 2000          Attorney for: Plaintiff

Seattle, WA 98104

Honorable Judge Timothy Ashcroft
Hearing: February 9, 2024
Time: 9:00 a.m.

1

2

3

4

5

6

7

**PIERCE COUNTY SUPERIOR COURT**
**STATE OF WASHINGTON**

8

9   DEPARTMENT OF LABOR AND
INDUSTRIES OF THE STATE OF
WASHINGTON,

No. 24-3-05626-9

MOTION FOR RULING ON
CONTEMPT

10

11            Plaintiff,

12   v.

Oral Argument Requested

13   GEO SECURE SERVICES LLC,

            Defendant.

14

15                    **I.    INTRODUCTION**

16        Workers have a fundamental right to a safe workplace as enshrined in the Washington

17   State Constitution and mandated by the Washington State Industrial Safety & Health Act

18   (WISHA). Const. art. II, § 35; RCW 49.17.010; *Martinez-Cuevas v. DeRuyter Bros. Dairy,*

19   *Inc.*, 196 Wn.2d 506, 520, 475 P.3d 164 (2020). Even so, GEO Secure Services LLC has

20   ignored this Court's warrant authorizing the Department of Labor and Industries' (L&I's)

21   safety inspection of GEO's workplace. RCW 49.17.070, .075.

22        In prior inspections of GEO's workplace, L&I has discovered unsafe conditions and

23   cited GEO for committing safety violations. This history of safety violations compels the need

24   to inspect GEO's workplace to protect GEO's employees' safety. GEO's workplace is a

25   private immigration detention facility that is designated a "hazardous workplace." Sandstrom

26

GEO_000017

1   Decl. Ex. 6 at 2. Yet despite GEO's non-delegable duty to provide a safe workplace for its

2   employees, GEO resists L&I's current inspection effort.

3       GEO gives three reasons for blocking entry to the Northwest ICE Processing Center

4   (NWIPC) for a lawful inspection. First, GEO observes that the United States Immigration and

5   Customs Enforcement (ICE) told them not to allow L&I's inspections without pre-clearance.

6   But GEO's report of ICE's position is pretextual. Not only has L&I routinely inspected the

7   NWIPC for almost 15 years without the need for pre-clearance, GEO also allows (and indeed

8   requested) unannounced visits by other local inspectors, while requiring no formal process.

9       Second, GEO thinks its workplace should not be inspected while its lawsuit against the

10  State is pending. Yet while GEO has sued the State to enjoin enforcement of RCW

11  70.395.050 and DOH is separately suing GEO to inspect under RCW 70.395.050, the Court

12  has yet to grant GEO any injunctive relief. Even more, L&I's request for inspection now

13  stems additionally from RCW 49.17 and WAC 296, for which no lawsuit is pending.

14      And third, GEO questions the fact that L&I did not schedule the inspection—what did

15  it have to hide? From previous inspections, it knows that Washington law "does not require

16  advanced notice of an inspection." RCW 49.17.070(5).

17      Contrary to GEO's assertions, L&I doesn't seek to regulate ICE. It seeks to regulate

18  GEO's conduct because GEO must fulfill its non-delegable duty for worker safety to comply

19  with the rules enacted pursuant to RCW 49.17 and cooperate with L&I. L&I asks this Court to

20  issue an order of contempt, ordering GEO to comply with the warrant issued by this Court

21  and/or cooperate with L&I about the inspection.

22                         **II.    FACTS**

23  **A.    GEO Is a Washington Employer**

24      The NWIPC is a private immigration detention facility. *Nwauzor v. The Geo Grp.*,

25  Inc., 540 P.3d 93, 97 (Wash. 2023). GEO, a Washington employer, has owned and operated

26  the NWIPC and has contracted with ICE since 2005. *Id.* at 97, 99. The corporation contracts

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000018

1   with ICE to provide "civil immigration detention management services." *Id.* at 97. These

2   services include "the building, management and administration, security, clean and vermin

3   free facilities, food service with three nutritious meals per day, clean uniforms and bedding,

4   and barbershop/grooming services." *Id.*

5   **B.   L&I Has Routinely Inspected GEO and Sought to Do So on December 27, 2023**

6        The federal Occupational Safety and Health Act (OSH Act) sets occupational standards

7   for the country. 29 U.S.C. § 651. And states may only act under the authority of the

8   Occupational Health and Safety Administration (OSHA). 29 U.S.C. § 667(b).

9        L&I has adopted workplace standards and entry procedures under the authority of the

10   OSH Act. 29 U.S.C. § 667(b); RCW 49.17.010. The OSH Act authorizes states to administer

11   their own state safety plan if the standards meet or exceed federal standards. 29 U.S.C. §

12   667(b); RCW 49.17.010. Washington has such a State Plan. RCW 49.17.010. The OSH Act's

13   delegation requires the inspection of workplaces operated by federal contractors, specifically

14   GEO. In 2013, GEO settled with the Secretary of Labor to require state inspections in State

15   Plan states of its facilities, including Washington. Sandstrom Decl. Ex. 1 at 10.

16        A contract between GEO and ICE provided that a safety and health program must be

17   maintained in compliance with all applicable federal, state and local laws, statutes, regulations

18   and codes:

19        The facility, whether new construction expansion or an existing physical plant,
     shall be designed, constructed, operated, and maintained in accordance with all

20        applicable federal, state, and local laws, regulations, codes, guidelines, and
     policies. In the event of a conflict between federal, state, or local codes,

21        regulations or requirements, the most stringent shall apply. In the event there is
     more than one reference to a safety, health, or environmental requirement in an

22        applicable law, standard, code, regulation or Government policy, the most
     stringent requirement shall apply.

23

24   Sandstrom Decl. Ex. 13 at 8. The contract also provides that "[t]he Contractor shall comply

25   with the requirements of the Occupational Safety and Health Act of 1970." Sandstrom Decl.

26   Ex. 13 at 6. This provision requires compliance with the State Plan settlement directing

MOTION FOR RULING ON CONTEMPT     3     ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000019

1  inspections of GEO's workplace in Washington by L&I. *See* 29 U.S.C. § 667(b); Sandstrom

2  Decl. Ex. 1 at 10.

3        L&I has routinely inspected GEO's workplace at the NWIPC. Korzenko Decl. 1;

4  Sandstrom Decl. Ex. 10-11. Unannounced inspections were performed in 2009, 2010, 2014,

5  2020 (twice), 2021, and 2022. Sandstrom Decl. Ex. 10-11; Korzenko Decl. 2; Smith Decl. 1.

6  L&I found safety violations several times. Sandstrom Decl. Ex. 10-11. These violations

7  included violations of confined space, respirator program violations, lack of an emergency eye

8  wash, and TB exposure and a lack of an exposure plan. Korzenko Decl. 2.

9        Although GEO has stated that "L&I typically coordinates the timing and scope of

10  inspections undertaken at the NWIPC," Sandstrom Decl. Ex. 2 at 5, L&I's compliance

11  manager for the region reveals this is not the case. L&I has often done unannounced visits.

12  Korzenko Decl. 2. This is because OSHA requires inspectors to have unannounced visits for

13  the initial visit. *Id.* As recent as May 2022, an L&I inspector inspected GEO's workplace

14  unannounced and was not denied entry. Smith Decl. 1.

15        In December 2023, L&I decided to investigate GEO's workplace as an unannounced

16  programmed inspection. Sandstrom Decl. Ex. 6 at 3. A programmed inspection means one

17  without a complaint. WAC 296-900-12005. L&I conducts such inspections when an employer

18  has a hazardous workplace. *Id*.

19        On December 27, 2023, two Department inspectors sought entry to GEO's workplace.

20  Sandstrom Ex. 6 at 3. Decl. Although these inspectors have had background checks, Korzenko

21  Decl. 2, GEO denied the inspectors entry. Sandstrom Ex. 6 at 3.

22  **C.    December 29, 2023 Warrant**

23        After GEO's refusal to allow L&I to inspect its workplace, L&I successfully obtained

24  a warrant for entry from this Court on December 29, 2023. Sandstrom Decl. Ex. 7. This

25  warrant relied on the authority of RCW 70.395, RCW 49.17, and WAC 296. Sandstrom Decl.

26  Ex. 7 at 2. Despite the warrant, GEO again denied L&I entry. Smith Decl. 1. GEO's

MOTION FOR RULING ON CONTEMPT          4          ATTORNEY GENERAL OF WASHINGTON
                                                                LABOR & INDUSTRIES DIVISION
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104-3188
                                                                (206) 464-7740

GEO_000020

1   ostensible reason was that ICE directed them to deny entry. Sandstrom Decl. Ex. 2 at 1. GEO

2   states that no one is able to enter the NWIPC without the express authorization of ICE. *Id.* at

3   Ex. 2 at 1-3. Yet, GEO admits that L&I has been able to inspect before. *Id.*, Ex. 3 at 2.

4        GEO then served a motion to quash. Furst Decl. 1. It held off pursuing this motion

5   because L&I requested time to deliberate. Furst Decl. 1. L&I now seeks to enforce the

6   warrant.

7   **D.      Litigation About GEO**

8        In 2017, the State of Washington sued GEO for violating the state's Minimum Wage

9   Act by paying detainee workers $1 per day for work performed. *Nwauzor*, 540 P.3d at 97. The

10  State was successful; the federal district court entered an injunction requiring GEO pay the

11  minimum wage to detainee workers. *Id.* GEO appealed to the Ninth Circuit, and the court

12  certified questions to the Washington State Supreme Court centering around whether the

13  detainees at NWIPC were employees. In 2023, the Supreme Court "conclude[ed] the detained

14  workers at the NWIPC are 'employees' under the [Minimum Wage Act]." *Nwauzor* 540 P.3d

15  at 99 (Wash. 2023). The matter is pending at the Ninth Circuit. GEO suspended its detainee

16  work program pending the outcome of the minimum wage litigation. Sandstrom Decl. Ex. 14.

17       In the 2023 session, the Legislature adopted HB 1470 to require routine unannounced

18  inspections by the Department of Health related to the health status of detainees at a private

19  detention center and by L&I to investigate for workplace safety issues including the

20  employment of detainees. RCW 70.395.050.

21       In July 2023, GEO sued the State in federal district to enjoin HB 1470, arguing it was

22  unconstitutional. No. 3:23-cv-05626. The federal district court has yet to issue any order

23  enjoining the enforcement of RCW 70.395.050.

24       In December 2023, DOH sued GEO in Thurston County Superior Court to seek

25  injunctive relief to exercise its authority under RCW 70.395.050 after GEO repeatedly refused

26  DOH inspectors admission to the NWIPC. DOH was prompted to act by 277 complaints

MOTION FOR RULING ON CONTEMPT                5          ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000021

1    lodged against GEO for unsafe conditions for detainees. Sandstrom Decl. Ex. 15. at 2. The

2    complaints included allegations about medical needs, contaminated food, insufficient food,

3    dirty clothes and bedding, mistreatment of detainees, and hunger strikes. *Id.* When attempting

4    to gain access to the NWIPC to investigate these conditions, the DOH staff person noted that

5    when the receptionist thought they were acting on the Tacoma-Pierce County Health

6    Department's (TPCHD's) behalf, they were to be given immediate access but when they

7    clarified they worked for DOH they were denied. Sandstrom Decl. Ex. 15 at 3.

8    **E.      TPCHD—Other Inspections of GEO**

9         The TPCHD inspects GEO's workplace without impediment by GEO. Sandstrom

10   Decl. Ex. 8 at 2. TPCHD is a combined county-city health department that operates under

11   RCW 70.05 and 70.08. *Id.*, Ex. 8 at 1

12        "At the request of the GEO Group, [TPCHD] conducts food safety inspections at the

13   Northwest Detention Facility in Tacoma and has done so since 2004." *Id.*, Ex. 8 at 2. TPCHD

14   conducts these inspections under WAC 246-215. *Id.*

15        Nigel Turner, the Division Director for Communicable Disease Control, reports that

16   when TPCHD staff conducts a food safety inspection at the NWIPC, they do not call ahead or

17   make appointments. *Id.* TPCHD requires unannounced inspections. *Id.* To date, GEO has

18   never required TPCHD staff to undergo a background check before entering the building. *Id.*

19   **F.      Enforcement Action**

20        L&I now seeks an order of contempt and an order enforcing the warrant, with

21   direction to GEO to cooperate with L&I's request for unannounced access to GEO's

22   workplace.

23                         **III.      EVIDENCE RELIED ON**

24   Declaration of Craig Blackwood

25   Declaration of Elliott Furst

26   Declaration of John Korzenko

MOTION FOR RULING ON CONTEMPT              6

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000022

1    Declaration of Anastasia Sandstrom, and exhibits

2    Declaration of Eric Smith

3    **IV.     AUTHORITY**

4    **A.     L&I Has a Statutory Right to Enter the NWIPC Without Advance Notice**

5        L&I has the right to inspect GEO's workplace without advance notice, contrary to

6    GEO's position and consistent with Washington's priority of ensuring workplace safety.

7    Sandstrom Decl. Ex. 2 at 5. Washington has a "long and proud history of being a pioneer in

8    the protection of employee rights." *Drinkwitz v. Alliant Techsys., Inc.*, 140 Wn.2d 291, 300,

9    996 P.2d 582 (2000). The Washington State Constitution mandates safety protections for all

10    Washington workers. Const. art. II, § 35; *Martinez-Cuevas*, 196 Wn.2d at 520; *Bayley Constr.*

11    *v. Dep't of Lab. & Indus.*, 10 Wn. App. 2d 768, 781, 450 P.3d 647 (2019). Protecting workers

12    from hazards is an overarching, constitutional demand, and so WISHA cannot be interpreted

13    to undercut worker safety. *See* Const. art. II, § 35; RCW 49.17.010; *Martinez-Cuevas*, 196

14    Wn.2d at 519-20; *Bayley*, 10 Wn. App. 2d at 781.

15        Regardless of GEO's challenges to RCW 70.395.050, L&I adopted workplace

16    standards under the authority of the OSH Act, which authorizes states to administer their own

17    state safety plan if the standards meet or exceed federal standards, as it does in Washington. 29

18    U.S.C. § 667(b); RCW 49.17.010.

19        In adopting Washington's State Plan, the Legislature's purpose was to "assure, insofar

20    as may reasonably be possible, safe and healthful working conditions for every man and

21    woman working in the state of Washington[.]" RCW 49.17.010. "As a remedial statute,

22    WISHA will be liberally construed to carry out this purpose." *Adkins v. Aluminum Co. of Am.*,

23    110 Wn.2d 128, 146, 750 P.2d 1257 (1988).

24        An employer owes to its employees a duty to provide a safe place to work. *LaRose v.*

25    *King Cnty.*, 8 Wn. App. 2d 90, 123, 437 P.3d 701 (2019). WISHA requires an employer to

26    "furnish to each of his or her employees a place of employment free from recognized hazards

MOTION FOR RULING ON CONTEMPT                7                ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000023

1   that are causing or likely to cause serious injury or death to his or her employees." RCW

2   49.17.060(1). The duty to provide a safe workplace is non-delegable. *Ward v. Ceco Corp.*, 40

3   Wn. App. 619, 628-29, 699 P.2d 814 (1985).

4          To satisfy federal requirements, L&I must have a right of entry to workplaces. *See* 29

5   U.S.C. § 667(c)(3). L&I has the authority to conduct unannounced inspections of all

6   employers' workplaces in Washington:

7          The director, or his or her authorized representative, in carrying out his or her
       duties under this chapter, upon the presentation of appropriate credentials to
8          the owner, manager, operator, or on-site person in charge of the worksite, is
       authorized . . . [t]o enter without delay and at all reasonable times the factory,
9          plant, establishment, construction site, or other area, workplace, or
       environment where work is performed by an employee of an employer . . . .
10         This section does not require advance notice of an inspection.

11   RCW 49.17.070; Sandstrom Decl. Ex. 1 at 10. WAC 296-900-12010 provides for criteria to

12   inspect workplaces, including a hazardous workplace. Washington has the right to inspect the

13   workplace of federal contractors even if they work on federal property. *In re Gen'l Sec. Servs.*

14   *Corp.* No. 96 W376, 1998 WL 960837 (Bd. of Indus. Ins. Appeals 1998), *attached to*

15   Sandstrom Decl. Ex. 9.

16         There are about 300,000 employers in Washington. Blackwood Decl. 2. L&I cannot

17   inspect all employers and must determine what employers to inspect. Thus, it uses the

18   technique of unannounced visits. The right to unannounced entry furthers important safety

19   purposes. RCW 49.17.070(5); Blackwood Decl. 3. There is evidence that regulatory

20   interventions can improve occupational health and safety outcomes. Blackwood Decl. The

21   results of pooled analysis by researchers provide strong evidence that L&I's Division of

22   Occupational Health and Safety inspection activities make a significant contribution to

23   reducing claims rates and costs in the period following the visit. *Id.*

24         Unannounced visits show the real working conditions at a workplace. *Id.* If an

25   employer has a warning about the inspection, they may create artificial conditions to hide non-

26   compliance with WAC rules and then return to dangerous practices after the inspectors leave.

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000024

1  *Id.* Here, GEO owns the NWIPC and, undoubtedly, L&I has the right to enforce WISHA's

2  entry statute. By obstructing an unannounced visit, GEO also obstructs important safety

3  objectives.

4       It appears GEO's real complaint vis-à-vis ICE is that the inspection was unannounced.

5  Sandstrom Decl. Ex. 2 at 5; Ex. 3 at 2; *id.*, Ex. 4 at 2. But, as discussed above, RCW

6  49.17.070 provides that L&I need not provide "advance notice of an inspection."

7       L&I has inspected GEO several times at the NWIPC, has found safety violations many

8  times, and is now investigating GEO because the NWIPC is an identified hazardous

9  workplace. Korzenko Decl. 2; Sandstrom Decl. Ex. 6 at 2; WAC 296-127-900-12010. GEO

10  also has had 277 complaints lodged against it for unsafe and unsanitary conditions for

11  detainees. Sandstrom Decl. Ex. 15 at 2. The number and scope of these complaints about

12  conditions for detainees certainly suggests that unsafe conditions for employees may be

13  present as well.

14       That GEO supports unannounced visits by TPCHD—but not L&I—shows that its

15  reliance on ICE's alleged pre-clearance requirements is a mere pretext. If GEO actually

16  believed that it was constrained by ICE's requirements, it would bar all inspectors from entry

17  without pre-clearance. But it doesn't—it freely allows unauthorized visits by TPCHD

18  inspectors. This shows game-playing by GEO given that TPCHD visits are unannounced.

19  Turner Decl. 2.

20       There is ample evidence that GEO has not acted in good faith by denying L&I's safety

21  inspectors entry to NWIPC.

22

23  **B.**    **GEO's Status as a Federal Contractor Doesn't Preclude Enforcement of WISHA**

     GEO argues that ICE has not allowed access to the NWIPC. Sandstrom Decl. Ex. 2 at

24  1-2. That ICE has purportedly barred access appears to be mere pretext as TPCHD may

25

26

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000025

1   inspect the facility. Sandstrom Decl. Ex. 8 at 2. And GEO allowed L&I to inspect many times

2   in the past. Sandstrom Decl. Ex. 10-11.

3        ICE's authority over GEO stems from contract. Sandstrom Decl. Ex. 4 at 2; *Nwauzor*,

4   540 P.3d at 97. But GEO cannot form a contract that impinges on its non-delegable duty to

5   protect workers. *Ward*, 40 Wn. App. at 628-29. In fact, GEO's contract with ICE does just the

6   opposite—requiring GEO comply with state workplace safety laws. Sandstrom Decl. Ex. 13 at

7   6, 8. And OSHA has further provided that Washington must inspect GEO's workplace.

8   Sandstrom Decl. Ex. 1 at 10. Congress delegated to OSHA the authority to direct compliance

9   with the State Plan, showing congressional intent for L&I to inspect. 29 U.S.C. § 667(b)

10        GEO has raised an intergovernmental immunity defense. Sandstrom Decl. Ex. 2 at 7. It

11   cites the Supremacy Clause of the United States Constitution to state that "the activities of the

12   Federal government are free from regulation by any state." *Id.*, Ex. 2 at 7 (quoting *Mayo v.*

13   *United States*, 319 U.S. 441, 445 (1943)). But the Ninth Circuit has warned GEO that federal

14   contractors like GEO must follow generally applicable safety laws. *Geo Grp., Inc. v. Newsom*,

15   50 F.4th 745, 755 (9th Cir. 2022). The en banc panel in *GEO Group* considered whether

16   California violated the Supremacy Clause with a provision preventing private detention

17   centers like GEOs from operation. *Id.* It decided that, under the facts of that case, there was a

18   violation because the State barred the facility's operation outright. *Id.* But the court

19   distinguished the facility-barring regulation from generally applicable laws: "Absent federal

20   law to the contrary, the Supremacy Clause therefore leaves considerable room for states to

21   enforce their generally applicable laws against federal contractors." *Id.* It went even further to

22   note that "the same principle would appear to hold for many generally applicable health and

23   safety laws." *Id.* at 755 n. 4. It pointed out that in *James Stewart & Co. v. Sadrakula*, the

24   Supreme Court held that a state law that required planking of beams used as walkways on

25   construction projects could be enforced against a federal construction contractor. *Id.* (citing

26

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7740

GEO_000026

1  309 U.S. 94, 104, 60 S. Ct. 431, 84 L. Ed. 596 (1940)). The court noted that lesser

2  considerations like cost related implications should not burden regulation. 50 F.4th at 755.

3    GEO has not said that an inspection itself would somehow interfere with ICE's

4  activities. In fact, L&I has inspected the NWIPC multiple times (as has TPCHD on several

5  occasions) with no claim of an interference of operations. That mere entry does not impair

6  GEO's operations is shown by how readily TPCHD enters. And, presumably, ICE wants the

7  entities that it contracts with, like GEO, to provide safe workplaces for its employees, which

8  is why it requires GEO to follow applicable safety laws in its contract.

9    Consistent with the United States Supreme Court's and OSHA's approval of

10 regulation of federal contractors, the Court should order Geo to permit L&I to inspect.

11

12 **C. GEO's Other Litigation Does Not Excuse Its Noncompliance with RCW 49.17**

13   As noted above, GEO thinks L&I shouldn't be able to inspect NWIPC while the

14 lawsuits about RCW 70.395 are pending. Sandstrom Decl. Ex. 2 at 1-2, 7. Yet the Court has

15 yet to grant GEO any injunctive relief. Even if it had, that would not bar L&I's inspection as

16 L&I's request for inspection now stems from RCW 49.17 and WAC 296, for which no lawsuit

17 is pending.

18 **D. GEO Violated RCW 49.17.070 So It Should Be Found in Contempt, and the Court Should Issue an Order Enforcing the Warrant**

19   The courts authorize administrative agencies such as L&I and OSHA to seek to

20 enforce administrative warrants. *Inlandboatmen's Union of the Pac. v. Dep't of Transp.*, 119

21 Wn. 2d 697, 710, 836 P.2d 823 (1992). The administrative warrant need not be based on

22 criminal standards of probable cause if it is based on statutory and regulatory authority, as is

23 the case here. *Horn Seed*, 647 F.2d 96 at 102; *City of Pasco v. Shaw*, 161 Wn.2d 450, 459,

24 166 P.3d 1157 (2007).

25   Under RCW 49.17.075, L&I may obtain a search warrant to enforce entry to a

26 workplace. L&I may seek an order finding an employer in contempt of court and ordering

GEO_000027

1  compliance with the court's order. RCW 7.21.030.  RCW 7.21.030(2)(c) permits this Court to

2  issue an order to ensure compliance with a prior order of the Court. The Court may do so

3  when it finds that the employer has failed or refused to perform an act within the employer's

4  power to perform. RCW 7.21.030(2)(c). GEO had the ability to cooperate with L&I and/or

5  allow L&I to inspect GEO's workplace as it has done many times before.

6       Under RCW 49.17.070(5)'s provision that allows an inspection without advance

7  notice, GEO cannot obstruct L&I's inspection. GEO violates .070(5) and the warrant by

8  insisting on advance notice. GEO has a non-delegable duty to ensure workplace safety. RCW

9  49.17.060(1); *Ward*, 40 Wn. App. at 628-29. Because GEO must follow state law in its

10  conduct, it must cooperate with L&I and allow it access to the NWIPC. GEO's litigation

11  strategy is no reason for GEO's flagrant flouting of its WISHA obligation.

12                    **V.    CONCLUSION**

13       L&I asks that the Court find GEO in contempt and order it to require GEO to allow

14  entry and/or cooperate with L&I about L&I's inspection. RCW 7.21.030 authorizes this Court

15  to issue such an order.

16       DATED this 31st day of January, 2024.

17                              ROBERT W. FERGUSON
                                Attorney General

18

19                              ANASTASIA SANDSTROM
                                WSBA No. 24163

20                              Senior Counsel
                                Attorney for Plaintiff

21

22

23

24

25

26

MOTION FOR RULING ON CONTEMPT                12                    ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000028

1
2
3
4
5
6
7

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

8  | DEPARTMENT OF LABOR AND INDUSTRIES, | NO. 24-2-05626-8
9
                                Plaintiff,     (PROPOSED) ORDER ON FINDING
10                                             OF CONTEMPT
11  v.

GEO SECURE SERVICES, LLC,
12
                                Defendant.
13

14        On February 9, 2024, this Court heard the Department of Labor & Industries' (L&I's)

15  Motion for Contempt.  The Court considered the following documents:

16        1.  L&I's Motion for Contempt

17        2.  Declaration of Craig Blackwood

18        3.  Declaration of Elliott Furst

19        4.  Declaration of John Korzenko

20        5.  Declaration of Anastasia Sandstrom, with exhibits

21        6.  Declaration of Eric Smith

22        7.  _____

23        8.  _____

24        9.  _____

25        10. _____

26        11. _____

1
ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000029

12. _____

## I.     FINDINGS OF FACT

1.  The Department of Labor and Industries (L&I) has routinely inspected GEO's workplace at the Northwest ICE Processing Center (NWIPC). Unannounced inspections were performed in 2009, 2010, 2014, 2020 (twice), 2021, and 2022. GEO did not object to L&I's entry to its workplace.

2.  In December 2023, L&I decided to investigate GEO's workplace as an unannounced programmed inspection for a hazardous workplace, relying on RCW 49.17.070, which gives L&I authority to enter all employers' workplaces in the State of Washington without advanced notice.

3.  On December 27, 2023, two Department inspectors sought entry to GEO's workplace. GEO denied the inspectors entry. GEO claimed that the U.S. Immigration and Customs Enforcement (ICE) told them not to allow L&I's inspection.

4.  After GEO's refusal to allow L&I to inspect its workplace, L&I successfully sought a warrant for entry from this Court on December 29, 2023. The warrant relied on the authority of RCW 70.395, RCW 49.17, and WAC 296. In its motion, L&I briefed its authority under RCW 49.17 and WAC 296.

5.  Despite the warrant, GEO again denied L&I entry based on information from ICE.

6.  On January 4, 2024, the inspectors returned the warrant to thist and obtained a warrant number, 24 150028.

7.  GEO allows other public entities to inspect its workplace without hindering them. Tacoma-Pierce County Health Department (TPCHD) is a combined county-city health department that operates under RCW 70.05, 70.08, and WAC 246-215. At the request of the GEO Group, TPCHD conducts food safety inspections at the Northwest Detention Facility in Tacoma and has done so since 2004. When TPCHD staff conducts a food safety inspection at the NWIPC they do not call ahead or make appointments.

(PROPOSED) ORDER ON FINDING OF
CONTEMPT                                          2                    ATTORNEY GENERAL OF WASHINGTON
                                                                       LABOR & INDUSTRIES DIVISION
                                                                       800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA  98104-3188
                                                                       (206) 464-7740

GEO_000030

TPCHD requires unannounced inspections. When food safety inspectors arrive at the NWIPC, they provide their ID to facility staff, sign into a log book, receive a badge to go through the metal detector, their bags are searched, and they receive a UV stamp on their wrist. Facility staff call the GEO kitchen manager, who escorts TPCHC staff throughout the facility. As of January 19, 2024, GEO has never required TPCHD staff to undergo a background check before entering the building.

8. Entry into the NWIPC doesn't affect the operations of the facility as shown by many visits by inspectors, both from L&I and from TPCHD.

9. GEO has not cooperated in good faith with L&I's inspection. The past history of not objecting to L&I's unannounced inspections and the current practice to let TPCHC enter without hindrance shows that GEO has engaged in a pretext in order to secure the situation where L&I can't fulfill its duty to inspect.

10. It was within GEO's power to perform compliance with the warrant by working with ICE to secure access for L&I just as it has done on numerous other occasions. It is plain it has engaged in a litigation position to avoid inspection of its workplace.

## II.    CONCLUSIONS OF LAW

1. This Court has jurisdiction of the matter and the parties.

2. GEO has a non-delegable duty to provide a safe workplace. RCW 49.17.060(1). This includes cooperating with L&I workplace inspections under RCW 49.17.070.

3. RCW 49.17.075 allows L&I to seek a warrant to inspect a workplace like GEO's.

4. RCW 49.17.070 provides the right to inspect GEO's workplace, and L&I need not provide advance notice of its inspection.

5. RCW 7.31.030 allows this Court to find a party in contempt and order compliance with a previous court order like the warrant here.

6. GEO acted in contempt with this Court's order.

(PROPOSED) ORDER ON FINDING OF CONTEMPT

3

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000031

1

### III.   ORDER

2          This Court finds GEO in contempt and orders it to ensure entry and/or to cooperate

3    with an unannounced inspection.

4    DATED this _____ day of February 2024.

5

6                                                    _____
                                                     HONORABLE JUDGE TIMOTHY ASHCRAFT

7    Presented by:

8    Anastasia Sandstrom
     Senior Counsel
9    WSBA No. 24163

10

11   Copy to:

     GEO Secure Services, LLC
12   Northwest ICE Processing Services
     1623 E. J Street
13   Tacoma WA  98421

14

15

16

17

18

19

20

21

22

23

24

25

26

(PROPOSED) ORDER ON FINDING OF                    4              ATTORNEY GENERAL OF WASHINGTON
CONTEMPT                                                          LABOR & INDUSTRIES DIVISION
                                                                   800 Fifth Avenue, Suite 2000
                                                                     Seattle, WA  98104-3188
                                                                        (206) 464-7740

1
2
3
4
5
6

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

7

| | |
|---|---|
| DEPARTMENT OF LABOR AND INDUSTRIES, | Cause No. 24-2-05626-8 |
| Plaintiff, | CERTIFICATE OF SERVICE |
| v. | |
| GEO SECURE SERVICES, LLC, | |
| Defendant. | |

8
9
10
11
12

13      I certify under penalty of perjury under the laws of the State of Washington, that I caused

14  the documents referenced below to be served as follows:

15  DOCUMENTS:          Motion for Contempt
                                   Note for Motion
16                                 Declaration of Anastasia Sandstrom, with Exhibits 1-15
                                   Declaration of Elliott Furst
17                                 Declaration of Craig Blackwood
                                   Declaration of John Korzenko
18                                 Declaration of Eric Smith
                                   Proposed Order
19
    E-FILED IN:            Pierce County Superior Court
20
    SERVED ON:          via personal service, by Pacific Northwest Legal Support
21
22                                 GEO Secure Services, LLC
                                   c/o Corporate Creations Network Inc.
23                                 707 W. Main Avenue, B1
                                   Spokane, WA 99201
24  COPY TO:              via E-mail
25
                                   Harry Korrell
26                                 Davis Wright Tremaine LLP
                                   harrykorrell@dwt.com
27

CERTIFICATE OF SERVICE                              1

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000033

1  COPY TO:        via ABC Legal

2                  Bruce Scott
                   Northwest ICE Processing Center
3                  1623 E. J. Street
                   Tacoma, WA 98421
4

5  WORKING COPIES:  Judge Ashcraft

6         DATED this 31st day of January, 2024, at Seattle, Washington.

7

8                                    _____
                                     BRITTNEY VALANDINGHAM
9                                    Legal Assistant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000034

1
2
3
4
5
6
7

**PIERCE COUNTY SUPERIOR COURT**
**STATE OF WASHINGTON**

8   DEPARTMENT OF LABOR AND
    INDUSTRIES OF THE STATE OF
9   WASHINGTON,

10                           Plaintiff,

11   v.

12   GEO SECURE SERVICES, LLC,

13                           Defendant.

No. 24-2-05626-8

DECLARATION OF ANASTASIA
SANDSTROM

14        I, Anastasia Sandstrom, declare under the penalty of perjury under the laws of the

15   United States that the following is true and correct.

16   1.   I am over the age of eighteen and am otherwise competent to testify. I make these

17        statements on personal knowledge and belief. I am the assistant attorney general

18        assigned to represent the Department of Labor and Industries in the case against GEO

19        Secure Services LLC (GEO).

20   2.   Attached are true and correct copies of the following documents:

21        Ex. 1:  Secretary of Labor v. The GEO Group, Inc., OSHRC Docket No. 12-1 381,

22                Settlement Agreement (Dec. 20, 2013);

23                https://www.osha.gov/enforcement/cwsa/geo-group-inc-12202013

24        Ex. 2:  GEO Motion to Quash Warrant

25        Ex. 3:  Knight Declaration in Support of Motion to Quash Warrant

26        Ex. 4:  Scott Declaration in Support of Motion to Quash Warrant

DECLARATION OF ANASTASIA                    1          ATTORNEY GENERAL OF WASHINGTON
SANDSTROM                                                  LABOR & INDUSTRIES DIVISION
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA  98104-3188
                                                                   (206) 464-7740

1    Ex. 5:  Application for Entry Warrant

2    Ex. 6:  Declaration for Entry Warrant

3    Ex. 7:  Entry Warrant

4    Ex. 8   Declaration of Nigel Turner

5    Ex. 9:  *In re Gen'l Sec. Servs. Corp*. No. 96 W376, 1998 WL 960837

6            (Bd. of Indus. Ins. Appeals 1998)

7    Ex. 10: GEO Inspection History (part 1)

8    Ex. 11: GEO Inspection History (part 2)

9    Ex. 12: GEO Inspection History (part 3)

10   Ex. 13: Excerpts of 2015 GEO contract

11   Ex. 14: Letter about Suspension of Detainee Work Program

12   Ex. 15: Declaration of Amanda Soleil Maria Muñiz

13   DATED this 31st day of January, 2024 in Seattle, Washington.

14                                    ROBERT W. FERGUSON
                                      Attorney General
15

16

17                                    ANASTASIA SANDSTROM
                                      Senior Counsel
18                                    WSBA No. 24163

19

20

21

22

23

24

25

26

DECLARATION OF ANASTASIA              2        ATTORNEY GENERAL OF WASHINGTON
SANDSTROM                                      LABOR & INDUSTRIES DIVISION
                                               800 Fifth Avenue, Suite 2000
                                               Seattle, WA  98104-3188
                                               (206) 464-7740

GEO_000036

 **U.S. DEPARTMENT OF LABOR**

**Occupational Safety and Health Administration**

Corporate-Wide Settlement Agreements - Publication Date  /  GEO Group, Inc.

---

- **Standard Number(s):**     1903.14a ;  1903.19 ;  1910.132(d)

---

December 20,2013

VIA FACSIMILE ONLY (404) 562-1650

Honorable Sharon D. Calhoun
Administrative Law Judge
Occupational Safety and Health
Review Commission
1924 Building - Room 2R90
100 Alabama Street, S.W.
Atlanta, GA 30303-3104

**Re: Secretary of Labor v. The GEO Group. Inc.**
OSHRC Docket No. 12-1 381 ; Region IV
Inspection No. 315306357
SOL Case No. 12-1 2439

Dear Judge Calhoun:

Enclosed is the executed Stipulation and Joint Motion which we believe disposes of all outstanding issues in this case.

Respectfully,

Stanley E. Keen
Regional Solicitor

By:Rolesia B. Dancy
Sophia E. Haynes
Attorneys

Enclosures

cc: J. Wilson Eaton III, Esq. (via e-mail)
Law Office of J. Wilson Eaton III PLLC
P. 0 . Box 3026
Gulfport, MS 39505
Wilson.eaton@eatonlawpllc.com

---

**UNITED STATES OF AMERICA**

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION**

**Exhibit 1, Page 1 of 11**

GEO_000037

| | | |
|---|---|---|
| SECRETARY OF LABOR,<br><br>    Complainant, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | OSHRC DOCKET No<br>12-1381<br>REGION IV<br><br><br>Inspection No.<br>315306357 |
| | ) | |
|     v.<br><br>THE GEO GROUP, INC.,<br><br>    Respondent. | )<br>)<br>)<br>)<br>) | |

**STIPULATION OF SETTLEMENT**

Complainant and Respondent (together, the "Parties") hereby stipulate and agree as follows:

**I.** Respondent, The GEO Group, was cited on June 11, 2012, for alleged violations of the Occupational Safety and Health Act ("Act") and was issued a Citation and Notification of Penalty containing three citations.

**2.** Respondent is an employer within the meaning of Section 3(5) of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§651 et seq., ("Act"). Respondent filed with representatives of the Secretary of Labor a notice of intent to contest the Citation and Notification of Penalty referenced in paragraph 1 above. This notice was transmitted to the Occupational Safety and Health Review Commission ("Commission"), and it is agreed that jurisdiction over this proceeding is conferred upon the Commission by Section 10( c) of the Act.

**3.** The Parties agree that Citation 1, Item 1 and Citation 3, Item I shall remain as written. Respondent states that these citations have been and will remain abated.

**4.** The Parties stipulate and agree that Citation 2, Item 1 of the above referenced Citation and Notification of Penalty is amended to reclassify the citation from Willful to Serious and to include the terms of this Stipulation of Settlement ("Agreement") as required abatement, as well as the abatement measures set forth in the Compliance Plan which is incorporated in this Agreement as "Appendix A". Respondent agrees that the abatement measures incorporated into this Agreement are required of Respondent and acceptable to Complainant as full and complete abatement of the violation alleged. The parties also agree that Citation, 2, Item 1 is amended to delete sub-paragraphs (a) through (f).

**5.** Respondent hereby withdraws its notice of contest to the Citation and Notification of Penalty, as amended and set forth herein, and the Parties agree to the entry of a final, enforceable Order ofthe Commission consistent with the terms of this Agreement.

**6.** Respondent agrees to pay to the Occupational Safety and Health Administration ("OSHA") the total proposed penalty amount of $13,600 in full settlement of the assessed penalty in this matter within ten (10) calendar days of the entry of an Order of the Commission approving this Agreement. Payment shall be accomplished by mailing a check payable to "DOL-OSHA" to OSHA's Jackson Area Office, A.H. McCoy Federal Bldg, IOO West Capitol Street, Suite 749, Jackson, Mississippi, 39269.

**7.** With respect to Citation 2, Item 1 of the above-referenced Citation and Notification of Penalty, and pursuant to 29 C.F.R. § 1903.19, Respondent shall submit to the Directorate of Enforcement Programs in OSHA's National Office and the Regional Office certification that the Company has completed each of the abatement measures set forth in the Compliance Plan (attached hereto as Appendix A). Respondent will submit the certification within 10 calendar days after expiration of the time periods specified in the Compliance Plan for completion of each of those measures.

**8.** The Parties understand and agree that a failure to perform in good faith any of the abatement measures required in the Compliance Plan or other provisions of this Agreement may be cited as failure to abate under Section 10(b) of the Act, 29 U.S.C. §659(b), and may be subject to an enforcement action brought by Complainant pursuant to Section 11 (b) of the Act, 29 U.S.C. §660(b), to the same extent as if these abatement measures had been set forth from the outset in the Citation and Notification of Penalty issued in this matter. Respondent agrees that it will not oppose the entry, pursuant to Section 11(b) of the Act, of an order of enforcement by the United States Court of Appeals to which Complainant presents this Agreement and supporting documents.

**9.** The Parties stipulate and agree that Respondent reserves its right to Petition OSHA for Modification of Abatement Dates, pursuant to 29 C.F.R. § 1903.14a, if Respondent is unable to meet any abatement deadline set forth in the Compliance Plan appended to this Agreement because of factors beyond Respondent's reasonable control and despite Respondent's good faith effort to comply with the required abatement measures. Complainant agrees that any such Petition for Modification of Abatement Date ("PMA") submitted by Respondent to the Directorate of Enforcement Programs in OSHA's National Office and the Regional Office, and any extension of time approved by OSHA in response to such a PMA,

**Exhibit 1, Page 2 of 11**

GEO_000038

need not be made specific to a single worksite, but may be made to apply to any or all of the worksites covered by this Agreement. The Parties further stipulate and agree that any extension of time approved by OSHA's National Office and the Regional Office in response to a PMA submitted by Respondent during the term of this Agreement shall be automatically incorporated into this Agreement and binding upon the Parties, and that Respondent retains its right to seek variances and/or other legal redress as to implementation of abatement as may be available at law.

**10.** Respondent certifies that affected employees are represented by the Security, Police and Fire Professionals of America at the following correctional and adult detention center locations:

D. Ray James Correctional Facility, 3262 Highway 252, Folkston, GA 31537; Moshannon Valley Correctional Facility, 555 GEO Drive, Philipsburg, PA 16866; Big Spring Correctional Center, 1701 Apron Drive, Big Spring, TX 79720; Central Texas Detention Facility, 218 South Laredo Street, San Antonio, TX 78207; Montgomery (Joe Corley Detention Facility), 500 Hilbig Street, Conroe, TX 77301; Rio Grande Detention Center, 1001 San Rio Boulevard, Laredo, TX 78046; South Texas Detention Complex, 566 Veterans Drive, Pearsall, TX 78061; Val Verde Correctional Facility, 253 FM 2523 Hamilton Lane, Del Rio, TX 78840; Adelanto Detention Facility, 10400 Rancho Road, P. 0. Box 6005, Adelanto, CA 92301; Central Arizona Correctional Facility, 1401 East Diversion Dam Road, Florence, AZ 85132.

Respondent certifies that affected employees are represented by the United Federation of Special Police and Security Officers, Inc. and its affiliated Local #500 at the following correctional and adult detention center location:

Queens Private Detention Facility, 182-22 1501 h Avenue, Jamaica, NY 11413

Respondent certifies that affected employees are represented by the United Government Security Officers of America, International Union at the following correctional and adult detention center location:

Aurora Ice Processing Center, 3130 North Oakland Street, Aurora, CO 80010

Respondent certifies that there is no authorized employee representative of Respondent's employees that are affected by this Agreement at the following correctional and adult detention facility locations:

Allen Correctional Center, 3751 Lauderdale Woodyard Road, Kinder, LA 70648; Blackwater River Correctional Facility, 5914 Jeff Ates Road, Milton, FL 32583-8233; Broward Transition Center, 3900 North Powerline Road, Pompano Beach, FL 33073; D. Ray James Detention Facility, 3423 Highway 252 East, Folkston, GA 31537, Mailing: P. 0. Box 2005, Folkston, GA 31537; Lasalle Detention Facility, P. 0. Box 2826, 830 Pinehill Rd., Jena, LA 71342; Lawrenceville Correctional Center, 1607 Planters Road, Lawrenceville, VA 23868; New Castle Correctional Facility, 1000 Van Nuys Road, New Castle, IN 47362; Plainfield Short Term Offender Program, 501 West Main Street, Plainfield, IN 46168; Riverbend Correctional Facility, 196 Laying Farm Road, Milledgeville, GA 31061; Rivers Correctional Institution, 145 Parker's Fishery Road, P. 0. Box 840, Winton, NC 27986; Robert A. Deyton Detention Facility, 11866 Hastings Bridge Road, P. 0. Box 429, Lovejoy, GA 30250; South Bay Correctional Facility, 600 US Highway 27 South, South Bay, FL 33493; Cleveland Correctional Center, 901 East 51 h Street, Cleveland, TX 77327, Mailing: P. 0. Box 1678, Cleveland, TX 77328; Karnes County Civil Detention Center, 409 FM 1144, Karnes City, TX 78118; Kames County Correctional Center, 810 Commerce Street, Karnes City, TX 78118; Lawton Correctional Facility, 8607 Southeast Flower Mound Road, Lawton, OK 73501; Lockhart Secure Work Program Facility, 1400 Industrial Boulevard, P. 0. Box 1170, Lockhart, TX 78644-1170; Arizona State PrisonFlorence West, 915 East Diversion Dam Road, P. 0. Box 1599, Florence, AZ 85232; Arizona State Prison- Phoenix West, 3402 West Cocopah, Phoenix, AZ 85009; Central Valley Medium Community Correctional Facility, 245 Taylor Avenue, McFarland, CA 93250; Desert View Medium Community Correctional Facility, 10450 Rancho Road, Adelanto, CA 92301; Golden State Medium Community Correctional Facility,611 Frontage Road, McFarland, CA 93250; Guadalupe County Correctional Facility, South Highway 54, P. 0. Box 520, Santa Rosa, NM 88435; Hudson Correctional Facility, 3001 North Juniper Street, Hudson, CO 80642; Lea County Correctional Facility, 6900 West Millen Drive, Hobbs, NM 88240; Northeast New Mexico Detention Facility (Clayton), 185 Dr. Michael Jenkins Road, Clayton, NM 88415; Northwest Detention Center, 1623 East J Street, Tacoma, WA 98421; Western Region Detention Facility At San Diego, 220 West C Street, San Diego, CA 92101, Reeves County Detention Complex (R1 and R2), 98 West County Road 204, P.O. Box 1560, Pecos, Texas 79772; Reeves County Detention Complex (R3), 100 West County Road 204, P.O. Box 2038, Pecos, Texas, 79772.

Respondent further certifies that this Agreement has been served on its employees by posting a copy of the Agreement at the cited worksites on_____, 2013, in accordance with Rules 7 and 100 of the Rules of Procedure of the Commission. Respondent further agrees that it shall post the SUMMARY of this Agreement set forth in the attached Appendix B, at all worksites subject to this Agreement, in places where affected employees may see it, within 30 days after the ALJ's approval of this Agreement, and said SUMMARY will remain posted in said locations until the expiration of this Agreement.

**11.** The Parties stipulate and agree that the terms of this Agreement are intended to apply to all of the correctional and adult detention center facility worksites of Respondent that are located within Federal OSHA's jurisdiction. In addition, over and above the requirements of this Agreement, Respondent intends to implement the abatement measures set forth in the attached Compliance Plan (Appendix A) at the Company's correctional and adult detention center facility worksites that are located in states that have assumed authority for the enforcement of OSHA Standards under a state plan pursuant to Section 18 of the Act ("State OSHA jurisdictions"). OSHA will notify the state plan officials in these State OSHA jurisdictions ofthe existence of this Agreement and will provide such officials with copies of this Agreement. Respondent agrees to inform OSHA of the city and state locations of all of Respondent's correctional and adult detention facility worksites in the United States, including those

**Exhibit 1, Page 3 of 11**

GEO_000039

in state OSHA plan states. Respondent shall submit to OSHA a list of such worksites that are in existence on the effective date of this Agreement, and shall notify OSHA within 90 calendar days of any newly acquired facility or facility that is no longer operated by Respondent during the term of this Agreement. These notifications shall be submitted to the same individuals designated by OSHA for receipt of progress reports discussed in paragraph 13 below.

**12.** Except as otherwise provided, nothing in this Agreement shall limit OSHA's right to use, any or all, enforcement measures provided under the Act.

**13.** Respondent agrees to monitor its progress in implementing a Workplace Violence Prevention Program, and to provide written progress reports on the status of that activity every 90 calendar days after the effective date of this Agreement to individuals designated by OSHA for the receipt of such reports.

**14.** Respondent agrees to engage at its own cost a qualified third-party consultant to conduct annual audits of Respondent's correctional and adult detention facility worksites and to monitor and assist with the Company's development and implementation of the Workplace Violence Prevention Program as specified in the Compliance Plan (Appendix A of this Agreement). The consultant will be retained for the term of this Agreement. The consultant's audits of Respondent's correctional and adult detention facility worksites will be included in the written progress reports referenced in Paragraph 13 above.

**15.** Respondent agrees to permit OSHA to physically enter into and conduct monitoring inspections at the Company's correctional and adult detention facility worksites within Federal OSHA's jurisdiction to verify compliance with this Agreement. Respondent shall not require any warrants for entry by OSHA, and shall not require subpoenas for access to documents, witnesses, or other information related to compliance with this Agreement. The scope of the OSHA monitoring inspections shall be limited to the verification of compliance with this Agreement, unless other non-compliant conditions are observed in the plain view of an OSHA compliance officer during the verification visit. Nothing in this Agreement shall be construed as a waiver or limitation of the Secretary's ability to monitor and/or enforce Respondent's compliance with the terms of this Agreement, or to otherwise enforce the Act; and nothing in this Agreement shall be construed to prejudice Respondent's rights to raise any defense or argument in any future or pending cases before this Commission.

**16.** Complainant agrees that if, during the term of this Agreement, OSHA reaches a preliminary determination that Respondent may not be in compliance with this Agreement, OSHA shall first notify Respondent in writing to Tom Boyer, Vice President, Risk Management, The GEO Group, One Park Place, Suite 700, 621 NW 53rd Street, Boca Raton, FL 33487. Respondent will have 15 calendar days from its receipt of OSHA's notification to provide a written response addressing any deficiencies noted to the Director of Enforcement Programs, U.S. Department of Labor, Occupational Safety and Health Administration, 200 Constitution Avenue, NW, Room N-3119, Washington, DC 20210 and the Atlanta Regional Office, Occupational Safety and Health Administration, 61 Forsyth St, Room 6T50, Atlanta, Georgia 30303. Within 30 calendar days after OSHA's receipt of Respondent's written response, the Parties will enter into good faith discussions in an attempt to resolve the issue. If the Parties are unable to resolve the issue within 15 calendar days of entering into such discussions, Complainant shall determine the appropriate course of action.

**17.** Each Party agrees to bear its own attorneys' fees, costs, and other expenses incurred by such Party in connection with any stage of the above-referenced proceeding including, but not limited to, attorneys' fees that may be available under the Equal Access to Justice Act, as amended.

**18.** None of the foregoing agreements, statements, findings, stipulations, and actions is intended as an admission by Respondent of the allegations contained within the citation, notification of penalties and the Complaint herein. The agreements herein are not intended to be used for any purpose other than actions arising directly under the Occupational Safety and Health Act of 1970, nor are they intended to be offered as evidence in any other federal or state court action.

**19.** Complainant agrees that, upon receiving any request for information from any third-party seeking any agreements, statements, stipulations, reports, and/or any other documents generated by Respondent as a result of requirements set forth in this Agreement, but which Respondent has marked as containing confidential trade secret or business confidential information, Complainant shall notify Respondent within 5 calendar days so the Company can intervene to object to Complainant's production of said agreements, statements, stipulations, reports, and/or other documents.

**20.** This Agreement shall become effective on the date that it becomes a Final Order of the Commission, and shall remain in effect for a term of 3 years from that effective date. Before the termination date of this Agreement, either Party may give notice to the other that it wishes to extend the Agreement for another term. If a Party gives such notice in writing, the Parties agree to enter into good faith discussions to address the continuation of the Agreement and the Parties agree that the Agreement shall thereafter remain in effect for up to 45 calendar days after the end of the three year term to allow the Parties to complete these good faith discussions.

**Exhibit 1, Page 4 of 11**

GEO_000040

GEO Group, Inc. - 12/20/2013 | Occupational Safety and Health Administration

| FOR RESPONDENT: | FOR COMPLAINANT: |
|---|---|
| Date: 12/20/2013 | M. PATRICIA SMITH |
| | Solicitor of Labor |
| J WILSON EATON, III | |
| Attorney for The GEO Group , Inc. | STANLEY KEEN |
| Law Office of Wilson Eaton, III, PLLC | Regional Solicitor |
| P.O. Box 3026 | |
| Gulfport, MS 39505 | CHRISTOPHER D. HELMS |
| | Counsel |
| | |
| | Date: 12/20/2013 |
| | |
| | ROLESIA BUTLER DANCY |
| | SOPHIA E. HAYNES |
| | |
| | Attorneys for Complainant. |
| | U.S. Department of Labor |
| | Occupational Safety and Health |
| | Administration |
| | |
| | TERESA A. HARRISON |
| | Acting Regional Administrator |
| | Region IV |
| | Occupational Safety and Health |
| | Administration |

APPENDIX A

## COMPLIANCE PLAN

### I. PREAMBLE

The Parties agree that employees at correctional facilities are at risk for serious injury and death from violent and hostile behavior from inmates. The GEO Group is committed to materially reducing or eliminating the hazard of violence, harassment, intimidation and other disruptive behavior directed toward employees in its workplaces. The Parties agree that the establishment and implementation of a Workplace Violence Prevention Program that includes worksite analyses, written policies, training and administrative and engineering controls can reduce or eliminate the hazards to worker health and safety in correctional facilities.

### II. DEFINITIONS

A. The term "Workplace Violence" as used in the Agreement and this Appendix means any act or threat of physical violence, harassment, intimidation, or other threatening disruptive behavior directed toward employees that occurs at the work site. It can affect and involve employees, contractors, inmates, and visitors at the workplace.

B. The term "Incident' as used in the Agreement and this Appendix means any action, event, situation or occurrence which involves actual or potential workplace violence. The term shall also include "near misses". Near misses describe incidents where no property is damaged and no personal injury sustained, but where, given a slight shift in time or position, damage and/or injury easily could have occurred.

### III. COMPLIANCE MEASURES

The Parties thus agree to the following compliance measures during the term of the Stipulation of Settlement ("Agreement"):

### A. Workplace Violence Prevention and Safety Program.

Respondent will develop and maintain, with the assistance of a third-party consultant as described in III (B) below, a Workplace Violence Prevention Program ("WVPP") which will be completed on or before June 1, 2014. Such program shall apply to all of Respondent's correctional and adult detention facilities and employees, and shall include but not be limited to the following:

**Exhibit 1, Page 5 of 11**

GEO_000041

1. A written workplace violence policy and procedure that clearly defines what is considered workplace violence and is endorsed by the highest level of management.

2. A clear statement regarding Management Commitment and Employee Involvement.

3. Worksite analysis and job hazard assessment for each of Respondent's worksites to find existing or potential hazards for workplace violence.

4. Hazard prevention and control through the implementation of engineering and administrative controls.

5. Safety and health training to make all employees aware of security hazards and how to protect themselves through established policies, procedures and training.

6. Procedures for reporting and for the investigation of act or threats of violence in the workplace and a system designed to quickly recognize trends or patterns of work place violence.

7. Recordkeeping and annual evaluation of WVPP.

8. Prohibition against the placement of inmates in cells with inoperable doors/locks.

9. Procedures that clearly and specifically designate the situations and in which employees should not work alone.

10. The provision of medical/psychological support to staff after incidents of workplace violence.

11. Commitment to employees that there will be no retaliation for reporting concerns about actual or potential workplace violence.

12. An annual audit of the WVPP program which will include an onsite audit as provided in Paragraph B, 4, infra. Respondent agrees to post conspicuously the results of the audit where affected employees can review them; implement corrective action promptly; and track progress and completion of corrective action. The first audit will be conducted at the end of the first 12 months after the execution of this Agreement.

**B. Retention of Third-Party Consultant.**

1. Respondent agrees to retain a third-party corrections management consultant who is qualified by education, experience and training with expertise in the field of corrections management and related workplace hazards ("Consultant") to conduct WVPP audits and review Respondent's development and implementation of the Workplace Violence Prevention Program.

2. Respondent agrees to provide the credentials of the Consultant, for review on or before February 14, 2014. OSHA shall have 10 calendar days thereafter to object to Respondent's selection. If OSHA objects, the agency shall indicate to Respondent the grounds for the objection, and Respondent will then continue to search until it locates persons to whom OSHA does not object. The selected consultant shall be retained by Respondent promptly following expiration of the 10-day period without objection.

3. The Consultant engaged under this Section shall assist Respondent in the development and implementation of its WVPP, including the implementation of training, worksite analyses and written policies and procedures.

4. Beginning July 1, 2014, the Consultant shall conduct a workplace violence onsite safety audit ("safety audit") at each of Respondent's correctional and adult detention facilities. The Consultant will conduct on-site safety audits as follows: (1) during months 7 through 18 of this Agreement, the Consultant will conduct on-site safety audits for at least 16 of Respondent's correctional and adult detention facilities; during months 18 through 30 of this Agreement, the Consultant will conduct on-site safety audits for at least 18 of Respondent's correctional and adult detention facilities and during months 30 through 36 of this Agreement, the Consultant will conduct on-site safety audits at all of Respondent's remaining correctional and adult detention facilities. The Consultant will prepare a Report for each facility which shall review the implementation of Respondent's WVPP to include, but not be limited to a review of the following:

**Exhibit 1, Page 6 of 11**

GEO_000042

a. Administrative controls and work practice controls, including, but not limited to ensuring that employee working alone in high risk areas have two way radios with man down alarm systems;

b. Engineering controls, including, but not limited to, two way radios, alarm systems, video cameras, and metal detectors;

c. The operation of locking mechanisms, including cell door lock systems and cell door maintenance;

d. The operation of housing control systems and indicators;

e. Staffing plans, and staff deployment, including, but not limited to, post assignments, appropriate or optimal staffing numbers to minimize workplace violence, working alone at posts, and staff turnover;

f. The need for Personal Protective Equipment ("PPE");

g. The physical environment of each facility to determine the presence of factors which may place an employee at risk.

5. As part of the audit, the Consultant shall interview a random sampling of employees at each worksite about workplace violence and safety.

6. Respondent will provide the Consultant's Report to OSHA. The Consultant's WVPP Audit Report for each facility will also be provided to each facility's public contracting agency upon request. The results of the WVPP audits shall be posted conspicuously where affected employees and affected contractor employees can review them.

7. Respondent will implement all feasible recommendations included in the WVPP audits. In the event any recommendations and/or deficiencies noted in the Audit Reports cannot be promptly implemented and/or corrected, Respondent agrees to provide interim measures immediately to prevent or materially reduce employee exposure. If Respondent believes the recommendations and/or deficiencies observed are not feasible to implement and/or correct or cannot be implemented and/or corrected within a period of 60 calendar days from the audit date, no later than 60 calendar days from the audit date, Respondent shall document the reasons for such infeasibility or the delay in implementation and/or correction, the interim measures in place, the permanent or alternative corrective measures to be implemented, and the schedule for implementation. Such documents shall be provided to Complainant upon request.

**C. Creation of Corporate Workplace Violence Coordinator Position and Management Accountability for Safety.**

Respondent will create a full-time Workplace Violence Coordinator position at the highest corporate management level on or before March 1, 2014. The Workplace Violence Coordinator will be qualified by education, experience and training in coordinating workplace violence prevention and response, including taking steps to prevent incidents, responding to incidents, and coordinating post-incident activities. Further, as part of its performance evaluation system, Respondent will ensure that all correctional and adult detention facility employees with management/supervisory duties will have a performance indicator for workplace violence prevention. Respondent shall assess correctional and adult detention facility managers'/supervisors' performance in the area of workplace violence prevention annually.

**D. Creation of a Workplace Safety Committee**

1. Immediately upon the execution of this Agreement, and no later than February 14, 2014, Respondent will create a WVPP Committee at each correctional and adult detention worksite to address workplace violence issues, including workplace violence incidents. At non-union worksites, the WVPP Committee shall be composed of management employees and shall meet at least twice per month. At union worksites, the WVPP Committee shall be composed of an equal number of both management and non-management employees. The Committee shall receive input from employees prior to each meeting regarding workplace violence hazards at the worksite and create a culture of communication and cooperation to encourage and enable effective employee involvement in decisions that affect employees' safety and health.

2. The WVPP Committee shall investigate all reports of workplace violence and will have access to the information described in Paragraph (F) below. The WVPP Committee shall insure that information concerning workplace violence incidents and the names of specific inmate(s) involved be provided to staff at roll call and that the minutes from WVPP committee meetings will be immediately posted in a conspicuous location in the workplace. The WVPP Committee will submit investigatory reports and minutes from its meetings to the Corporate Workplace Violence Coordinator and Warden or Facility Administrator, as applicable.

**Exhibit 1, Page 7 of 11**

GEO_000043

3. *Worksite Analysis.* On or before March 31, 2014, Respondent will ensure that each WVPP Committee has completed a Worksite Analysis at each facility. The Analysis will review every aspect of the workplace to address existing or potential hazards for workplace violence. The analysis will include an assessment of the staffing, security and maintenance of all cells and door locking indicators and a review of job assignments which require employees to work alone at the correctional facility. The Safety Committee will recommend to the Warden or Facility Administrator, as applicable, all measures that will reduce the risk of workplace violence.

> a. In the event any deficiencies observed in the analysis cannot be promptly corrected, Respondent agrees to provide interim measures immediately to eliminate or materially reduce the risk of employee exposure. If Respondent believes the deficiencies observed are not feasible to correct or cannot be corrected within 45 calendar days from the inspection date, no later than 45 calendar days from the inspection date, Respondent shall document the reasons for such infeasibility or the delay in correction, the interim measures in place, the permanent or alternative corrective measures to be implemented, and the schedule for implementation.
>
> b. A written worksite analyses for each correctional facility shall be provided to the third-party consultant described in paragraph B and reviewed by the Consultant.
>
> c. Worksite Analyses will be updated annually by the WVPP Committee.

**E. Workplace Violence Prevention Training.**

Respondent will develop and maintain training for all its correctional and adult detention facility employees regarding workplace violence and prevention. On or before June 30, 2014, Respondent shall require all Respondent's employees to successfully complete the training. Such training shall include, but not be limited, to the following:

1. Risk factors identified in the workplace assessment.

2. Measures to protect employees from the identified risks, including specific procedures that GEO has implemented to protect employees such as incident alert and notification procedures, appropriate work practices, emergency procedures, and use of security alarms, radio and other devices.

3. Review of the written workplace violence program.

4. How to report workplace violence concerns and GEO's commitment that there will be no retaliation for reporting concerns about workplace violence.

5. Advanced training for supervisory personnel on the staffing issues which will include topics such as: post modifications, staffing rosters, relief factors, and staff experience level.

A copy of the WVPP policy will be provided to all correctional and adult detention center employees. The training shall be provided at the time of the employee's initial assignment and at least annually thereafter. On or before March 31, 2014, Respondent shall provide a lesson plan or written outline of the training to the Regional Office and the Consultant for review and approval.

**F. Reporting of Workplace Violence Incidents**

1. Respondent will develop a data-base to be used by Respondent as a management tool designed to track and identify workplace violence incidents, trends and patterns and provide a formal means of intervention to correct workplace violence issues. The system will provide a means of collecting data regarding workplace violence incidents at each correctional and adult detention facility website, show patterns/trends, and track how such incidents are resolved. The Workplace Violence Coordinator described in Paragraph C above, will review workplace violence incident reports every six months to identify trends in the types of incidents and review the effectiveness of the mitigating actions taken.

2. As part of its WVPP Policy, Respondent will develop and maintain a workplace violence incident report. The report can be in any fonnat, but at a minimum must contain the following information related to the incident being reported: Workplace location where incident occurred; Time of day/shift when incident occurred; Detailed description of the incident, including events leading up to the incident and how the incident ended; Names and job titles of involved employees; Name or other identifier of other individuals(s) involved; Names of witnesses; Mitigating Action taken to address the cause of the incident. The incident reports will be made available to employees and authorized employee representatives upon request.

3. The workplace violence incident report must be maintained for use in the annual program review and kept by Respondent for at least 5 years.

1/29/24, 7:23 AM                              GEO Group, Inc. - 12/20/2013 | Occupational Safety and Health Administration

4. All new GEO contracts for managing/operating correctional and adult detention centers will require reporting of all workplace violence incidents and all staff complaints about workplace violence to the public correctional agency. Respondent will voluntarily provide this information to current public agencies with whom it contracts.

5. Respondent will develop a protocol with the local District Attorney or Police for each correctional and adult detention facility to insure that violent crimes committed against employees in the workplace are promptly reported for investigation and appropriate prosecution. Respondent will provide information on such protocols and contact information to employees who wish to file a criminal complaint after a workplace violence incident.

**G. Preventative Maintenance Policy.**

On or before March 31, 2014, Respondent will develop a program to continuously inspect each correctional and adult detention facility worksite for problems or defects related to cell door locks, inmate monitoring systems and door lock status equipment; and to institute interim protective measures (including requesting the removal of inmates from the facility) if defective equipment cannot be repaired immediately and there is no acceptable alternative housing.

**H. Record Maintenance/Retention Policy.**

On or before March l, 2014, Respondent will develop a record retention policy to ensure that all incident reports, unusual occurrence reports, logbooks, daily and master staffing rosters, staffing plans, maintenance records and other related information for correctional and adult detention facilities is kept by Respondent for at least 5 years.

**I. Assessment and Policy on PPE, Other Equipment and Engineering Controls.**

On or before March 31, 2014, Respondent shall conduct a hazard assessment pursuant to 29 C.F.R. § 19 0.132(d) regarding workplace violence hazards at Respondent's correctional and adult detention facilities, shall select, and have each affected employee use the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment. Respondent shall also conduct an assessment, identify and select, and have each affected employee use any other equipment or engineering controls that will protect affected employees from workplace violence hazards. The policy shall clearly establish if and when PPE, other equipment or engineering controls will be provided to employees.

**IV. THE GEO GROUP FACILITIES WITHIN THE UNITED STATES**

As of the date of Respondent's execution of the Agreement, Respondent represents that it is engaged in the operation of correctional and adult detention facilities at the following locations in both Federal and State OSHA jurisdictions:

### FEDERAL OSHA JURISDICTION WORKSITES

ALLEN CORRECTIONAL CENTER-Kinder, LA
BLACKWATER RIVER CORRECTIONAL FACILITY-Milton, FL
D. RAY JAMES CORRECTIONAL FACILITY-Folkston, GA
MOSHANNON VALLEY CORRECTIONAL FACILITY -Philipsburg, PA
RIVERBEND CORRECTIONAL FACILITY -Milledgeville, GA
SOUTH BAY CORRECTIONAL FACILITY-South Bay, FL
BIG SPRING CORRECTIONAL CENTER-Big Spring, TX
CLEVELAND CORRECTIONAL CENTER-Cleveland, TX
KARNES COUNTY CORRECTIONAL CENTER-Karnes City, TX
KARNES COUNTY CIVIL DETENTION CENTER, Karnes City, TX
LAWTON CORRECTIONAL FACILITY -Lawton, OK
VAL VERDE CORRECTIONAL FACILITY -Del Rio, TX
HUDSON CORRECTIONAL FACILITY-Hudson, CO
BROWARD TRANSITION CENTER, Pompano Beach, FL
D. RAY JAMES DETENTION FACILITY, Folkston, Ga
LASALLE DETENTION FACILITY, Jena, LA
ROBERT A. DEYTON DETENTION FACILITY, Lovejoy, Ga
QUEENS PRIVATE DETENTION FACILITY, Jamaica, NY
CENTRAL TEXAS DETENTION FACILITY, San Antonio, TX
LOCKHART SECURE WORK PROGRAM FACILITY, Lockhart, TX
MONTGOMERY (JOE CORLEY) DETENTION FACILITY, Conroe, TX
RIO GRANDE DETENTION CENTER, Laredo, TX
SOUTH TEXAS DETENTION COMPLEX, Pearsall, TX

**Exhibit 1, Page 9 of 11**

GEO_000045

AURORA ICE PROCESSING CENTER, Aurora, CO
REEVES COUNTY DETENTION COMPLEX (R 1 AND R2), Pecos, TX
REEVES COUNTY DETENTION COMPLEX (R3), Pecos, TX

**STATE OSHA JURISDICTIONS WORKSITES**

ARIZONA STATE PRISON- FLORENCE WEST-Florence, AZ
ARIZONA STATE PRISON - PHOENIX WEST -Phoenix, AZ
CENTRAL ARIZONA CORRECTIONAL FACILITY -Florence, AZ
GOLDEN STATE MEDIUM COMMUNITY CORRECTIONAL FACILITY -McFarland, CA
NEW CASTLE CORRECTIONAL FACILITY -New Castle, IN
GUADALUPE COUNTY CORRECTIONAL FACILITY -Santa Rosa, NM
LEA COUNTY CORRECTIONAL FACILITY -Hobbs, NM
RIVERS CORRECTIONAL INSTITUTION-Winton, NC
LAWRENCEVILLE CORRECTIONAL CENTER-Lawrenceville, VA
PLAINFIELD SHORT TERM OFFENDER PROGRAM, Plainfield, IN
ADELANTO DETENTION FACILITY, Adelanto, CA
CENTRAL VALLEY MEDIUM COMMUNITY CORRECTIONAL FACILITY, McFarland,CA
DESERT VIEW MEDIUM COMMUNITY CORRECTIONAL FACILITY, Adelanto, CA
NORTHEAST NEW MEXICO DETENTION FACILITY (CLAYTON), Clayton, NM
NORTHWEST DETENTION CENTER, Tacoma, WA
WESTERN REGION DETENTION FACILITY AT SAN DIEGO, San Diego, CA

APPENDIX B

SUMMARY OF AGREEMENT

**Notice of Settlement Between The GEO Group, Inc. and OSHA, and Summary of
Nationwide Workplace Violence Safety Initiatives**

The Occupational Safety and Health Administration ("OSHA") and The GEO Group, Inc. ("GEO") have entered into a written settlement agreement ("Agreement") to settle an OSHA case pending before the Occupational Safety and Health Review Commission. The Agreement will be effective through January 1, 2017 and resolves allegations of workplace violence contained within OSHA citations that were issued following a health and safety inspection at the East Mississippi Correctional Facility in Meridian, Mississippi. At the time of the inspection, GEO was the operator of that facility.

This notice summarizes the workplace violence prevention measures GEO has agreed to implement in all of its correctional and adult detention facilities ("Facilities") in the United States. Specifically, the Agreement provides that GEO will:

- Hire a third party corrections management consultant who will conduct an audit of, including but not limited to, the adequacy of staffing plans, the need for Personal Protective Equipment, and the physical environment to determine the presence of factors which may place an employee at risk in each of GEO's correctional and adult detention facilities.
- Conduct a hazard assessment regarding workplace violence hazards and have each affected employee use the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment.
- Develop and implement a Workplace Violence Prevention and Safety Program at each of GEO's correctional and adult detention facilities.
- Provide employee training in the Workplace Violence Prevention Program.
- Create a Workplace Safety Committee at each of GEO' s correctional and adult detention facilities that will address workplace violence incidents and enable employee involvement in decisions that affect employee safety and health.
- Develop a data-base to be used to identify, track, and communicate to potentially exposed staff workplace violence incidents, trends and patterns and provide a formal means to correct workplace violence issues.
- Report all workplace violence incidents and staff complaints about workplace violence to the public correctional agency.

The full text of the settlement agreement can be found on OSHA's website at www.osha.gov

Protection from retaliation: The Occupational Safety and Health Act ("OSH Act") prohibits persons from retaliating against any employee because the employee has exercised a right protected by the OSH Act, including complaining to their employer, to OSHA, or to other government agencies about unsafe or unhealthful working conditions in the workplace. Types of prohibited retaliation include firing, transferring, denying benefits, reducing pay or hours and other actions. Complaints of retaliation may be filed directly with OSHA.

For more information about OSHA or if you think your job is unsafe and you have questions, contact OSHA's toll free number at 1 (800) 321-0SHA (6742) or visit OSHA's website at www.osha.gov. Your communication to OSHA is confidential.

**Exhibit 1, Page 10 of 11**
GEO_000046

Scroll to Top ⊕

---

**OSHA**    **Standards**    **Enforcement**    **Topics**    **Media Center**    **Contact Us**



**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
200 Constitution Ave NW
Washington, DC 20210
☎ 1-800-321-OSHA
1-800-321-6742
www.osha.gov

| **FEDERAL GOVERNMENT**⊞ | **OCCUPATIONAL SAFETY & HEALTH**⊞ | **ABOUT THE SITE**⊞ |
|---|---|---|
| White House | Frequently Asked Questions | Freedom of Information Act |
| Benefits.gov | A - Z Index | Disclaimers |
| Coronavirus Resources | Freedom of Information Act - OSHA | Plug-ins Used on DOL.gov |
| Disaster Recovery Assistance | Read The OSHA Newsletter | Accessibility Statement |
| DisasterAssistance.gov | Subscribe to the OSHA Newsletter | |
| USA.gov | OSHA Publications | |
| Notification of EEO Violations | Office of Inspector General | |
| No Fear Act Data | | |
| U.S. Office of Special Counsel | | |

Connect With OSHA

    

Site Map    |    Important Website Notices    |    Privacy & Security Statement

**Exhibit 1, Page 11 of 11**
GEO_000047

The Honorable Garold E. Johnson
Hearing Date:  January 2, 2024

SUPERIOR COURT OF THE STATE OF WASHINGTON
PIERCE COUNTY

In re:

WASHINGTON DEPARTMENT OF LABOR
AND INDUSTRIES

No.

**MOTION TO QUASH
WARRANT**

## I.      RELIEF REQUESTED

GEO Secure Services, LLC ("GEO") requests that this Court quash the warrant obtained *ex parte* by the Washington Department of Labor and Industries ("L&I") on December 29, 2023, on the grounds that (a) GEO does not control access to the facility identified in the warrant, the Northwest ICE Processing Center ("NWIPC" or the "Facility"), (b) the federal agency that controls access to the Facility, the U.S. Immigration and Customs Enforcement Agency ("ICE") has directed GEO to deny access to the Facility to state agencies purporting to conduct inspections and investigations under RCW 70.395 (which is currently the subject of a constitutional challenge in the U.S. District Court for the Western District of Washington), and (c) if the warrant is not quashed, GEO is at risk of contempt sanctions if it follows the direction of the federal agency that controls all aspects, including access to the Facility.

## II.      INTRODUCTION

The NWIPC is a federal immigration detention center under the complete control of ICE. ICE provides funding for the use of one hundred percent of the premises from GEO, the owner of the Facility.  ICE officers and administrative offices are located on the NWIPC property.  ICE (not GEO) has absolute control over ingress and egress to the NWIPC.  No one, from detainees to GEO

GEO'S MOTION TO QUASH - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 2, Page 1 of 10**

GEO_000048

1  employees to vendors, is allowed to enter the NWIPC without the express authorization of ICE.

2  ICE also controls and monitors the secure residential care procedures and policies under which the

3  Facility is operated. Consistent with the explicit legislative intent of HB 1470, the State of

4  Washington is attempting to weaponize HB 1470 as a direct means of thwarting and undermining

5  the current federal immigration policy.  Despite pending federal litigation regarding the

6  Constitutionality of HB 1470, the State has repeatedly attempted to use HB 1470 as authority to

7  gain access to the federal NWIPC over the past two months.  On each occasion, ICE has directed

8  GEO to deny the State access to the Facility.  Despite knowledge that ICE exercises exclusive

9  control over all access to the NWIPC, the State has now—likely based on incomplete or misleading

10  information–obtained a warrant directing GEO to provide the State with access to the NWIPC.

11  But the State knows that GEO cannot provide access to the NWIPC without the pre-clearance and

12  approval of ICE, which approval has been denied.  Rather than engaging in a meaningful dialogue

13  regarding this issue, the State has chosen to sidestep the pending federal litigation and launch state

14  court attacks on GEO.  Those attacks, including the current warrant, are based on the fiction

15  repeatedly advanced by the State that the NWIPC, a federal immigration facility, is merely "a

16  private detention facility," and as such, its owner GEO, can provide the State access to the NWIPC.

17  The State knows this is not the case, and knows further that GEO cannot grant anyone, including

18  the State, access to the Facility without the express authorization of ICE.  This Court should quash

19  the current warrant and allow the federal court the opportunity to address the serious Constitutional

20  questions raised by HB 1470.

21                        **III.    EVIDENCE RELIED UPON**

22        GEO relies on the Declaration of the NWIPC Facility Administrator Mr. Bruce Scott, the

23  Declaration of NWIPC Assistant Facility Administrator Mr. Michael Knight, the Declaration of

24  Harry Korrell, and the underlying motion.

25                        **IV.    STATEMENT OF FACTS**

26        A.  The NWIPC and HB 1470

27        The NWIPC is a secure federal immigration detention facility.  GEO provides  secure

GEO'S MOTION TO QUASH - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  residential care support at the NWIPC pursuant to a federal contract with the United States

2  Immigrations and Customs Enforcement ("ICE"). (Scott Decl. ¶¶ 4-8).  Consistent with the

3  requirements of GEO's contract for secure residential services at the federal NWIPC, ICE

4  exercises exclusive control over all access to the NWIPC. (Scott Decl.¶ 4).  All requests for access

5  to the NWIPC must obtain pre-clearance approvals by ICE, including all requests for access by

6  federal and state employees, as well as GEO employees. (Scott Decl. ¶ 6).  GEO is without

7  authority to provide access to the NWIPC absent ICE clearance and approval. (Scott Decl. ¶ 7).

8       On January 20, 2023, House Bill 1470 was introduced in the Washington Legislature. On

9  April 23, 2023, the enrolled bill was presented to Governor Inslee, and he signed HB 1470 on May

10  11, 2023.  HB 1470 amends and creates various new sections of the Revised Code of Washington

11  (primarily RCW 70.395) all relating to "private detention facilities."

12       During a March 13, 2023 Public Hearing of the Washington Senate Human Services

13  Committee, HB 1470's primary House sponsor expressly acknowledged that there is only one

14  private detention facility (the mischaracterized refence was to the federal NWIPC) that would be

15  subject to HB 1470. Washington State Senate Human Services Committee hearing on 2SHB 1470

16  - Concerning private detention facilities (Mar. 13, 2023 10:30 a.m. at 16:20), available at

17  https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331.        Similarly,

18  during a March 30, 2023 Public Hearing of the Washington Senate Ways and Means Committee,

19  a representative of the Committee on Human Services confirmed that "only one facility would be

20  covered" by HB 1470—the federal government's Northwest ICE Processing Center in Tacoma.

21  Washington State Senate Ways & Means Committee hearing on 2SHB 1470 -Concerning private

22  detention facilities (Mar. 30, 2023 12:30 p.m. at 4:07:34), available at https://tvw.org/video/senate-

23  ways-means-2023031607/?eventID=2023031607.

24       HB 1470 Section 3 grants broad new rule making, inspection, investigation, and testing

25  powers over the NWIPC to the Washington Department of Health and the Washington Department

26  of Labor and Industries.  Section 3(4) specifically provides: "The department of labor and

27  industries shall conduct routine, unannounced inspections of workplace conditions at private

GEO'S MOTION TO QUASH - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 2, Page 3 of 10**
GEO_000050

1    detention facilities, including work undertaken by detained persons." RCW 70.395.050(4).

2        B.  Pending Litigation re HB 1470

3        On July 13, 2023, GEO filed a Complaint and Motion for Preliminary Injunction in the

4    United States District Court for the Western District of Washington at Tacoma, challenging the

5    Constitutionality of HB 1470, including Section 3.  (No. 3:23-cv-05626).  In that action GEO, *inter*

6    *alia*, seeks a declaration invalidating and preliminarily and permanently enjoining the enforcement

7    of HB 1470, on the basis that it is preempted by federal law and impermissibly discriminates

8    against the United States and GEO as its contractor and, therefore, violates the Supremacy Clause

9    of the United States Constitution.  In connection with this litigation, GEO filed a declaration from

10   NWIPC Facility Administrator Bruce Scott which noted repeated attempts by the Washington

11   Department of Health to gain access to the NWIPC under HB 1470 Section 3 in November 2023.

12   This Declaration specifically notes the following:

13           5. On November 14, 2023, two representatives of the Washington
             Department of Health ("DOH") arrived at the NWIPC unannounced and demanded
14           access to the facility under the authority of HB 1470.

15           6. The DOH representatives indicated they were demanding access to the
             facility to investigate complaints about alleged violations of HB 1470. ICE directed
16           GEO to deny DOH representatives access to the facility on November 14, 2023.

17           7. On November 27, 2023, three individuals from the DOH arrived at the
             NWIPC unannounced and demanded access to the facility to investigate complaints
18           related to Medical, Food Service and Laundry.

19           8. One of the DOH representatives indicated that HB 1470 provided DOH
             with authority to access the facility and investigate complaints. ICE directed GEO
             to deny DOH representatives access to the facility on November 27, 2023.

20

21   Korrell Decl. Ex. A.  This action is ongoing, and the Federal District Court has yet to rule on

22   GEO's motion.

23       On December 29, 2023, GEO was served with a Complaint for Injunctive Relief filed by

24   the State of Washington in Thurston County Superior Court. (NO. 23-2-04215-34).   The

25   Complaint specifically seeks an order enjoining GEO Group from refusing entry to perform

26   investigations and unannounced inspections pursuant to HB 1470 Section 3 (RCW 70.395.050).

27   In this Complaint, filed more than a week after the filing of Mr. Scott's declaration quoted above,

GEO'S MOTION TO QUASH - 4

**Exhibit 2, Page 4 of 10**

1   the State incorrectly and misleadingly claims that "The stated reason to refuse entry GEO Group

2   gave to [Washington Department of Health] was because of 'litigation.'"

3          C.   L&I Attempts to Access NWIPC Pursuant to HB 1470

4          L&I typically coordinates the timing and scope of inspections undertaken at the NWIPC.

5   This coordination includes GEO submitting L&I's requests for access to ICE for necessary pre-

6   clearance approvals. (Scott Decl. ¶¶ 7-9).  On December 27, 2023 at approximately 0930 hours,

7   Washington State Labor and Industries ("L&I") employees Eric Smith and Matt Williams arrived

8   at the NWIPC and demanded access to the entire facility to do a comprehensive workplace

9   inspection. (Scott Decl. ¶ 8).  Mr. Smith stated there were no specific workplace complaints that

10  prompted the attempted inspection, but that L&I was demanding access to the entire facility to

11  perform inspections under new law RCW 70.395.  (Scott Decl. ¶ 10).  Since RCW 70.395 was a

12  new law, GEO offered to schedule a discussion with L&I at a mutually beneficial time so that

13  GEO could include corporate representatives.  Mr. Smith declined this offer stating that he could

14  not schedule an unannounced inspection.  (Scott Decl. ¶ 11).  Mr. Smith stated that he did have a

15  scope for the inspection, but did not show it to GEO.   Consistent with GEO's contractual

16  requirements and NWIPC operational procedures, Mr. Scott conveyed L&I's request to on-site

17  ICE representatives.  (Scott Decl. ¶ 12).  In response, ICE directed GEO to deny L&I access to the

18  NWIPC, and Mr. Scott communicated that decision by ICE to Mr. Smith. (Scott Decl. ¶ 12).

19         On December 29, 2023 L&I arrived at the NWIPC and again demanded access to the entire

20  facility. (Knight Decl. ¶ 3). Mr. Smith did not identify any authority for his requested access to

21  NWIPC but presented GEO with a warrant from Pierce County Court that referenced RCW 70.395.

22  Consistent with GEO's contractual requirements and NWIPC security protocols, GEO conveyed

23  L&I's request to ICE representatives. (Knight Decl. ¶¶ 4, 5; Korrell Decl. Ex. B).  Following ICE's

24  review of the L&I's request and warrant, ICE Supervisory Detention and Deportation Officer

25  ("SDDO") D. Jennings  directly communicated to L&I that "ICE is denying entry into the facility."

26  (Knight Decl. ¶ 7).

27

GEO'S MOTION TO QUASH - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

### V.       AUTHORITY AND ARGUMENT

A.  GEO Does Not Control Access to The NWIPC

The warrant purports to direct GEO to provide L&I with access to the NWIPC.  However, GEO does not have the authority or control to provide access to a federal facility controlled by ICE.  The NWIPC is a secure federal immigration detention facility under the control of ICE.  While GEO provides secure residential support services at the NWIPC pursuant to a lengthy federal contract, ICE exercises exclusive control over all access to the NWIPC.  (Scott Decl. ¶¶ 5-7).  All requests for access to the NWIPC must obtain pre-clearance approvals by ICE, including all requests for access by federal and state employees.  (Scott Decl. ¶ 6).  GEO is simply without actual authority to provide access to the NWIPC absent ICE clearance and approval. (Scott Decl. ¶ 7).

The State is aware of this reality.  Even if the State could claim it was ignorant of this fact in November of 2023, the filing of Mr. Scott's Second Updated Declaration on December 8, 2023, in the pending federal litigation belies any claim that L&I was unaware of or confused about this critical fact when it attempted to gain entry to the facility.  Compelling GEO to provide access to the NWIPC to anyone absent ICE pre-clearance and approval would breach security requirements, constitute a violation of GEO's contractual obligations, and likely constitute a violation of federal law.   As a result, the issuance of a warrant compelling GEO to take actions it has no authority to take in direct contravention of directions of the federal government is defective and should be quashed.   Again, the State's actions are fully consistent with its intentional and persistent mischaracterization of the NWIPC as "a private detention facility" when the Facility is, in fact, a federal immigration processing center controlled by ICE for purposes of fulfilling its Congressionally-mandated immigration law enforcement duties. The fact that ICE has contracted with a private company to provide secure residential services at the Facility does not change its fundamental status as a federal immigration processing center. To state the obvious, there are no "private detention facilities" in the United States – such facilities, by definition, would constitute places of false imprisonment. Whether the secure residential services in a public facility – in this

GEO'S MOTION TO QUASH - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1   case, a federal immigration processing center – are provided directly by federal employees or by

2   the employees of a private sector company pursuant to a contract with a public agency is in no way

3   determinative of the facility's status as a public facility.

4       B.   ICE Properly Directed GEO to Deny Access

5       On each occasion in November and December 2023 when the Washington Department of

6   Health and L&I requested access to NWIPC pursuant to HB 1470, GEO submitted that request to

7   ICE.  On each occasion, ICE—not GEO—denied the State's request.  To the extent GEO has

8   control over access to the NWIPC, that control is limited only to allowing those to enter who have

9   been given permission to do so by ICE following a proper request submitted to ICE for clearance

10  and ICE's approval of such requests.  Despite the pending federal litigation challenging the

11  Constitutionality of HB 1470, on each occasion that the State attempted access to NWIPC pursuant

12  to HB 1470 GEO submitted those requests to ICE.  As a result, GEO has taken appropriate action

13  when the State has requested access to the Facility, and has no further authority with respect to

14  granting the State such access.  Compliance with the warrant would require GEO to breach security

15  requirements, constitute a violation of GEO's contractual obligations with ICE, and likely

16  constitute a violation of federal law.

17      HB 1470 implicates complex and Constitutionally significant questions that are pending

18  before the federal district court.  Under the Supremacy Clause of the United States Constitution,

19  "the activities of the Federal government are free from regulation by any state." *Mayo v. United*

20  *States*, 319 U.S. 441, 445 (1943). State laws run afoul of intergovernmental immunity when they

21  "involve[] a direct, physical interference with federal activities . . . or some direct, immediate

22  burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88,

23  96 (1945).  By prescribing operational requirements regarding numerous aspects of a federal

24  detention facility involving a private contractor, HB 1470 substantially interferes with federal

25  government operations and places immediate burdens on the performance of federal functions.

26  Similarly, HB 1470 substantially interferes with ICE's ability to carry out its Congressionally

27  mandated detention responsibilities.  Congress has not authorized the State of Washington to

GEO'S MOTION TO QUASH - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  regulate the federal government's activities with respect to federal immigration facilities like the

2  NWIPC.  HB 1470 is unconstitutional and invalid as applied to GEO's provision of secure

3  residential services at the NWIPC on behalf of ICE because it directly attempts to allow the State

4  to regulate the physical and operational requirements of the NWIPC. *United States v. Washington*,

5  142 S.Ct. 1976 (2022); *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014).

6          It is a well known fact that the overwhelming majority (up to 90 percent) of federal

7  immigration detention/processing centers involve private contractors who provide the use of a

8  facility and support services involving residential care of the detainees.  ICE has chosen the use of

9  private contractors to carry out its federal responsibilities regarding immigration enforcement and

10  detention, as authorized by Congress.  Such private contractors like GEO are engaged through

11  lengthy contracts specifying ICE secure residential care requirements inside the facility, which is

12  under the legal control of ICE.

13          Through its *ex parte* warrant, the State attempts to undercut the federal court's

14  consideration of these weighty Constitutional issues and force its way into a federal facility in

15  service of HB 1470's explicit goal of disrupting the operation of the NWIPC. However, the United

16  States Constitution simply does not afford the State the power to regulate, burden or shut down

17  federal operations it does not like.  This Court should quash the warrant and allow the federal

18  district court the opportunity to rule on the Constitutionality of HB 1470.

19          C.  The Warrant is Inconsistent With L&I Repeated Representations

20          On December 27, 2023 L&I representatives indicated they were demanding access to the

21  NWIPC pursuant to RCW 70.395 (*i.e.*, HB 1470 Section 3).  L&I identified no other authority in

22  support of their demands for immediate and unlimited access to the NWIPC.  While the warrant

23  cites to RCW 70.395, it also cites to established authority under RCW 49.17.  However, the L&I

24  representatives never mentioned RCW 49.17, and repeatedly asserted they were demanding access

25  under "new law" RCW 70.395.  This inconsistency appears intentional and raises serious questions

26  regarding the sufficiency of representations supporting the warrant and whether L&I is acting in

27  good faith.

GEO'S MOTION TO QUASH - 8

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 2, Page 8 of 10**
GEO_000055

1    D.  The Warrant Cites No Urgency And is Overbroad

2    Despite the fact that the warrant attempts to undercut the consideration of weighty

3    Constitutional issues currently pending before the federal district court and allow L&I to force its

4    way into a federal facility, the warrant includes no demonstration of urgency to justify this action.

5    In fact, when L&I attempted to gain access to the NWIPC on December 27, 2023 Mr. Smith stated

6    there were no specific workplace complaints that prompted the attempted inspection, but that L&I

7    was demanding access to the entire facility to perform inspections under new law RCW 70.395.

8    (Scott Decl.¶ 10).  Similarly, the warrant includes no specific allegations of workplace complaints

9    or any facts demonstrating an urgency that would justify an *ex parte* warrant.

10    L&I typically coordinates the timing and scope of inspections undertaken at NWIPC.  That

11    coordination usually involves a description of specific complaints or concerns, and a

12    corresponding scope of the inspection or investigation. During L&I's attempt to enter the NWIPC

13    on December 27 and December 29, L&I identified no specific complaints or concerns, and no

14    scope for its inspections or investigations. (Scott Decl. ¶ 10).  This court should quash the warrant

15    as overbroad and inconsistent with L&I existing statutory authority.

16                              **VI.    CONCLUSION**

17    For the foregoing reasons, GEO respectfully requests the Court grant its motion and

18    quash the warrant.

19

20    DATED this 2nd day of January, 2024.

21                              DAVIS WRIGHT TREMAINE LLP
                               Attorneys for GEO Secure Services, LLC
22

23

24    By */s/ Harry Korrell*
                               Harry J. F. Korrell, WSBA 23173
25                              920 Fifth Avenue, Suite 3300
                               Seattle, WA  98104-1610
26                              P: (206) 757-8080
                               F: (206) 757-7080
27                              Email: harrykorrell@dwt.com

GEO'S MOTION TO QUASH - 9

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 2, Page 9 of 10**

GEO_000056

1

**CERTIFICATE OF SERVICE**

2    The undersigned certifies under the penalty of perjury under the laws of the State of

3  Washington that I am now and at all times herein mentioned, a citizen of the United States, a

4  resident of the state of Washington, over the age of eighteen years, not a party to or interested in

5  the above-entitled action, and competent to be a witness herein.

6    On this date I caused to be served in the manner noted below a copy of the document

7  attached herewith on the following:

8    Eric Smith                                    ☒ Via Legal Messenger
     Industrial Hygiene Compliance                 ☐ U.S. Mail, postage prepaid
9    Investigator                                  ☐ Federal Express
     Division of Occupational Safety & Health      ☐ Facsimile
10   Washington State Department of Labor &         ☒ Email
     Industries
11   Email: arre235@lni.wa.gov

12    DATED this 2nd day of January, 2024.

13

14                                                  _____
                                                    Heather Persun
15

16

17

18

19

20

21

22

23

24

25

26

27

GEO'S MOTION TO QUASH - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 2, Page 10 of 10**

GEO_000057

SUPERIOR COURT OF THE STATE OF WASHINGTON
PIERCE COUNTY

In re:

WASHINGTON DEPARTMENT OF LABOR
AND INDUSTRIES

No.

**DECLARATION OF MICHAEL
KNIGHT IN SUPPORT OF THE
GEO GROUP'S MOTION TO
QUASH WARRANT**

I, Michael Knight, declare as follows:

1.      I am the Assistant Facility Administrator ("AFA") of the Northwest ICE Processing Center ("NWIPC") and an employee of The GEO Group, Inc. ("GEO").

2.      I have personal knowledge of the matters set forth herein. If called as a witness, I could and would testify competently thereto under oath.

3.      At 1006 am. on December 29, 2023, Mr. Eric Smith and Mr. Matt Williams from Washington State Department of Labor and Industries ("L&I") entered the lobby of the NWIPC and handed me a warrant from Pierce County Court demanding that L&I be granted entrance into the facility.

4.      During our discussion, Mr. Smith did not identify any authority for his requested access to NWIPC.

5.      At about 1010 am. on December 29, 2023, I met with Spencer Taylor, Asst Chief Counsel for ICE and participated in a Teams meeting with Erin Clifford, Chief Counsel, Office of the Principal Legal Advisor, Seattle ("OPLA"), U.S. Immigration and Customs Enforcement, Sylvie

Declaration of Michael Knight in Support of
The GEO Group's Motion to Quash Warrant                    1

Renda, Deputy Field Office Director, ICE, Christopher Coxe, Assistant Director, OPLA and Kathleen Patrick, Deputy Chief Counsel, Seattle.

6.      During the Teams meeting the warrant was reviewed and ICE directed GEO to deny access to L&I for the requested inspection.

7.      At 1053 am., ICE Supervisory Detention and Deportation Officer ("SDDO") Ryan Jennings and I returned to the front lobby and SDDO Ryan Jennings advised Mr. Smith and Matt Williams that "ICE is denying entry into the facility and there are formal channels they may use to request a tour and once the request has been made then the request will be reviewed." Eric Smith responded, they were to get everyone's names and titles, which were provided including the lobby officer Edwin Tajalle. Mr. Smith asked SDDO Ryan Jennings to repeat his response so he could write the response word for word.

8.      Mr. Smith then stated he would report the denial to his supervisor and the court and that the court may then find us in contempt of court and further warrants may be issued.

9.      At 1058 am., Eric and Matt were given back their identification cards and departed the facility.

I declare under penalty of perjury under the laws of the United States of America and the State of Washington that the foregoing is true and correct.

Executed this 2nd day of January 2024, in Tacoma, Washington.

Michael Knight

The Honorable Garold E. Johnson
Hearing Date: January 2, 2024

1

2

3

4

5

6

7

8

SUPERIOR COURT OF THE STATE OF WASHINGTON
PIERCE COUNTY

9   In Re:

10  WASHINGTON STATE DEPARTMENT OF                No.
    LABOR & INDUSTRIES

11                                                DECLARATION OF BRUCE
                                                  SCOTT IN SUPPORT OF
12                                                MOTION TO QUASH
                                                  WARRANT
13

14        I, Bruce Scott, declare as follows:

15        1.      I am the Facility Administrator of the Northwest ICE Processing Center ("NWIPC"

16  or the "Facility") and an employee of The GEO Group, Inc. ("GEO").

17        2.      I have personal knowledge of the matters set forth herein. If called as a witness, I

18  could and would testify competently thereto under oath.

19        3.      The NWIPC is a federal immigration detention facility.  GEO owns and provides

20  secure housing and residential support services at the NWIPC pursuant to a federal contract with

21  the United States Immigrations and Customs Enforcement ("ICE").

22        4.      The NWIPC is a federal immigration detention center under the complete control

23  of ICE.  ICE provides funding for the use of one hundred percent of the premises from GEO, which

24  owns the Facility.  ICE officers and administrative offices are located on the NWIPC property.

25  ICE (not GEO) has absolute control over ingress and egress to the NWIPC.  No one, from detainees

26  to GEO employees to vendors, is allowed to enter NWIPC without the express authorization of

27

DECLARATION OF BRUCE SCOTT IN SUPPORT OF MOTION TO QUASH
WARRANT - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 4, Page 1 of 4**

GEO_000060

1    ICE.  The operation of the Facility is fully governed by federal policies and procedures known as

2    the Performance Based National Detention Standards (PBNDS).

3         5.      Consistent with the requirements of GEO's contract for secure residential support

4    services at the federal NWIPC, ICE exercises exclusive control over all access to the NWIPC.

5         6.      All persons requesting access to the NWIPC must obtain pre-clearance approvals

6    by ICE, including all requests for access by federal and state employees, as well as GEO

7    employees.

8         7.      GEO has no authority to provide access to the NWIPC absent ICE clearance and

9    approval.

10        8.      On December 27, 2023 at approximately 0930 hours, Washington State Labor and

11   Industries ("L&I") employees Eric Smith and Matt Williams arrived at the NWIPC and demanded

12   access to the entire facility to do a comprehensive workplace inspection.

13        9.      In my experience, L&I typically coordinates the timing and scope of inspections

14   undertaken at NWIPC.  This coordination includes GEO submitting L&I's request for access to

15   ICE for necessary pre-clearance approvals.

16        10.     Mr. Smith stated there were no specific workplace complaints that prompted the

17   attempted inspection, but that L&I was demanding access to the entire facility to perform

18   inspections under new law RCW 70.395.

19        11.     Since RCW 70.395 was a new law, I offered to reschedule our discussion for a

20   mutually beneficial time that could include GEO corporate representatives.  Mr. Smith declined

21   stating that he could not schedule an unannounced inspection.  Mr. Smith stated that he did have a

22   scope for the inspection, but did not show it to me.

23        12.     Consistent with GEO's contractual requirements and NWIPC operational

24   procedures, I conveyed L&I's request to on-site ICE representatives.  In response, ICE directed

25   GEO to deny L&I access to the NWIPC and I communicated that decision by ICE to Mr. Smith.

26

27

DECLARATION OF BRUCE SCOTT IN SUPPORT OF MOTION TO QUASH
WARRANT - 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 4, Page 2 of 4**

1       I declare under penalty of perjury under the laws of the State of Washington that the

2   foregoing is true and correct.

3

4       Executed this 2nd day of January 2024, in Tacoma, Washington.

5

6

                                Bruce Scott

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF BRUCE SCOTT IN SUPPORT OF MOTION TO QUASH
WARRANT - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 4, Page 3 of 4**

1

## CERTIFICATE OF SERVICE

2

The undersigned certifies under the penalty of perjury under the laws of the State of

3

Washington that I am now and at all times herein mentioned, a citizen of the United States, a

4

resident of the state of Washington, over the age of eighteen years, not a party to or interested in

5

the above-entitled action, and competent to be a witness herein.

6

On this date I caused to be served in the manner noted below a copy of the document

7

attached herewith on the following:

8

Eric Smith
Industrial Hygiene Compliance
Investigator

9

Division of Occupational Safety & Health

10

Washington State Department of Labor &
Industries

11

Email: arre235@lni.wa.gov

⊠ Via Legal Messenger
☐ U.S. Mail, postage prepaid
☐ Federal Express
☐ Facsimile
⊠ Email

12

DATED this 2nd day of January, 2024.

13

14

15

Heather Persun

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF BRUCE SCOTT IN SUPPORT OF MOTION TO QUASH
WARRANT - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**Exhibit 4, Page 4 of 4**

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF PIERCE**

| | |
|---|---|
| In Re:<br>**GEO Secure Services LLC**<br>**1623 East J Street**<br>**Tacoma, WA 98421**<br><br><br>**INSPECTION 317977630** | NO. _____<br><br>APPLICATION FOR SAFETY AND<br>HEALTH INSPECTION ENTRY<br>WARRANT PURSUANT TO THE<br>WASHINGTON INDUSTRIAL<br>SAFETY AND HEALTH ACT |

   The Department of Labor and Industries of the State of Washington (Department), by and through its designated representative, compliance industrial safety and health investigators (CISHI) Eric Smith and Matthew Williams, requests the issuance of a safety and health inspection entry warrant pursuant to the Washington Industrial Safety and Health Act, ch. 49.17 RCW (WISHA).

   This inspection entry warrant application is made pursuant to RCW 49.17.070, RCW 49.17.075 and RCW 70.395, and applies to the jobsite of **GEO Secure Services LLC** located at **1623 East J Street, Tacoma, WA 98421** (the Jobsite). An inspection entry warrant is necessary to allow the Department to perform an inspection at the Jobsite based on the reasonable belief that workers at the Jobsite are being or have been exposed to one or more hazards because of a violation of Washington's safety and health standards, and that such workers are or have been in danger of serious injury or death.

APPLICATION FOR WISHA
SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

1

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway Suite 200
Tacoma, WA 98402
253-596-3878

**Exhibit 5, Page 1 of 2**

GEO_000064

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Additionally, on May 11, 2023, the Washington State Legislature passed RCW 70.395, An Act Relating to Private Detention Facilities. RCW 70.395.050 (4) provides:

Inspections-Delegation-Rules-Enforcement

(4) The Department of Labor and Industries shall conduct routine, unannounced inspections of workplace conditions at private detention facilities, including work undertaken by detained persons.

This inspection is mandated by RCW 70.395.050 (4). And, this is the first inspection conducted pursuant to the above statute.

The underlying facts establishing grounds for issuance of an inspection entry warrant are set out in the accompanying declaration of **CISHI Eric Smith and Matthew Williams.**

DATED this 29 day of December, 2023.

Cindy Sims
Department of Labor & Industries
Division of Occupational Safety
And Health

APPLICATION FOR WISHA
SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

2

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway Suite 200
Tacoma, WA 98402
253-596-3878

1
2
3
4
5
6
7
8

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF [COUNTY]**

9   In Re:
    **GEO Secure Services LLC**                    NO. _____
10  **1623 East J Street**
    **Tacoma, WA 98421**                           DECLARATION OF SUPPORT FOR
11                                                  ENTRY WARRANT.

12  **INSPECTION 317977630**

13

14      1.      I, Eric Smith, am an authorized representative of the Director of the Department

15  of Labor & Industries (Department), employed as a Region 3 Compliance Safety and Health

16  Officer under the Washington Industrial Safety and Health Act, ch. 49.17 RCW (WISHA).  I am

17  over the age of 18 and am competent to testify herein. Eric Smith is a pseudonym used in the

18  course of my inspections with the Department for my personal safety. My legal name is Eric

19  Arroyo. I make these statements on personal knowledge and belief.

20      2.      I make this declaration in support of the Department's Application for WISHA

21  Safety and Health Inspection Entry Warrant. More specifically, the Department requests

22  issuance of an inspection entry warrant permitting an inspection of the GEO Secure Services

23  LLC jobsite located at 1623 East J Street, Tacoma WA 98421 to determine compliance with the

24  safety and health standards promulgated under WISHA.

25

DECLARATION OF                      1          WASHINGTON STATE DEPARTMENT OF
SUPPORT FOR ENTRY                                      LABOR & INDUSTRIES
WARRANT                                       950 Broadway, Suite 200, Tacoma, WA 98402

3.      This entry warrant request is pursuant to RCW 49.17.070, RCW 49.17.075 and RCW 70.395 and is:

[X]  1.  A routine programmed inspection of an identified hazardous workplace, which is a <u>private detention facility</u>.

[ ]  2.  An unprogrammed inspection of a workplace based upon a complaint/referral from a person who reasonably believes workers are or have been exposed to a hazard because of a violation.

[ ]  3.  An investigation of a workplace death, serious injury or illness to determine whether it was caused by a violation of safety or health rules or Chapter 49.17 RCW, Washington Industrial Safety and Health Act.

[ ]  4.  An inspection of a workplace where the Department of Labor & Industries has reason to believe that employees may be in imminent danger of serious injury or death.

[ ]  5.  A follow up inspection to verify whether the employer has abated any hazards for which the employer has been previously cited.

The facts establishing grounds for issuance of an entry warrant are:

On May 11, 2023, Washington State Legislature passed RCW 70.395, An Act Relating to Private Detention Facilities. RCW 70.395.050 (4) provides:

Inspections-Delegation-Rules-Enforcement
(4) The Department of Labor and Industries shall conduct routine, unannounced inspections of workplace conditions at private detention facilities, including work undertaken by detained persons.

For private detention facilities, RCW 70.395.050 adds a routine, unannounced, inspection requirement of workplace conditions for work undertaken by detained persons. This will be the first inspection conducted pursuant to RCW 70.395.050 (4).

DECLARATION OF
SUPPORT FOR ENTRY
WARRANT

2

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway, Suite 200, Tacoma, WA 98402

**Exhibit 6, Page 2 of 3**

GEO_000067

1
2
3
4
5
6
7
8
9
10
11
12
13

On December 27, 2023, Matt Williams and I entered the GEO Secure Services LLC., ICE Detention facility in Tacoma to open a comprehensive workplace safety and health inspection to enforce the new RCW 70.395 regulations. After waiting in the lobby for approximately 20 minutes, the Facility Administrator, Bruce Scott, and another individual from management greeted us and asked why we were there. Matt and I explained we were from WA L&I and we are here to open a comprehensive workplace safety and health inspection. When we asked for permission to be on the premises and conduct a comprehensive workplace safety and health inspection, Bruce Scott said before he gives us permission he will have to make a phone call and asked us to continue to wait in the lobby. After returning to the lobby, Bruce Scott said "ICE has directed us to not allow you entry today." We read to Mr. Scott the denial of entry statement on the WISHA 1A form, marked the date and time of denial of entry, and left the facility.

14
15
16
17

I certify, under penalty of perjury under the laws of the State of Washington that the above is true and correct to the best of my knowledge.

18
19
20
21
22
23
24
25

Date: <u>12/29/2023</u>                    Place:  <u>950 Broadway, Suite 220, Tacoma, WA 98402</u>

Name:  <u>Eric Smith</u>

---

DECLARATION OF
SUPPORT FOR ENTRY
WARRANT

3

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway, Suite 200, Tacoma, WA 98402

**Exhibit 6, Page 3 of 3**
GEO_000068

1

2

3

4

5

FILED
IN COUNTY CLERK'S OFFICE

JAN 0 4 2024

PIERCE COUNTY, WASHINGTON
CONSTANCE R. WHITE, County Clerk
BY_____ DEPUTY

6

7    **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
     **IN AND FOR THE COUNTY OF PIERCE**

8

9    In Re:

10   WASHINGTON STATE
     DEPARTMENT OF LABOR &
     INDUSTRIES
11   950 Broadway, Suite 200, Tacoma, WA
     98402

12

13

14

NO 24 1 50028

WISHA SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

15   TO:        GEO Secure Services LLC; it's Principals, Manager, Operator, or Agent in
     charge;

16

17   AND TO:

18          WHEREAS, the Director of the Department of Labor and Industries of the State of

19   Washington (Department), by and through its designated representative, compliance industrial

20   safety and health investigator (CISHI) Eric Smith, has applied for a safety and health inspection

21   entry warrant authorizing him or his authorized representative(s) to conduct a safety and health

22   inspection of the workplace of GEO Secure Services LLC, located at 1623 East J Street, Tacoma,

23   WA 98421; and

24          WHEREAS, it appearing that probable cause exists for the issuance of said warrant;

25

WISHA SAFETY AND HEALTH                    1          WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                              LABOR & INDUSTRIES
                                                      950 Broadway Suite 200
                                                      Tacoma, WA 98402
                                                      253-596-3878

NOW THEREFORE, by the authority of this Court of the State of Washington, you are hereby commanded to allow entry into the workplace of GEO Secure Services LLC specified above, during regular working hours, or at other reasonable times, to allow the conducting therein of a safety and health inspection for the purpose of ascertaining and causing to be corrected any conditions presenting safety or health hazards to employees of GEO Secure Services LLC, under chapter 49.17 Revised Code of Washington (RCW), chapter 70.395 RCW and Title 296 of the Washington Administrative Code (WAC).

Specifically, you are commanded to allow the Director or his/her authorized representative to perform the following functions:

1.  Inspect, survey and investigate all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials.

2.  To privately question any employer, owner, operator, agent, or employee for the purpose of obtaining data necessary to determine compliance with chapter 49.17 RCW, chapter 70.395 RCW, and Title 296 WAC.

3.  Take photographs, video tapes, audio tapes, samples and any other tests necessary to record or evaluate the safety and health conditions at the workplace.

4.  Obtain copies of all pertinent documentation, including, but not limited to: accident prevention program, hazard communication program, personal protective equipment (PPE) hazard assessment, safety committee meeting records, and employee training records.

5.  [Identify any other pertinent or necessary inspection activities here]

The Director of the Department, or his/her representative, shall execute this warrant within ten (10) days from the date issued and shall promptly return this warrant to the issuing court.

WISHA SAFETY AND HEALTH
INSPECTION ENTRY WARRANT

2

WASHINGTON STATE DEPARTMENT OF
LABOR & INDUSTRIES
950 Broadway Suite 200
Tacoma, WA 98402
253-596-3878

Exhibit 7, Page 2 of 4
GEO_000070

1        The Director, or his/her representative, shall serve a copy of this warrant at the time of

2   authorized entry, upon an owner, agent, or representative of GEO Secure Services LLC.

3   //

4   //

5   //

6   //

7   //

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WISHA SAFETY AND HEALTH          3        WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                      LABOR & INDUSTRIES
                                              950 Broadway Suite 200
                                              Tacoma, WA 98402
                                              253-596-3878

1

2   THIS SAFETY AND HEALTH ENTRY WARRANT IS AN ORDER OF THE COURT.

3   FAILURE TO HONOR THIS WARRANT MAY RESULT IN PUNISHMENT FOR

4   CONTEMPT OF COURT.

5

6

7

8   12-29-2023

    DATE                            JUDGE'S SIGNATURE

9

10   9:20 AM

11   TIME ISSUED (A.M.)(P.M.)       GRACE E Johnson

                                      Type or Print Judge's Name

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WISHA SAFETY AND HEALTH        4        WASHINGTON STATE DEPARTMENT OF
INSPECTION ENTRY WARRANT                   LABOR & INDUSTRIES
                                             950 Broadway Suite 200
                                             Tacoma, WA 98402
                                             253-596-3878

1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

9  STATE OF WASHINGTON,
   DEPARTMENT OF HEALTH,

10                               Plaintiff,

11        v.

12  THE GEO GROUP, INC.,

13                               Defendant.

14

NO. 3:24-cv-05029

DECLARATION OF NIGEL
TURNER

15        I, NIGEL TURNER, hereby declare the following:

16        1.      I am over the age of 18, competent to testify as to the matters herein, and make this

17  declaration based on my personal knowledge.

18        2.      I have served as the Division Director for Communicable Disease Control at the

19  Tacoma-Pierce County Health Department (TPCHD) since 2010. TPCHD is a combined county-

20  city health department that operates pursuant to chapters 70.05 and 70.8 RCW. It is one of 35

21  local health departments and local health districts (serving 39 counties) in Washington.

22        3.      TPCHD's mission is to protect and improve the health of all people and places in

23  Pierce County. The Communicable Disease Control division's principal responsibility is to

24  prevent and control the spread of diseases in Pierce County. This work includes ensuring food

25  in restaurants, schools, and other institutions in Pierce County is safe to eat. TPCHD inspects a

26  number of institutional food establishments including: Pierce County Jail, local Community

ATTORNEY GENERAL OF WASHINGTON
Agriculture & Health Division
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-6500

**Exhibit 8, Page 1 of 2**

GEO_000073

Colleges, as well as public and private K-12 schools.

4.      At the request of the GEO Group, TPCHD conducts food safety inspections at the Northwest Detention Facility in Tacoma and has done so since 2004. These inspections are conducted under the authority set forth in chapter 246-215 of the Washington Administrative Code (WAC), also known as the Washington State Food Code.

5.      When TPCHD staff conducts a food safety inspection at the Northwest Detention Facility, they do not call ahead or make appointments. We require unannounced inspections. When food safety inspectors arrive, they provide their ID to facility staff, sign into a log book, receive a badge to go through the metal detector, their bags are searched, and they receive a UV stamp on their wrist. Facility staff call the Geo Group kitchen manager, who escorts TPCHD staff throughout the facility.

6.      To date, TPCHD staff have never been required to undergo a background check by GEO prior to entering the building.

7.      I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED at Tacoma, Washington, this 19th day of January 2024.

_____

Nigel Turner

DECLARATION OF NIGEL TURNER        2        ATTORNEY GENERAL OF WASHINGTON
Agriculture & Health Division
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-6500

**Exhibit 8, Page 2 of 2**

# General Security Services Corp

## SAFETY AND HEALTH

**Enforcement of safety standards in federal enclave**

Art. 1, Sec. 8, cl. 17 of the Constitution of the United States does not prevent the Department from enforcing WISHA upon the operations of private contractors located within a federal enclave, regardless of the method of acquisition of the enclave by the United States, unless the state legislature ceded exclusive jurisdiction to the United States, and the United States has continually used the property for a purpose enumerated by Art. 1, Sec. 8, cl.17 of the federal constitution. ....***In re General Security Services Corp.*, BIIA Dec., 96 W376 (1998)** [*Editor's Note*: The Board's decision was appealed to superior court under King County Cause No. 99-2-00176-1SEA, Department, Pierce County Cause No. 99-2-04341-9, Employer.]

Operations at the federal courthouse in Tacoma are subject to WISHA since the land was acquired in 1989 and the governing statute at that time ceded concurrent (rather than exclusive) jurisdiction to the federal government. ....***In re General Security Services Corp.*, BIIA Dec., 96 W376 (1998)** [*Editor's Note*: The Board's decision was appealed to superior court under King County Cause No. 99-2-00176-1SEA, Department,  Pierce County Cause No. 99-2-04341-9, Employer.]

**Grouping of violations**

The Department may group two or more non-serious (general) violations to form a single serious violation (with sub-parts) and assess a penalty so long as the existence of the combined violation created a substantial probability that death or serious physical harm could result therefrom.  ....***In re General Security Services Corp.*, BIIA Dec., 96 W376 (1998)** [*Editor's Note*: The Board's decision was appealed to superior court King County Cause No. 99-2-00176-1SEA, Department; Pierce County Cause No. 99-2-04341-9, Employer.]

Scroll down for order.

## BEFORE THE BOARD OF INDUSTRIAL INSURANCE APPEALS
## STATE OF WASHINGTON

| | | |
|---|---|---|
| IN RE:   **GENERAL SECURITY SERVICES CORPORATION** | ) ) ) | **DOCKET NOS. 96 W376 & 97 W463** |
| **CITATION & NOTICE NOS.  115319824 & 115191728** | ) ) | **DECISION AND ORDER** |

APPEARANCES:

Employer, General Security Services Corporation, by
Davis, Wright & Tremaine, per
Michael J. Killeen

Employees of General Security Services Corporation, by
Northwest Federal Court Security Officers Union, per
Edwin H. White, President

Department of Labor and Industries, by
The Office of the Attorney General, per
James M. Hawk, Assistant

Docket No. 96 W376 is an appeal filed on September 20, 1996, with the Board of Industrial Insurance Appeals by the employer, General Security Services Corporation, from Corrective Notice of Redetermination  (CNR) No. 115319824, dated September 4, 1996. The CNR affirmed Citation and Notice No. 115319824, dated June 26, 1996, that cited the employer with one serious violation, containing four sub-parts, of regulations issued under the authority of the Washington Industrial Safety and Health Act with a total penalty assessed equal to $850.  **AFFIRMED AS MODIFIED.**

Docket No. 97 W463 is an appeal filed on September 2, 1997, with the Board of Industrial Insurance Appeals by the employer, General Security Services Corporation, from Citation and Notice No. 115191728, dated August 14, 1997. The Citation and Notice cited the employer with three serious violations of regulations issued under the authority of the Washington Industrial Safety and Health Act (WISHA) with a total penalty assessed equal to $3,600.  **VACATED.**

1

12/15/98

**Exhibit 9, Page 2 of 25**

GEO_000076

**PROCEDURAL AND EVIDENTIARY MATTERS**

On December 19, 1997, the Department moved to amend Item No. 1-3 of Citation and Notice No. 115191728 by changing the cited safety standard from WAC 296-24-007501(1)(a) to WAC 296-24-07501(2)(a).  The Department's motion is granted.

The employer submitted, as Exhibit No. 10, a one-page "memorial" dated August 30, 1996, from a Department employee to an assistant attorney general, the Department's legal representative.  The Department objected to the admission of Exhibit No. 10 on grounds of attorney-client privilege and relevance.  The attorney-client privilege normally applies to prevent the discovery and use of such documents at trial.  However, the Department waived this privilege by disclosing this document while complying with a public disclosure request.  The waiver of the privilege occurs even when, as here, the disclosure of the document was accidental or due to a clerical error.  Nonetheless, Exhibit No. 10 remains rejected pursuant to ER 402 inasmuch as its contents are irrelevant.

The September 23, 1997 deposition of compliance officer Don Lofgren was published without objection during the January 5, 1998 hearing.  Pursuant to CR 32(a)(2), there are no restrictions on the usage of this deposition.  It is in evidence for all purposes, not merely for impeachment of the deponent.  Deposition Exhibit No. 2 is renumbered as Exhibit No. 22 and is admitted.  Deposition Exhibit No. 1 is noted to be part of Exhibit No. 3 and has already been admitted under that number.  Deposition Exhibit No. 3 is noted to be the same as Exhibit No. 10 and remains rejected under that number.

On November 16, 1998, we reopened the record of these appeals, pursuant to RCW 51.52.102, in order to obtain evidence necessary to the disposition of one of these appeals, Docket No. 97 W463.  At the hearing held on November 16, 1998, a document previously marked for identification as Exhibit No. 12 that was withdrawn, was admitted as Exhibit No. 12.  Thereafter,

2

the employer, employees and Department waived the presentation of additional evidence and the record was closed.

As part of its Petition for Review, the Department submitted declarations of Stephen M. Cant and John R. Spear with accompanying documents for inclusion in the hearing record. This proffered material is rejected as untimely.

## DECISION

Pursuant to RCW 51.52.104 and RCW 51.52.106, this matter is before the Board for review and decision on timely Petitions for Review filed by the employer, General Security, its employees, and the Department of Labor and Industries, to a Proposed Decision and Order issued on May 27, 1998, in which CNR No. 115319824, dated September 4, 1996, and Citation and Notice No. 115191728, dated August 14, 1997, were vacated. We have granted review to consider a large number of issues, including the Department's jurisdiction and authority to enforce WISHA under the following circumstances.

On August 13, 1937, the United States purchased the 1010 5th Avenue property in Seattle, on which the federal courthouse was erected. In 1989, the United States acquired the Union Station Building at 1717 Pacific Avenue in Tacoma through a 30-year lease with an option to buy for a nominal amount at the end of the lease term. The purpose of this acquisition was to renovate and use the buildings thereon as a federal courthouse. In 1996 and 1997, the buildings at both of these locations were being used as federal courthouses.

General Security Services Corporation (GSSC) is a Minnesota corporation that employs Court Security Officers (CSOs) in federal courthouses in Tacoma and Seattle (including the bankruptcy courthouse in Seattle) and in other western states. GSSC has fewer than 50 employees in the State of Washington. GSSC contracts with the United States Marshal Service (USMS) to assist it in providing security in those federal facilities. CSOs monitor courthouse

**Exhibit 9, Page 4 of 25**

GEO_000078

entrances, a function that requires them to operate x-ray machines and metal detectors provided by the USMS.  CSOs also conduct foot patrols throughout the courthouses, monitor trials held at the courthouses and assist the USMS with prisoners in transit within the courthouses and during trials. CSOs generally have considerable experience in law enforcement before they are hired by GSSC. General Security pays them, provides their uniforms and supervises them in a limited fashion.  The CSOs are deputized by the USMS.  Each CSO carries identification while on duty within the courthouses identifying him or her as a "Special Deputy U.S. Marshal Court Security Officer."  The USMS requires them to go to a federal training school for orientation training.  The USMS provides the weapons and equipment carried by CSOs while on duty.  The USMS has a firearm or deadly force policy with which the CSOs must comply.  The USMS requires that each CSO annually qualify on the shooting range with the firearm it assigns to him or her.  The USMS determines the type and style of uniform that CSOs wear while on duty, the locations at which they are stationed and the hours they work.  GSSC has the power to hire and fire CSOs, but they are subject to multiple background checks conducted by the USMS.  The USMS can refuse to allow a CSO to work at the courthouses for disciplinary or other reasons.  This is tantamount to firing the CSO inasmuch as the only GSSC workplaces within this state are federal courthouses.

The first issue we address is whether the Department has jurisdiction to enforce safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA) of 1973 upon a private company who contracts with the United States government to provide services solely within United States courthouses.  This issue requires interpretation of the United States Constitution art. I, § 8, cl. 17.

United States Constitution art. I, § 8, cl. 17 of the Constitution of the United States confers upon the United States Congress the power:

> To exercise exclusive legislation in all cases whatsoever, over such
> district (not exceeding ten miles square) as may, by cession of particular

4

states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings;

Exclusive "legislation" is the same thing as exclusive "jurisdiction." *Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525 (1884).   This provision essentially is reiterated by Article XXV of the Constitution of the State of Washington.

The Washington State Supreme Court has interpreted this constitutional provision in the context of the Department's power to enforce WISHA upon the operations of a private contractor performing work solely within a federal enclave.  The federal enclave in question was Mt. Rainier National Park, over which the state legislature ceded exclusive jurisdiction to the United States by enacting Rem. Rev. Stat. § 8110 (now codified as RCW 37.08.200).  In *Department of Labor & Indus. v. Dirt & Aggregate, Inc.*, 120 Wn.2d 49 (1992), the Washington State Supreme Court determined that the federal government had obtained exclusive jurisdiction over the land within the boundaries of the national park.  Because of the cession of exclusive jurisdiction, the State could not enforce safety and health regulations promulgated under WISHA within the park since the United States Congress had not granted the State such regulatory authority.

In the appeals before us, the Department has attempted to distinguish *Dirt & Aggregate* by noting that the federal enclave in that case, Mt. Rainier National Park, was ceded to the United States while the federal courthouses in Seattle and Tacoma were purchased and leased, respectively.  However, the holding in *Dirt & Aggregate* was not dependent on the method by which the United States obtained the property, but instead upon the extent of jurisdiction over the property that was granted it by the state Legislature.

5

Mere ownership by the federal government and use for public purposes of lands within a state, by itself, does not withdraw the lands from the jurisdiction of the state.  *James v. Dravo Contracting Co.*, 302 U.S. 134, 82 L. Ed. 155, 58 S. Ct. 208 (1937).  The two methods specified in art. I, § 8, cl. 17 of the Constitution of the United States by which the United States obtains jurisdiction over land within this and other states are cession (as in *Dirt & Aggregate*) and purchase by the consent of the legislature. Jurisdiction over property purchased by the federal government can be exclusive or concurrent.  *Ryan v. State*, 188 Wash. 115 (1936).  A state, by statute, may qualify its consent to federal jurisdiction by reserving for itself concurrent jurisdiction with the federal government over the land acquired.  *Dravo Contracting Co.*, 302 U.S. 134.

In our state, legislative consent for acquisition of property by the United States, along with the cession of jurisdiction over it, has been accomplished by statute.  Initially, the jurisdiction acquired by the United States over property purchased in this state was exclusive.  Rem. Rev. Stat. § 8108, adopted in 1891, stated:

> The consent of the state of Washington be and the same is hereby given to the acquisition by purchase or by condemnation, under the laws of this state relating to the appropriation of private property to public uses, by the United States of America, or under the authority of the same, of any tract, piece, or parcel of land, from any individual or individuals, bodies politic or corporate, within the boundaries or limits of this state, for the sites of locks, dams, piers, breakwaters, keepers' dwellings, and other necessary structures and purposes required in the improvement of the rivers and harbors of this state, or bordering thereon, or for the sites of forts, magazines, arsenals, docks, navy yards, naval stations, or other needful buildings authorized by any act of congress, . . . the consent herein and hereby given being in accordance with the seventeenth clause of the eighth section of the first article of the Constitution of the United States, and with the acts of congress in such cases made and provided; and the jurisdiction of this state is hereby ceded to the United States of America over all such land or lands as may have been or may be hereafter acquired by purchase or by condemnation, or set apart by the general government for any or either of the purposes before mentioned: Provided, that this state shall retain a concurrent jurisdiction with the United States in and over all tracts so acquired or set apart as aforesaid, so far as that all civil and criminal process that may issue under the authority of this state against any

person or persons charged with crimes committed, or for any cause of action or suit accruing without the bounds of any such tract, may be executed therein, in the same manner and with like effect as though this assent and cession had not been granted."

The use of the term "concurrent" in Rem. Rev. Stat. § 8108 did not change the nature and extent of the federal government's jurisdiction from exclusive to concurrent.  *See*, John N. Rupp, 14 Wash. L. Rev. 1, 23 (1939).  A limited reservation by the state of jurisdiction to serve process does not remove or defeat the grant of exclusive jurisdiction.  *State v. Lane*, 112 Wn.2d 464, 470 (1989).

The Legislature's consent to exclusive jurisdiction of the United States is dependent on the purchased property being used by the United States for a purpose enumerated in art. I, § 8, cl. 17 of the Constitution of the United States.  *Ryan*, 188 Wash., at 126-127.  One of these purposes is "for the erection of . . . 'needful buildings.'"  A federal courthouse is a "needful building" within the meaning of art. I, § 8, cl. 17 of the Constitution of the United States.  *Ryan*, 188 Wash. at 127-128; *Dravo Contracting Co.*, 302 U.S. 134.  Inasmuch as Rem. Rev. Stat. § 8108 was in effect on August 13, 1937, the United States obtained exclusive jurisdiction over that property as provided by that statute.

In 1939, Rem. Rev. Stat. § 8108 was repealed and replaced with Rem. Rev. Stat. §§ 8108-1 through 8101-4 (Laws of 1939, ch. 126, §§ 1-4, effective June 7, 1939), that is now codified in Chapter 37.04 RCW.  RCW 37.04.010 contains the State Legislature's consent to acquisition of land "by purchase, lease, condemnation, or otherwise" for the uses described by art. I, § 8, cl. 17 of the United States Constitution, including "needful buildings."  RCW 37.04.020 defines the jurisdiction ceded to the United States as "concurrent jurisdiction with this state in and over any land so acquired by the United States . . .." Thus, the Washington State Legislature no longer granted exclusive jurisdiction to the federal government over property it purchased in this state.

This change in legislative consent did not change the grant of exclusive jurisdiction the United States had already obtained over the Seattle federal courthouse property.  RCW 37.04.040

7

provides that "jurisdiction heretofore ceded to the United States over any land within this state by any previous act of the legislature shall continue according to the terms of the respective cessions," so long as the United States has affirmatively accepted the ceded jurisdiction and has not failed or ceased to use the land for the purpose for which it was required.  There is no evidence in the record regarding an acceptance of jurisdiction over the Seattle federal courthouse property by the United States.   Nonetheless, such acceptance of jurisdiction by the United States is presumed. *Ft. Leavenworth R. Co.*, *Silas Mason, Inc. v State Tax Comm'n.*, 302 U.S. 134, 82 L. Ed. 155, 114 A.L.R 318 (1937).  This presumption is lent additional weight by the construction and continuous use for almost 60 years of a federal courthouse on the purchased premises.  Absent evidence to the contrary, the presumption of acceptance has not been rebutted.  Acceptance of exclusive jurisdiction over the property by the United States government is deemed established.

The establishment of exclusive jurisdiction by the federal government over the Seattle courthouse property does not mean that all state law is no longer valid there.  State law that had applied to the property at the time of the transfer of ownership and jurisdiction to the United States is still applicable to the property, although the state no longer has the power to amend those laws or pass new ones applicable therein.  *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 84 L. Ed. 596, 60 S. Ct. 431, 127 A.L.R. 821 (1940); *Pacific Coast Dairy, Inc. v. Department of Agriculture*, 318 U.S. 285, 295, 87 L. Ed. 761, 63 S. Ct. 628 (1943).  Since WISHA was not enacted until long after the United States purchased and obtained exclusive jurisdiction over the Seattle federal courthouse property, its enactment in and of itself does not permit it to be applied within the boundaries of that federal enclave.

Since the federal government has obtained exclusive jurisdiction over the Seattle courthouse property it acquired in 1937, many of the principles discussed by our state's Supreme Court in *Dirt & Aggregate* also apply to prevent the Department from enforcing WISHA within the

8

Seattle federal courthouse. Because the United States has exclusive jurisdiction over the courthouse property, the state may not resume regulation within it without the express permission of Congress. The Occupational Safety and Health Act (OSHA) of 1970, 29 U.S.C. § 651 et seq., does not contain express congressional permission for the resumption of state regulation over safety and health on federal enclaves nor does it expand state regulatory power beyond its normal legislative limits. *Dirt & Aggregate*, 120 Wn.2d at 53-56. The inescapable conclusion is that the Department of Labor and Industries lacks jurisdiction to enforce WISHA within the Seattle Federal courthouse. Therefore, Citation and Notice No. 115191728, issued on August 14, 1997, (Docket No. 97 W463) must be vacated due to this lack of jurisdiction.

The remainder of this Decision and Order addresses only CNR No. 115319824, issued on September 4, 1996, (Docket No. 96 W376) involving the application of WISHA to the Tacoma federal courthouse.

The jurisdictional situation regarding the federal courthouse in Tacoma is materially different from that of the Seattle courthouse because of the date the United States acquired the Tacoma courthouse property. RCW 37.04.020, that was applicable in 1989, only ceded concurrent jurisdiction to the federal government over property it acquired in this state. That the federal government's acquisition of the property was by lease rather than purchase is not important. RCW 37.04.010 shows that the legislature consented to the acquisition of property by the federal government through lease as well as by purchase. Since the property in question is subject to the concurrent jurisdiction of both the federal and state government, instead of the exclusive jurisdiction of the federal government, it is subject to the jurisdiction of the state. *Ryan,* 188 Wash. 115; *State v. Williams*, 23 Wn. App. 694 (1979).

9

The extent of the state's jurisdiction is described by RCW 37.04.030.  It states:

> The state of Washington hereby expressly reserves such jurisdiction and authority over land acquired or to be acquired by the United States as aforesaid as is not inconsistent with the jurisdiction ceded to the United States by virtue of such acquisition.

Inasmuch as our state legislature has consented to (granted) only concurrent jurisdiction to the federal government, art. I, § 8, cl. 17 of the United States Constitution does not prevent all state regulation at the Tacoma federal courthouse.  Our review must now expand to consider whether the Department's attempt to enforce WISHA upon a private contractor at a worksite within the Tacoma federal courthouse is preempted by federal law pursuant to art. VI, cl. 2, of the Constitution of the United States, also known as the Supremacy Clause.

United States Const. art VI, cl. 2, states:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding.

Supremacy Clause questions often are referred to as questions of  "preemption" by federal law of state regulation or action.

In *Inlandboatmen's Union of the Pacific v. Department of Transp.*, 119 Wn.2d 697 (1992), the Washington State Supreme Court considered whether the Department of Labor and Industries' power to enforce safety regulations promulgated under the authority of WISHA upon the Washington State Ferry System was preempted by federal law in the form of United States Coast Guard regulations.  In discussing the case, the court provided an overview of the preemption law:

> State law can be preempted in two ways: field preemption or conflict preemption. If Congress indicates an intent to occupy a given field (explicitly or impliedly), any state law falling within that field is preempted; even if Congress has not indicated an intent to occupy a field, state law is still preempted to the extent it would actually conflict with federal law.

10

Federal preemption is governed by the intent of Congress and may be expressed in the federal statute. Absent explicit preemptive language, Congress' intent to supersede state law in a given area may be implied if (1) a scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it, (2) if the federal act touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or (3) if the goals sought to be obtained or the obligations imposed reveal a purpose to preclude state authority. Federal regulations, within the scope of an agency's authority, have the same preemptive effect as federal statutes.

Even if Congress has not occupied an entire field, preemption may occur to the extent that state and federal law actually conflict. Such a conflict occurs (1) when compliance with both laws is physically impossible or (2) when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

There is a strong presumption against finding preemption in an ambiguous case, and the burden of proof is on the party claiming preemption.

*Inlandboatmen*, 119 Wn.2d, at 701-702. Footnotes and citations omitted. *See also*, *Department of Labor & Indus. v. Common Carriers, Inc.*, 111 Wn.2d 586, 588 (1988); and *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 326-327 (1993).

There is no federal statute that expressly preempts the state's regulation of workplace safety and health. While OSHA appears to regulate the entire field of industrial safety and health, a provision of that act (29 U.S.C. § 667) actually removed federal preemption by allowing the states to adopt their own plans and standards to regulate this field in lieu of the federal government. *Inlandboatmen*, 119 Wn.2d, at 704. Our state took advantage of this federal "offer" to allow it to regulate this field itself by adopting WISHA through an exercise of the police power.

We do not conclude that the United States Congress implicitly intended to supercede state industrial safety and health regulation of private employers whose worksites are within federal courthouses. Courts are reticent to imply federal preemption of an entire field, such as industrial safety and health, without an unambiguous congressional mandate to that effect. *Inlandboatmen*, 119 Wn.2d, at 705. The historic police powers of a state to provide for the health and safety of its

11

1
2
3   citizens are not to be preempted absent a clear and manifest purpose of Congress.  *Medtronic Inc.*
4
5   *v. Lohr*, 518 U.S. 470, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996); Reece *v. Good Samaritan Hosp.*,
6
7   90 Wn. App. 574, 578 (1998).  Great deference is given to state legislation such as WISHA where
8
9   public health and safety are involved.  *Inlandboatmen*; *Fisons.*  Washington State's interest in
10
11  protecting Washington workers' safety and health is strong and local in character, and WISHA was
12
13  enacted pursuant to the state's police power. *Inlandboatmen*, 119 Wn.2d, at 706.  Because of the
14
15  subject matter of the legislation involved in this case and the use by the state of its police power to
16  protect a strong, local interest, it is unlikely that any implicit intent to supercede WISHA exists.
17
18          The employer has not shown any pervasive scheme of federal regulation, dominant federal
19
20  interest or any federal goal or obligation that reveals a purpose to preclude state authority.  GSSC
21
22  maintains that it is tightly controlled by the federal government in the form of the United States
23
24  Marshal Service (USMS).  The record clearly reflects that the USMS is integrally involved in the
25
26  supervision and control of CSOs employed by GSSC.  However, there is a paucity of evidence
27
28  showing that such regulation extended to include the safety and health of the CSOs within their
29
30  workplaces at the federal courthouses.  Even if USMS policy such as the firearms policy could be
31
32  construed as regulating the subject matter of workplace safety and health, the existence of such a
33
34  policy is not sufficient to show that a pervasive federal regulatory scheme exists or that Congress
35
36  intended to preempt state safety and health law.  The fact that CSOs are expected to attend
37
38  orientation training at a federal training center also does not establish congressional intent to
39
40  preempt all training requirements contained in state regulations of workplace safety and health.
41
42          There is no evidence that state regulation of workplace safety and health actually conflicts
43
44  with federal law since compliance with both is possible.  There is very little applicable federal law in
45
46  the field of workplace safety and health with which WISHA could conflict.  Statutes related to the
47  USMS, 28 U.S.C. § 561, *et seq.*, do not address safety or health-related issues.  The regulations

**Exhibit 9, Page 13 of 25**

GEO_000087

found in 29 C.F.R. § 1960.1, *et seq.* do not apply to CSOs since they are not federal employees. The regulations in 21 C.F.R., pt. 1925, regarding safety and health standards for federal service contracts, do not preclude states from setting additional safety and health standards, nor does compliance with those federal standards relieve a private contractor from compliance with stricter state or local safety and health standards. 21 C.F.R. § 1925.1 (d) & (e). These federal regulations refer to another regulation regarding personal protective equipment, located at 41 C.F.R. 50-204.7. However, that regulation does not conflict with the WISHA requirement for employer assessment of the need for personal protective equipment for its workers, since it does not contain or prohibit such a requirement.

The heart of GSSC's argument is that imposition of WISHA on their operation is a regulation of the activities of the United States government because it is performing a uniquely federal function. This is merely another way of stating that WISHA should be preempted as an obstacle to the accomplishment of the full purpose and objectives of Congress. The employer has contended that its case is not based upon a preemption argument. But such a contention is disingenuous inasmuch as many of the cases it cites are preemption cases and the "interference with a federal function" analysis has been used by the United States Supreme Court in deciding preemption cases. *See, e.g.*, *Hancock v. Train*, 426 U.S. 167, 48 L. Ed. 2d 555, 96 S. Ct. 2006 (1976); and *Goodyear Atomic Corp. V. Miller*, 486 U.S. 174, 100 L. Ed.2d 158, 108 S. Ct. 1704 (1988).

In *Goodyear Atomic Corp.*, the Supreme Court noted that state regulation may be invalidated under the Supremacy Clause when the state is claiming authority to dictate the manner in which the federal function (in that case, control over the production of nuclear material) is carried out. In *Leslie v. Miller*, 352 U.S. 187, 1 L. Ed. 2d 231, 77 S. Ct. 257 (1956), the Supreme Court invalidated a state licensing requirement for contractors that, in essence, gave the state the power of reviewing and approving contractors hired by the United States. In this case, the federal function

13

is the protection of people and property within a federal courthouse.  The Department, when enforcing WISHA, is not attempting to dictate, amend, review or obstruct the ability of either the USMS or GSSC to fulfill that purpose.  All that the Department has attempted to do is ensure that GSSC employees are adequately trained and protected in order to prevent and reduce injuries when job-related safety or health hazards are encountered.  It is GSSC, not the USMS, that would be responsible to provide that training.

GSSC complains that meeting WISHA requirements will be inconvenient and/or costly.  This is not a valid reason to conclude that WISHA should be preempted.  In *Sadrakula*, the Supreme Court declared that the fact the federal government chose to accomplish its purpose by contracting with a private contractor did not enable that contractor to share the government's immunity from state regulation.  The Court stated that the mere increase in the cost of a contract caused by compliance with state law was not enough of an interference with a federal purpose to require preemption of the state law.

Similarly, the additional burden of dual regulation does not mandate preemption of the state law so long as no actual conflict with federal law exists. *Inlandboatmen*, 119 Wn.2d, at 708-709. Certainly there are instances where an attempt to enforce certain WISHA regulations at a federal courthouse could conflict with federal law or the accomplishment of a federal purpose.  However, the employer has not shown that such a conflict actually occurred in this case, and we will not presume that one exists.  The Department did not attempt to "lock out" or "red tag" x-ray machines, metal detectors or other government-owned equipment.  It did not attempt to issue an order of immediate restraint.  There is no indication that this inspection by the Department prevented CSOs from performing their duties, inhibited any activities within the courthouse or compromised the safety of CSOs or others within the courthouse.  As stated in *Inlandboatmen,* "The possibility of interference or the potential for future conflicts do not justify a finding of preemption."

14

To summarize thus far, we have determined that neither the operation of art. I, § 8, cl. 17, nor art. VI, cl. 2 of the Constitution of the United States operates to invalidate CNR No. 115319824, dated September 4, 1996, alleging violations of safety standards promulgated under the authority of WISHA at the GSSC workplace in the federal courthouse in Tacoma.  Since CNR No. 115319824 has survived the constitutional attacks on it, we now look at the particulars of the violations it cited and the penalty it assessed.

The Department cited GSSC for violations of four safety regulations at its Tacoma courthouse work-site.  The item cited as No. 1-1a is for a violation of WAC 296-24-040(2), that requires an employer to have an accident prevention program outlined in a written format.  The item cited as No. 1-1b is for a violation of WAC 296-24-045(1) that requires an employer with 11 or more employees to have a safety committee (or at least periodic crew safety meetings).  The item cited as No. 1-1c is for a violation of WAC 296-24-060(2) that requires that a person holding a valid first aid card (certificate of first aid training) be present or available at the work-site at all times.  The item cited as No. 1-1d is for a violation of WAC 296-24-07501(2)(a) that requires an employer to assess a workplace to determine if hazards are present, or are likely to be present, that necessitate the use of personal protective equipment.

The Department has proved that the employer violated three of the four safety standards listed above.  Donald Arnett, the employer's district supervisor since February 1994, admitted that in May 1996 the employer had no written accident prevention program, had no safety committee, and had not performed an assessment of the need to provide CSOs with body armor.  These admissions are consistent with the information gathered by Don Lofgren, the compliance officer who conducted the inspection of the Tacoma work-site of the employer, and with the testimony of Edwin White, the only CSO who testified who was stationed in Tacoma in May 1996.  Mr. Lofgren testified that Mr. Arnett told him that GSSC has 11 CSOs working at the Tacoma courthouse.

15

Although Mr. Arnett also admitted that in May 1996 the employer did not require any employee to hold a valid first aid card, we find that the employer was not in violation of WAC 296-24-060(2), and, therefore, vacate Item No. 1-1c.

WAC 296-24-060 states in relevant part:

> (1) In addition to RCW 51.36.030, every employer shall comply with the department's requirements for first aid training and certification.

> (2) There shall present or available at all times a person or persons holding a valid certificate of first-aid training.  (A valid first-aid certificate is one which is less than three years old.)

This regulation is in direct conflict with RCW 51.36.030 that states:

> Every employer, who employs workers, shall keep as required by the Department's rules a first aid kit or kits equipped as required by such rules with materials for first aid to his or her injured workers.  **Every employer who employs fifty or more workers**, shall keep one first aid station equipped as required by the department's rules with materials for first aid to his or her injured workers, and **shall cooperate with the department in training one or more employees in first aid to the injured**.  The maintenance of such first aid kits and stations shall be deemed to be a part of any safety and health standards established under Title 49 RCW.

(Emphasis added.)

It is clear that the Legislature intended, with RCW 51.36.030, to exempt employers with fewer than 50 workers from the requirement for first aid training.  Although it is also clear that the Department has broad rule-making authority under Title 49 RCW, the general provisions of Title 49, and the regulations promulgated under Title 49 cannot be read to repeal the specific exemption provided in RCW 51.36.030.  Although the Department certainly has the authority to adopt rules and regulations regarding safety and health standards under Title 49, the Legislature did not give the Department the authority to repeal legislative enactments.  Because the evidence demonstrates that GSSC had fewer than 50 employees at the time of the inspection, and because WAC 296-24-060 is therefore in conflict with the exemption provided by RCW 51.36.030, the statute must be

16

**Exhibit 9, Page 17 of 25**

GEO_000091

accorded more weight than the regulation with which it is in conflict and Item No. 1-1c must be vacated.

The employer notes that Exhibit No. 4, the WISHA interpretative memo regarding body armor as personal protective equipment had not been written as May 31, 1996, when the inspection occurred. Nonetheless, WAC 296-24-07501(2)(a) was in existence as of that date. Furthermore, personal protective equipment was described in WAC 296-24-07501(a) as including protective clothing and protective shields and barriers that would include body armor or bulletproof vests.

The Department grouped these four violations into one serious violation (with four subparts) for which a penalty of $850 was assessed. Mr. Lofgren acknowledged that the grouping of violations was discretionary. He testified that each of the first three violations, by itself, did not rise to the level of a serious violation. He stated that Item No. 1-1d, the failure to assess the need for personal protective equipment, helped considerably in raising the grouped violation to a rating of "serious," but he never testified that this violation alone was serious. Mr. Lofgren concluded that the four violations, when grouped, constituted a serious violation because together they increased the likelihood that serious injury or death could occur. Although we have vacated Item No. 1-1c, we conclude that the remaining three violations may reasonably be grouped in order to find one serious violation.

GSSC contends that the Department should not be allowed to group these violations when the only reason for grouping them is to allow the assessment of a penalty for a serious violation. This is a question of first impression in this state. We have suggested that grouping violations should occur when a logical relationship exists among the violations or when an articulated legal standard requires them to be grouped, *In re Berg Equipment & Scaffolding, Inc.*, Dckt. No. 93 W163 (September 6, 1994), but that statement does not foreclose grouping them for the purpose of producing a serious violation.

**Exhibit 9, Page 18 of 25**

GEO_000092

In order to reach a proper decision on this matter, we have examined OSHA case law for guidance.  It is well established in federal administrative decisions that grouping of non-serious violations is permissible even if the only purpose for grouping them is to obtain one serious violation for penalty assessment purposes.  Two or more non-serious violations may be grouped together to form a single serious violation if the combined violations create a substantial probability of death or serious physical injury or cause a condition that could result in death or serious injury.  *Secretary of Labor v. CTM, Inc.,* 4 OSHC 1468 (1976), *vacated on other grounds by*, 572 F.2d 262 (10th Cir., 1978); *Secretary of Labor v. Harold A. Simpson & Assoc. Dev. Co.*, 4 OSHC 1894 (1976); *Secretary of Labor v. A.R.A. Mfg. Co.*, 9 OSHC 1271 (1981); and *Secretary of Labor v. A. R. Butler Constr. Co.*, 14 OSHC 2140 (1991).

In this case, the grouping of general (or non-serious) violations to create a single serious violation is appropriate.  It is true that the job-related hazards to which the CSOs are exposed--physical assaults, often with deadly weapons--has nothing to do with the violations in question.  However, it is easy to see how the lack of training and protection resulting from these violations when considered together, would make serious physical injury or death more likely to occur whenever a CSO is assaulted.  Accident prevention programs include instructions on actions to take in case of emergencies, identification of hazards, escape routes and locations of first aid facilities.  Safety committee responsibilities include the identification of unsafe conditions or acts and review of programs for safety improvement purposes.  An assessment of the need for personal protective equipment may reveal situations where such gear or clothing, if provided, would lessen or even prevent injury or death.  In the most likely hazard to confront a CSO, an armed assault at a courthouse entrance by an irate or mentally unstable person, there is no question that death or serious physical harm to a CSO could occur in a number of ways.  Compliance by the employer with the three standards in question would reduce the chance and severity of injury.

18

For a violation to be rated as serious, the Department must show that the employer had knowledge of the hazardous conduct or condition and that there was a substantial probability that death or physical harm could result from the violation.  RCW 49.17.180(6); *In re Erection Co. (II)*, BIIA Dec. 88 W142 (1990).  The Department has met the burden of proof of both these elements in this case.  All of the witnesses, including Mr. Arnett, testified that the CSOs are exposed to hazards while performing their duties.  These hazards included bodily assaults with fists, knives or guns.  Mr. Arnett stated that CSOs potentially are exposed to fatal injury each day they are on the job.  He acknowledged that a few CSOs had been killed on the job during the past 14 years.  Mr. Arnett also acknowledged the need for CSOs to have safety training.  However, he felt it was the responsibility of the USMS to provide safety training and personal protective equipment to the CSOs.

Having determined that the Department correctly cited GSSC for one serious violation, consisting of a grouping of three non-serious violations, we turn to the appropriateness of the penalty that was assessed.  An examination of Exhibit No. 5, the Department's penalty worksheet, reveals potential issues only regarding the Department's rating of the severity of the violation and the size and good faith of the employer.  The Department rated the severity of the hazard as a "6" on a scale of 1 to 6, indicating an injury sustained likely could have the most severe consequences.  Since the type of injuries that could be sustained (bullet wounds or knife wounds for example) could easily result in severe disability or death, the highest possible rating for severity is justified.  The rating of the size of the employer is based on the statement of Mr. Arnett to Mr. Lofgren as well as Mr. Arnett's testimony that GSSC has between 40 and 50 employees in this state.  Therefore, the Department's categorization of the employer's size is also correct.

We disagree with the Department's characterization of the employer's good faith as only "fair."  Mr. Lofgren cited the lack of safety programs by the employer as well as his own "neutral" feelings about its cooperation with the inspection as his reasons for rating its good faith that low.

19

We believe that the evidence in the record supports a higher rating of "good" good faith on the part of the employer.  Despite Mr. Lofgren's "neutral" feeling about the employer's cooperation, he testified that GSSC permitted and cooperated with the inspection.  There is no indication in the record that GSSC's history of injuries or claims costs was higher than average.  Furthermore, action evidently was taken to address the violations found during the May 31, 1996 inspection.  Another inspection at the GSSC Tacoma courthouse worksite took place in early 1997 at which time no safety violations were found.  (*See* Exhibit No. 21).

The effect of reclassifying the employer's good faith from "fair" to "good" is to reduce the base penalty for Item No. 1-1 by 20 percent.  This results in a reduction of $340 from the $850 penalty assessed by the Department.  Therefore, the total penalty for Item No. 1-1 should be $510.

Our disposition of the issues related to the contents of CNR No. 115319824, issued on September 4, 1996, regarding the Tacoma federal courthouse worksite of GSSC is as follows:  The Department correctly cited the employer with non-serious (general) violations of three safety standards found within Chapter 296-24, WAC.  The action by the Department of grouping these three violations into one serious violation for penalty purposes was permissible.  The amount of the penalty assessed should be reduced from $850 to $510 based on a revision in the rating of the employer's good faith from "fair" to "good".  CNR No. 115319824, as modified, is affirmed.

## **FINDINGS OF FACT**

1.  On May 31, 1996, the Department of Labor and Industries conducted an inspection of General Security Services Corporation at their place of business at 1717 Pacific Avenue in Tacoma, Washington.  On June 26, 1996, the Department issued Citation and Notice No. 115319824 that alleged one serious violation, with four subparts, of safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA), with a total penalty assessed equal to $850. Following a timely appeal by the employer, the Department issued Corrective Notice of Redetermination (CNR) No. 115319824 on September 4, 1996 that affirmed the violations and penalty but changed the abatement dates.  On September 20, 1996, the employer filed a

20

Notice of Appeal with Board of Industrial Insurance Appeals that assigned the claim Docket No. 96 W376.

2.    On July 8, 1997, the Department of Labor and Industries conducted an inspection of General Security Services Corp. at their place of business at 1010 5th Ave. in Seattle, Washington.  On August 14, 1997, the Department issued Citation and Notice No. 15191728 that alleged three serious violations of safety regulations promulgated under the authority of the Washington Industrial Safety and Health Act (WISHA), with a total penalty assessed equal to $3,600.  On September 2, 1997, the employer filed a Notice of Appeal with Board of Industrial Insurance Appeals that assigned the claim Docket No. 97 W463.

3.    On August 13, 1937 the United States purchased land at 1010 5th Ave. in Seattle, Washington upon which it built the federal courthouse that it currently occupies.  By statute, the Washington State Legislature consented to the purchase of property and ceded jurisdiction over it to the United States.  The United States accepted the cession of jurisdiction by the state.

4.    In 1989 the United States acquired the Union Station Building located at 1717 Pacific Ave. in Tacoma, Washington by the means of a 30-year lease with an option to buy for a nominal sum at the end of the lease term. By statute, the Washington State Legislature consented to the purchase of property and ceded concurrent jurisdiction over it to the United States.  The United States accepted the cession of jurisdiction by the state.

5.    General Security Services Corp. (GSSC) is a Minnesota corporation that employs between 40 and 50 Court Security Officers (CSOs) in federal courthouses in Tacoma and Seattle (including the bankruptcy courthouse).  GSSC contracts with the United States Marshal Service (USMS) to assist it in providing security in those federal facilities.  CSOs monitor courthouse entrances, a function that requires them to operate x-ray machines and metal detectors provided by the USMS.  CSOs also conduct foot patrols throughout the courthouses and monitor trials held at the courthouses as well as assist the USMS with prisoners in transit within the courthouses and during trials.   CSOs generally have considerable experience in law enforcement before they are hired by GSSC.  They are employees of GSSC, who pays them, provides their uniforms to them and supervises them in a limited fashion.  The CSOs are deputized by the USMS.  Each CSO carries identification while on duty at the courthouses identifying him or her as a "Special Deputy U.S. Marshal Court Security Officer."  CSOs employed by GSSC in Western Washington do not work outside the boundaries of the federal courthouses in Seattle and Tacoma.  The USMS requires all CSOs to go to a federal training school for orientation training.  The USMS provides the weapons and equipment carried by CSOs while on duty.  The USMS

21

has a firearm or deadly force policy with which the CSOs must comply. The USMS requires that each CSO annually qualify on the shooting range with the firearm it assigns to him or her. The USMS determines the type and style of uniform that CSOs wear while on duty, the locations at which they are stationed and the hours they work.  GSSC has the power to hire and fire CSOs, but they are subject to multiple background checks conducted by the USMS.  The USMS can refuse to allow a CSO to work at the courthouses for disciplinary or other reasons.

6.    The safety inspection conducted by the Department at the Tacoma federal courthouse on May 31, 1996, did not interfere or obstruct the performance of the CSOs duties or the functioning of the courthouse itself.

7.    CSOs employed at the Tacoma federal courthouse are exposed to hazards, including the possibility of physical assaults, and assaults by individuals armed with deadly weapons.

8.    As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have an accident prevention plan outlined in a written format as required by WAC 296-24-040(2).  This violation was cited by the Department as Item No. 1-1a.

9.    As of May 31, 1996, eleven CSOs worked at the Tacoma federal courthouse.

10.   As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have a safety committee or periodic crew safety meetings as required by WAC 296-24-045(1).   This violation was cited by the Department as Item No. 1-1b.

11.   As of May 31, 1996, at the Tacoma federal courthouse, GSSC did not have present or available at all times, at least one person holding a valid certificate of first aid training as required by WAC 296-24-060(2) This violation was cited by the Department as Item No. 1-1c.

12.   As of May 31, 1996, GSSC had not assessed, as required by WAC 296-24-07501(2)(a), whether hazards present, or likely to be present at the Tacoma federal courthouse workplace, would necessitate use of personal protective equipment, including protective shields and barriers such as body armor and bulletproof vests.  This violation was cited by the Department as Item No. 1-1d.

13.   In CNR 115319824, the Department grouped or combined the safety violations cited by it as Item Nos. 1-1a, 1-1b, 1-1c, 1-1d into one violation, Item No. 1-1, that it labeled as serious.  The lack of training and protection of CSOs, related to these safety violations grouped by the Department into Item No. 1-1, expose them to a substantial

22

probability of serious physical harm or death in view of the occupational hazards that they may encounter as part of their duties at the Tacoma federal courthouse.  GSSC knew or should have known of this additional exposure of CSOs to serious physical harm or death caused by the lack of training and protection.

14.  The severity of the potential effects to the CSOs of the safety violations grouped as Item No. 1-1 in CNR No. 115319824, is most accurately rated as a "6" on a scale of "1" to "6" where a "6" corresponds to very severe adverse effects of worker safety or health and a "1" corresponds to a very low severity of adverse effects.

15.  In regard to Item No. 1-1, of CNR No. 115319824, the employer's good faith is best described as "good."

16.  The employer has fewer than 50 employees.

## CONCLUSIONS OF LAW

1.  The Board of Industrial Insurance Appeals has jurisdiction over the subject matter and parties to these appeals.

2.  Federal courthouses are "needful buildings" within the meaning of art. I, § 8, cl. 17 of the United States Constitution.

3.  The United States has exclusive jurisdiction over the property located at 1010 5th Ave. in Seattle, Washington, including the federal courthouse building.

4.  The United States and the State of Washington have concurrent jurisdiction over the property located at 1717 Pacific Ave. in Tacoma Washington, including the Union Station Building where the federal courthouse is located.

5.  Property leased, with an option to buy, is the equivalent of property purchased within the meaning of art. I, § 8, cl. 17 of the United States Constitution and RCW 37.04.010.

6.  The Department of Labor and Industries does not have jurisdiction to enforce safety and health regulations, promulgated under the authority of Chapter 49.17 RCW (WISHA) within the federal courthouse located at 1010 5th Ave. in Seattle, Washington.

7.  The Department of Labor and Industries has jurisdiction to enforce safety and health regulations, promulgated under the authority of Chapter 49.17 RCW (WISHA) within the federal courthouse located at 1717 Pacific Ave. in Tacoma, Washington.

23

GEO_000098

8. The enforcement of industrial safety and health regulations by the Department at the federal courthouse in Tacoma upon a private employer, whose employees only work in federal courthouses, is not preempted, per se, by art. VI, cl. 2 of the United States Constitution or by any Act of Congress or federal regulation.

9. The state safety regulations that GSSC was cited for violating do not conflict with any federal statute or regulation, either expressly or impliedly, nor do they actually conflict with any federal law either by making it impossible for GSSC to comply with both or by standing as an obstacle to the accomplishment of federal purposes, objectives or functioning.

10. Item Nos. 1-1a, 1-1b, and 1-1d, cited in CNR No. 115319824, may be grouped by the Department for the purpose of establishing a single serious violation

11. The employer is not required, within the meaning of RCW 51.36.030, to cooperate with the Department's first aid training program.  Item No. 1-1c, in CNR No. 115319824, citing a general violation of WAC 296-24-060(2), is vacated.

12. The penalty assessed by the Department for Item No. 1-1 in CNR No. 115319824 shall be reduced from $850 to $510.

13. CNR No. 115319824, dated September 4, 1996, is affirmed as modified herein, with a total penalty of $510.

14. Citation and Notice No. 115191728, dated August 14, 1997, is vacated.

It is so **ORDERED**.

Dated this 15th day of December, 1998.

BOARD OF INDUSTRIAL INSURANCE APPEALS

/s/_____
THOMAS E. EGAN                    Chairperson

/s/_____
JUDITH E. SCHURKE                 Member

wisha.apps-inside.lni.wa.gov/WIN/RPT_WebLayer/RPTViewEmployerHistoryDetail.aspx?UBI=601791682&Account=11084300&DBAName=Northwest+Detention+Center++The+GEO+Group+Inc

## View Employer History Details

Enforcement - UBI-601791682/Account-11084300

Enforcement Search Results: 3 records.

Total Records = 3

| Activity / Type | Site / CSHO Region | Legal / DBA Name | Opening / Closing Conference | Citation Issued | Violation | Samples | Appeal Received / Level | Settlement Agreement | Safety or Health | Final Order |
|---|---|---|---|---|---|---|---|---|---|---|
| 310968742 Complaint | 03 | GEO GROUP INC Northwest Detention Center - The GEO Group Inc | 03/07/2014 03/07/2014 | 02/25/2010 | No | No | No | No | Health | |
| 313923152 Referral | 03 01 | GEO GROUP INC (THE) NORTHWEST DETENTION CENTER THE | 02/11/2010 02/11/2010 | 10/08/2009 | No | No | 10/26/2009 BIA | No | Safety | 2/25/2010 |
| 313195175 Referral | 03 01 | GEO GROUP INC (THE) NORTHWEST DETENTION CENTER(THE) GEO GROUP INC | 06/02/2009 09/29/2009 | | Yes | No | No | No | Health | 09/29/2010 |

Consultation Search Results: 0 records.

○

Risk Management Search Results: 0 records.

○

Discrimination Search Results: 0 records.

○

**Exhibit 10, Page 1 of 1**

GEO_000100

wisha.apps-inside.lni.wa.gov/WINRPT_WebLayer/RPTViewEmployerHistoryDetail.aspx?UBI=603274879&Account=11084303&DBAName=GEO+SECURE+SERVICES+LLC

# View Employer History Details

## View Employer History Details

Enforcement - UBI 603274879/Account 11084303

Total Records = 8

Enforcement Search Results: 8 records.

| Activity / Type | Site / CSHO Region | Legal / DBA Name | Opening / Closing Conference | Citation Issued | Violations | Samples | Appeal Received / Level | Settlement Agreement | Safety or Health | Final Order |
|---|---|---|---|---|---|---|---|---|---|---|
| 317977529 Referral | 03 | GEO SECURE SERVICES LLC | | | No | No | | | Safety | |
| 317977530 Referral | 03 | GEO SECURE SERVICES LLC | | | No | No | | | Health | |
| 209548472 Complaint | 03 | GEO SECURE SERVICES LLC | | | No | No | | | Safety | |
| 209489615 Complaint | 03 | GEO SECURE SERVICES LLC | 05/26/2022 | 07/15/2022 | No | No | | | Safety | 7/15/2022 |
| 317968697 Complaint | 03 | GEO CORRECTIONS & DETENTION LL | 07/07/2022 | | No | No | | | Health | |
| 317903491 Complaint | 03 | GEO CORRECTIONS & DETENTION | 09/01/2021 | 02/16/2022 | No | No | 03/24/2022 Department | No | Safety | 04/15/2022 |
| 317960541 Referral | 03 | GEO CORRECTIONS & DETENTION | 01/26/2022 | | Yes | No | | No | Safety | 08/17/2022 |
| 317960904 Referral | 03 | GEO SECURE SERVICES LLC | 09/25/2020 | 02/19/2021 | Yes | No | 03/11/2021 BIIA | No | Health | 08/17/2022 |
| 317959181 Complaint | 03 | GEO CORRECTIONS & DETENTION | 12/22/2020 | | No | No | 10/13/2020 BIIA | No | Health | 08/17/2021 |
| | | GEO SECURE SERVICES LLC | 04/29/2020 | | | | | | Safety | |
| | | GEO CORRECTIONS & DETENTION | 08/21/2020 | | | | | | | |

Consultation Search Results: 0 records.

Risk Management Search Results: 0 records.

Discrimination Search Results: 0 records.

**Exhibit 11, Page 1 of 1**

GEO_000101

wisha.apps-inside.lni.wa.gov/WINRPT_WebLayer/RPTViewEmployerHistoryDetail.aspx?UBI=601791682&Account=1108430&DBAName=GEO+INC

# View Employer History Details

View Employer History Details

**Enforcement Search Results: 1 records**

| Activity / Type | Site / CMO Region | Legal / DBA Name | Opening / Closing Conference | Citation Issued | Violations | Samples | Appeal Received / Level | Settlement Agreement | Safety or Health | Final Order |
|---|---|---|---|---|---|---|---|---|---|---|
| 20948716 Complaint | 03 02 | THE GEO GROUP INC GEO INC | | | No | No | | No | Safety | |

Total Records = 1

**Consultation Search Results: 0 records**

**Risk Management Search Results: 0 records**

**Discrimination Search Results: 0 records**

**Exhibit 12, Page 1 of 1**

GEO_000102

Case# 17-05806RJB
17-05569RJB
Exhibit #   129
Admitted _____

| AWARD/CONTRACT | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE OF PAGES 1    115 |
|---|---|---|---|

| 2 CONTRACT (Proc Inst. Ident.) NO | 3. EFFECTIVE DATE | 4 REQUISITION/PURCHASE REQUEST/PROJECT NO |
|---|---|---|
| HSCEDM-15-D-00015 | 09/28/2015 | 192115FSETACXX0012 |

| 5 ISSUED BY | CODE | ICE/DM/DC-LAGUNA | 6. ADMINISTERED BY (If other than Item 5) | CODE | ICE/DM/DC-LAGUNA |
|---|---|---|---|---|---|

ICE/Detent Mngt/Dent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, Room 3104
Attn: Jun Surla (949) 360-3073
Laguna Niguel CA 92677

ICE/Detent Mngt/Dent Contract-LAG
Immigration and Customs Enforcement
Office of Acquisition Management
24000 Avila Road, Room 3104
Attn: Jun Surla    949-360-3073
Laguna Niguel CA 92677

| 7 NAME AND ADDRESS OF CONTRACTOR (No., Street, City, Country, State and ZIP Code) | 8. DELIVERY |
|---|---|

GEO GROUP INC THE
621 NW 53RD ST STE 700
BOCA RATON FL 334878242

**8. DELIVERY**
FOB ORIGIN      X  OTHER (See below)

**9. DISCOUNT FOR PROMPT PAYMENT**
Net 30

**10 SUBMIT INVOICES**  ITEM
(4 copies unless otherwise specified)
TO THE ADDRESS SHOWN IN

| CODE  6127064650000 | FACILITY CODE |
|---|---|

| 11. SHIP TO/MARK FOR | CODE | 12. PAYMENT WILL BE MADE BY | CODE | ICE-ERO-FOD-SEATTLE |
|---|---|---|---|---|

Department of Homeland Security
Immigration and Customs Enforcement
1623 East J Street
Tacoma, WA 98421
Attn: James Gronewold

DHS, ICE
Burlington Finance Center
P.O. Box 1620
Attn: ICE-ERO-FOD-Seattle
Williston VT 05495-1620

| 13 AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION | 14 ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| ☐ 10 U.S.C. 2304 (c) (    )    ☐ 41 U.S.C. 253 (c) (    ) | See Schedule |

| 15A. ITEM NO | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
|  | Continued |  |  |  |  |
|  |  |  | 15G. TOTAL AMOUNT OF CONTRACT ▶ |  | $0.00 |

**16. TABLE OF CONTENTS**

| (X) | SEC | DESCRIPTION | PAGE(S) | (X) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
|  |  | **PART I - THE SCHEDULE** |  |  |  | **PART II - CONTRACT CLAUSES** |  |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 103 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 |  |  | **PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH** |  |
| X | C | DESCRIPTION/SPECS /WORK STATEMENT | 43 | X | J | LIST OF ATTACHMENTS | 115 |
| X | D | PACKAGING AND MARKING | 92 |  |  | **PART IV - REPRESENTATIONS AND INSTRUCTIONS** |  |
| X | E | INSPECTION AND ACCEPTANCE | 93 |  | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS |  |
| X | F | DELIVERIES OR PERFORMANCE | 95 |  |  |  |  |
| X | G | CONTRACT ADMINISTRATION DATA | 97 |  | L | INSTRS., CONDS., AND NOTICES TO OFFERORS |  |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 101 |  | M | EVALUATION FACTORS FOR AWARD |  |

**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

**17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT** (Contractor is required to sign this document and return ___1___ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

**18. ☐ AWARD** (Contractor is not required to sign this document.) Your offer on Solicitation Number _HSCEDM-15-R-00001_ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

| 19A. NAME AND TITLE OF SIGNER (Type or print) | 20A. NAME OF CONTRACTING OFFICER |
|---|---|
| Amber Martin, EVP, Contract Administration | Roberta J. Halls |

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| BY [signature]  (Signature of person authorized to sign) | 9/24/15 | BY [signature]  (Signature of the Contracting Officer) | 9-24-15 |

NSN 7540-01-152-8069
PREVIOUS EDITION IS UNUSABLE

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

EXHIBIT 129
DATE: _____
B. Decater, CCR, RPR

GEO-TCC 005740

GEO-State 036825

HSCEDM-15-D-00015

# SECTION C – DESCRIPTION / SPECIFICATION
## PERFORMANCE WORK STATEMENT

### I. INTRODUCTION

**A. Objective**

The objective of this contract is to obtain a facility for the detention, transportation and food services for ICE detainees located in the Seattle, WA area in support of the ICE ERO-Seattle Field Office. The contractor shall furnish the facility and services inclusive of a trained and qualified management staff, supervision, manpower, relief officer(s), uniforms, equipment, vehicles, and supplies (which includes firearms, ammunition, body restraints, non-lethal devices, body armor, radios and cellular telephones) to provide support seven (7) days a week, twenty-four (24) hours per day.

ICE is anticipating a one (1) year base period with nine (9) one-year and one (1) six month optional periods, and a 60 day transition period.

**B. Background**

The United States Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE) is responsible for the detention, health, welfare, transportation, and deportation of detainees in removal proceedings, and those subject to final order of removal from the United States. ICE houses detainees in Contractor-owned, Contractor-operated detention facilities, and other federal, state, local, and private facilities.

**C. Mission**

The mission of the ICE Enforcement and Removal Operations (ERO) Program is to identify, arrest, and remove aliens, who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally or otherwise undermine the integrity of our immigration laws and border control efforts. ERO upholds America's immigration laws at, within and beyond our borders through efficient enforcement and removal operations.

ERO currently maintains and operates various databases used to process cases located by Federal, state and local law enforcement agencies. ERO functions are directly reliant upon these activities. In implementing its mission, ERO is responsible for carrying out all orders for the required departure of detainees handed down in removal proceedings, or prior thereto, and arranging for detention of detainees when such detention becomes necessary.

**D. Partnership Philosophy**

A major intent of this acquisition is to create a "partnership" between ICE and the Contractor. ICE intends to structure the contract in a manner that ensures the Contractor's goals and objectives are in alignment with those of ICE. Superior performance on the Contractor's part will have both an indirect and direct effect on the accomplishment of ICE's mission. Within the context of the ICE/Contractor partnership, ICE does not use the terms "partner" and "partnership" as legal terms. The ICE/Contractor partnership will reflect the attributes of an open, collaborative, customer-oriented, and professional relationship. In addition to meeting the program objectives, the contractor is encouraged to:

1. Consistently take steps to understand ICE's crucial national security mission, its business issues and opportunities, and its responsibilities under Section 287(g), Immigration and Nationality Act.

2. Work collaboratively with other Federal, state and local law enforcement organizations, contractors, government agencies, and business partners to ensure success; and

3. Under a performance-based contract, performance measures and metrics will be used extensively to monitor contractor performance.

The following constraints comprise the statutory, regulatory, policy and operational considerations that will impact the contractor. The contractor is expected to become familiar with all constraints affecting the work

43

GEO-TCC 005782

GEO-State 036867

**Exhibit 13, Page 2 of 9**

GEO_000104

HSCEDM-15-D-00015

to be performed. These constraints may change over time; the contractor is expected to be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints. Constraints include, but are not limited to:

a) Memoranda of Understanding between ICE and individual law enforcement jurisdictions that may apply

b) Department of Homeland Security Management Directive (MD) 11042.1 - Safeguarding Sensitive but Unclassified (For Official Use Only) Information

c) Department of Homeland Security Instruction Handbook 121-01-007, The Department of Homeland Security Personnel and Suitability Program

d) Other applicable Executive Orders and Management Directives

e) Post Orders

f) General Directives

g) American Correctional Association (ACA) Standards for Adult Detention Facilities (most current edition) and the most recent copy of the supplement issued every two years. A copy is obtainable for purchase through the Internet website http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/Purch ase/ACA_Member/Standards_and_Accreditation/Standards_Books___Merchandise.aspx?hkey=9a fcadb3-623d-4933-825d-32458db12f83

h) ICE/ DHS Officer's Handbook (current and future editions, as issued)

i) A Guide to Proper Conduct and Relationships with Aliens and the General Public

j) The ICE/DHS Performance Base Detention Standards – A copy is obtainable on the ICE Internet website

k) All rules and regulations governing usage of firearms, public buildings and grounds

l) All regulations provided to the Contractor through the COR

m) The Patriot Act of 2001

n) The Illegal Immigration Reform and Immigrant Responsibility Act (IIAIRA), P. L. 104-208

o) Federal Acquisition Regulations (FAR) and Department of Homeland Security Acquisition Regulations (HSAR)

p) Applicable federal, state facility codes, rules, regulations and policies

q) Applicable federal, state and local labor laws and codes

r) Applicable federal, state and local firearm laws, regulations and codes

s) Alignment with external sources (e.g. state and local law enforcement organizations)

t) Pre-clearance approvals are required for access to ICE field staff, facilities and information

u) Pre-employment suitability clearance is required for contract employees before any access is granted to ICE field staff, facilities and information

v) All applicable environmental requirements, including Executive Orders and Management Directives

w) Existing lease agreements

x) DHS Non-Disclosure Agreement Requirements

y) Organizational Conflict of Interest Provisions

Accomplishments of some ACA standards are augmented by DHS/ICE policy and/or procedure. In these instances, the PWS identifies and provides direction for the enhanced requirements. In cases where other standards conflict with DHS/ICE policy or standards, DHS/ICE policy and standards prevail.

GEO-TCC 005783

GEO-State 036868

**Exhibit 13, Page 3 of 9**
GEO_000105

HSCEDM-15-D-00015

90. <u>PERFORMANCE WORK STATEMENT (PWS)</u>:  That portion of the contract, which describes the services to be performed under the contract.

91. <u>STRIP SEARCH</u>:  An examination of a detainee's naked body for weapons, contraband, and physical abnormalities.  This also includes a thorough search of all of the individual's clothing while not being worn.

92. <u>SUITABILITY CHECK</u>:  Security clearance process for Contractor and all Contractor Employees to determine favorable suitability to work on a Government contract.

93. <u>TOUR OF DUTY</u>:  No more than 12 hours in any 24-hour period with a minimum of eight hours off between shifts, except as directed by state or local law.

94. <u>TRAINING</u>:  An organized, planned, and evaluated activity designed to achieve specific learning objectives.  Training may occur on site, at an academy of training center, at an institution of higher learning, through contract service, at professional meetings or through closely supervised on-the-job training.  Meetings of professional associations are considered training when there is clear evidence of the above elements.  All trainers must be certified and certification shall be approved by the COR or ICE-designated employee.

95. <u>TRANSPORTATION COSTS</u>:  All materials, equipment and labor necessary to respond to requests by designated officials for secure movement of detainees from place to place necessary for processing, hearings, interviews, etc.

96. <u>TRANSPORTATION SERVICE COST</u>:  An all-inclusive or burdened rate.  Cost includes but is not limited to labor, equipment, material, supplies, and other related costs necessary to respond to requests by designated officials for movement of detainees from place to place necessary for processing, court hearings, interviews, doctor's appointments, ICE Air/airports, and transporting in-between detention facilities (counties, state and federal).

97. <u>TRAVEL COST</u>:  Cost inclusive of lodging and meals and incidental expenses (MI&E) for Transportation Officers exceeding the standard working hours. Cost is based on actual charges per occurrence, not to exceed the allowable Federal Travel Regulation rates/costs in effect on the dates of travel.

98. <u>WEAPONS</u>:  This includes but is not limited to firearms, ammunition, knives, slappers, billy clubs, electronic defense modules, chemical weapons (mace), and nightsticks.

**Ambiguities**
All services must comply with the Performance Work Statement (PWS) and all applicable federal, state, and local laws and standards.  Should a conflict exist between any of these standards, the most stringent shall apply.  If the Contractor is unable to determine which standard is more stringent, the Contracting Officer (CO) shall determine the appropriate standard.

The COR does not have authority to modify the stated terms of the contract, or to approve any action that would result in additional charges to the Government.  The CO will make all modifications in writing.

**G.  Hold Harmless**
The Contractor shall protect, defend, indemnify, save, and hold harmless the United States Government and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgments and liability arising out of, or in connection with, any negligent acts or omissions of the Contractor, its agents, sub-contractors, employees, assignees, or anyone for whom the Contractor may be responsible.  The Contractor shall also be liable for any and all costs, expenses and attorney's fees incurred as a result of any such claim, demand, cause of action, judgment or liability, including those costs, expenses, and attorneys' fees incurred by the United States Government and its employees or agents.  The Contractor's liability shall not be limited by any provision or limits of insurance set forth in the resulting contract.

In awarding the contract, the Government does not assume any liability to third parties, nor will the Government reimburse the Contractor for its liabilities to third parties, with respect to loss due to death,

GEO-TCC 005791

GEO-State 036876

**Exhibit 13, Page 4 of 9**

GEO_000106

HSCEDM-15-D-00015

significant environmental problems that impact the facility operations; transportation accidents (e.g., airlift, bus) resulting in injuries, death or property damage; and sexual assaults.

Pursuant to ICE instructions, the Contractor shall counteract civil disturbances, attempts to commit espionage or sabotage, and other acts that adversely affect the normal site conditions, the security and safety of personnel, property, detainees, and the general public.

### K.  Maintain Institutional Emergency Readiness
The Contractor shall submit an institutional emergency plan that will be operational prior to issuance of the Notice to Proceed, per the ICE PBNDS on Emergency Plans. The plan shall receive the concurrence of the COR prior to implementation and shall not be modified without the further written concurrence of the CO.

The Contractor shall have written agreements with appropriate state and local authorities that will allow the Contractor to make requests for assistance in the event of any emergency incident that would adversely affect the community.

Likewise, the Contractor shall have in place, an internal corporate nation-wide staff contingency plan consisting of employees who possess the same expertise and skills required of staff working directly on this contract. At the discretion of ICE, these employees would be required to respond to an institutional emergency at the contracted facility if deemed necessary.

The emergency plans shall include provisions for two or more disturbance control teams. Protective clothing and equipment for each team member and 30 percent of all additional facility staff members shall be provided by the Contractor, and maintained in a secure location outside the secure perimeter of the facility.

Any decision by ICE or other federal agencies to provide and/or direct emergency assistance will be at the discretion of the Government. The Contractor shall reimburse the Government for any and all expenses incurred in providing such assistance.

Attempts to apprehend any escapee(s) shall be in accordance with the Emergency Plan, which shall comply with ICE PBNDS regarding Emergency Plans.

The Contractor shall submit to the COR a proposed inventory of intervention equipment (e.g., weapons, munitions, chemical agents) intended for use during performance of this contract. In accordance with ICE policy, the use of electro-muscular disruption (EMD) devices is prohibited. The COR, prior to issuance of the NTP, shall provide concurrence of the intervention equipment. The approved intervention equipment inventory shall not be modified without prior written concurrence of the CO.

The Contractor shall obtain the appropriate authority from state or local law enforcement agencies to use force as necessary to maintain the security of the facility. The use of force by the Contractor shall at all times be consistent with all applicable policies of ICE PBNDS on Use of Force.

### L.  Manage Computer Equipment and Services in Accordance with all Operational Security Requirements
The Contractor shall comply with all federal security and privacy laws and regulations established to protect federal systems and data. The Contractor shall inform all personnel of the confidential nature of ICE detainee information.

The Contractor shall restrict access of data information pertaining to ICE detainees to authorized employees with appropriate clearance who require this information in the course of their official duties.

In accordance with the *Freedom of Information/Privacy Act* (FOIA/PA), the Contractor may not disclose information obtained pertaining to ICE detainees to a third party without written permission from the COR.

The Contractor shall develop a procedural system to identify and record unauthorized access, or attempts to access ICE detainee information. The Contractor shall notify the COR or ICE-designated employee within four hours of a security incident.

77

**Exhibit 13, Page 5 of 9**

HSCEDM-15-D-00015

The Contractor shall submit a monthly injury report summary containing, but not limited to, name, time/date, location, circumstances, care rendered, current status, Worker's Compensation status, and reference to identification of initial report.

**V.  Protection of Employees**
The Contractor shall develop plans that comply with ICE comprehensive plans and procedures to safeguard employees against exposure of blood borne pathogens.  The ICE plan is based upon OSHA standards found in the Employee Occupational Safety and Health (EOSH) Manual.

**W.  Medical Requests**
The Contractor shall adhere to ICE policies and procedures regarding detainee medical requests.  If a detainee requires immediate medical attention, the officer shall immediately notify IHSC staff via telephone.  The Contractor's Supervisor will, in turn, notify the medical provider as well as the COR or ICE-designated employee.

**X.  Emergency Medical Evacuation**
The Contractor shall develop and implement written policies and procedures that define emergency health care evacuation of detainees from within the facility.

**Y.  Sanitation and Hygienic Living Conditions**
The Contractor shall comply with the requirements of the Occupational Safety and Health Act of 1970 and all codes and regulations associated with 29 CFR 1910 and 1926.  The Contractor shall comply with all applicable ICE, federal, state and local laws, statutes, regulations, and codes.  In the event there is more than one reference to a safety, health, or environment requirement in an applicable, law, standard, code, regulation, or ICE policy, the most stringent requirement shall apply.

## VIII.  DETAINEE RIGHTS, RULES, DISCIPLINE, AND PRIVILEGES
The Contractor shall supervise, observe, and protect detainees from personal abuse, discrimination, corporal punishment, personal injury, property damage, harassment, or violation of detainee's civil rights. Contract personnel shall adhere to ICE policies and procedures, and the PBNDS.

In accordance with ICE PBNDS, the Contractor shall permit detainees to:  access the law library, legal materials, facilities, and equipment; have document copy privileges; and have the opportunity to prepare legal documents.

## IX.  MANAGE A DETAINEE WORK PROGRAM
Detainee labor shall be used in accordance with the detainee work plan developed by the Contractor, and will adhere to the ICE PBNDS on Voluntary Work Program.  The detainee work plan must be voluntary, and may include work or program assignments for industrial, maintenance, custodial, service, or other jobs. The detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations.

Detainees shall not be used to perform the responsibilities or duties of an employee of the Contractor. Detainees shall not be used to perform work in areas where sensitive documents are maintained (designated ICE workspace).  Custodial/janitorial services to be performed in designated ICE work space will be the responsibility of the Contractor.

Appropriate safety/protective clothing and equipment shall be provided to detainee workers.  Detainees shall not be assigned work that is considered hazardous or dangerous.  This includes, but is not limited to, areas or assignments requiring great heights, extreme temperatures, use of toxic substances, and unusual physical demands.

The Contractor shall supply sufficient officers to monitor and control detainee work details.  Unless approved by the COR, these work details must be within the security perimeter.

It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level.  All detainees shall be searched when they are returned from work details.

GEO-TCC 005821

GEO-State 036906

**Exhibit 13, Page 6 of 9**

GEO_000108

HSCEDM-15-D-00015

**B.  Manage Multi-Denominational Religious Services Program**
The Contractor shall ensure detainees of different religious beliefs will be provided reasonable and equitable opportunity to practice their respective faiths.  The religious services program shall comply with all elements of the ICE PBNDS on Religious Practices.  The Contractor shall provide a full-time FTE non-denominational chaplain.

**C.  Provide for a Detainee Recreation Program**
The Contractor shall develop adequate and meaningful recreation programs for detainees at the facility. The Contractor shall ensure that sufficient officers are assigned to supervise all recreation activities.  The detainee recreation program will comply with all elements of the ICE PBNDS on Recreation.

**D.  Manage and Maintain a Commissary**
A commissary shall be operated by the Contractor as a privilege to detainees who will have the opportunity to purchase from the commissary at least once per week.  These items will not include those items prohibited by the Warden/Facility Director.  All items available at the commissary must be approved by the COR.  The commissary inventory shall be provided to the COR upon request.  Notice of any price increases must be provided to the COR.  The Contractor may assess sales tax to the price of items, if state sales tax is applicable.

Revenues shall be maintained in a separate account and not commingled with any other funds.  If funds are placed in an interest bearing account, the interest earned shall be credited to the detainees.  Any expenditure of funds from the account shall only be made with the approval of the CO.  Any revenues earned in excess of those needed for commissary operations shall be used solely to benefit detainees at the facility.

At the end of the contract period, or as directed by the CO, a check for any balance remaining in this account shall be made payable to the Treasury General Trust Fund and given/transmitted to the CO.

Detainees are permitted to receive funds from outside sources (i.e., from family, friends, bank accounts). Outside funds or those generated from work may be used to pay for products and services from the commissary.

**E.  Manage and Maintain a Detainee Telephone System**
The Contractor shall provide detainees with reasonable and equitable access to telephones as specified in ICE PBNDS on Telephone Access.  Telephones shall be located in an area that provides for a reasonable degree of privacy and a minimal amount of environmental noise during phone calls.

If authorized to do so under applicable law, the Contractor shall monitor and record detainee conversations. If detainee telephone conversations can be monitored under applicable law, the Contractor shall provide notice to detainees of the potential for monitoring.  However, the Contractor shall also provide procedures at the facility for detainees to be able to place unmonitored telephone calls to their attorneys.

Telephone rates shall not exceed the dominant carrier tariff rate and shall conform to all applicable federal, state, and local telephone regulations.

The ICE designated Detainee Telephone Services (DTS) vendor will be the exclusive provider of detainee telephones for this facility.  The DTS contractor shall be allowed to install vending debit machines and shall receive 100 percent of all revenues collected by sale of prepaid debit services.  The DTS provider shall be responsible for furnishing all inventory and supply of prepaid debit cards to the Contractor.  The DTS provider shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of DTS, and the maintenance and operation of the system. The Contractor shall not be entitled to any commissions, fees, or revenues generated by the use of the DTS or the detainee telephones.

Telephones should be inspected for serviceability, in accordance with ICE policies and procedures.  The Contractor shall notify the COR or ICE-designated employee of any inoperable telephones.

**F.  Provide for the Special Needs of the Female Detainee Population**
The Contractor shall provide programs and services to meet the special needs of the female detainee population, including the provision of feminine hygiene products for the female detainee population.

GEO-TCC 005823

GEO-State 036908

**Exhibit 13, Page 7 of 9**
GEO_000109

HSCEDM-15-D-00015

**G.  Law Library**
The Contractor shall provide secure space within the secure perimeter, either a dedicated room or a multipurpose room for books and materials to provide a reading area – "Law Library" – in accordance with the ICE PBNDS on Law Libraries and Legal Material.

**H.  Physical Plant**
The facility operation and maintenance shall ensure that detainees are housed in a safe, secure, and humane manner.  All equipment, supplies, and services shall be Contractor-furnished except as otherwise noted.

The facility, whether new construction expansion or an existing physical plant, shall be designed, constructed, operated, and maintained in accordance with all applicable federal, state, and local laws, regulations, codes, guidelines, and policies.  In the event of a conflict between federal, state, or local codes, regulations or requirements, the most stringent shall apply.  In the event there is more than one reference to a safety, health, or environmental requirement in an applicable law, standard, code, regulation or Government policy, the most stringent requirement shall apply.

The facility shall provide housing configurations commensurate with the security needs of the population.

The facility, whether new construction expansion or existing physical plant, shall comply with 40 U.S.C. 619, which stipulates compliance with nationally recognized codes and comply with the latest edition in effect on the date of proposal submission of one of the following codes:

1.  The Uniform Building Code (UBC), with the State of facility location's Amendments

2.  The Building Officials and Code Administrators (BOCA) National Building Code (NBC)

3.  The Standard Building Code (SBC)

In the event the jurisdiction in which the facility is located does not mandate use of UBC, BOCA NBC or SBC, then the facility shall comply with the BOCA NBC.  Whether the facility is new construction or an expansion of an existing physical plant fire protection and life safety issues shall be governed by the latest edition of the National Fire Protection Association (NFPA) 101 Code for Safety to Life from Fire in Buildings and Structures and applicable National Fire Codes (NFC).  Should conflicts occur between NBC and NFC, NFC shall apply.

E.O. 12699, as amended by E.O. 13286 - Whether new construction expansion or existing physical plant, the facility shall comply with the Seismic Safety of Federal and Federally Assisted or Regulated New Building Construction.  The seismic safety requirements as set forth in either the 1991 International Conference of Building Officials, the UBC, the 1992 BOCA, NBC (or the 1992 Amendments to the Southern Building Code Congress) or SBC are the minimum standards.  Should the code applicable for the state in which the facility is located be more stringent than the other codes set forth herein; the state code shall prevails.

The facility, whether new construction expansion or existing physical plant, shall comply with the requirements of the *Architectural Barriers Act of 1968* as amended and the *Rehabilitation Act of 1973* as amended.  The standards for facility accessibility by physically handicapped persons as set forth in "Uniform Federal Accessibility Standards/Fed Std. - 795 4/01/88 Edition" (UFAS) shall apply.  All areas of the buildings and site shall meet these requirements.

Activities, which are implemented in whole or in part with federal funds, must comply with applicable legislation and regulations established to protect the human or physical environment and to ensure public opportunity for review.  The Contractor shall remain in compliance with federal statutes during performance of the contract including, but not limited to, the following Acts: *Clean Air, Clean Water, Endangered Species, Resources Conservation and Recovery*; and other applicable laws, regulations and requirements.  The Contractor shall also comply with all applicable limitations and mitigation identified in any Environmental Assessment or Environmental Impact Statement prepared in conjunction with the contract pursuant to the *National Environmental Policy Act*, 42 U.S.C. 4321.

The Contractor shall be responsible for and shall indemnify and hold the Government harmless for any and all spills, releases, emission, disposal and discharges of any toxic or hazardous substance, any pollutant, or any waste, whether sudden or gradual, caused by or arising under the performance of the contract or any

GEO-TCC 005824

GEO-State 036909

**Exhibit 13, Page 8 of 9**

GEO_000110

HSCEDM-15-D-00015

substance, material, equipment, or facility utilized. For the purposes of any environmental statute or regulation, the Contractor shall be considered the "owner and operator" for any facility utilized in the performance of the contract, and shall indemnify and hold the Government harmless for the failure to adhere to any applicable law or regulation established to protect the human or physical environment. The Contractor shall be responsible in the same manner as above regardless of whether activities leading to or causing a spill, release, emission or discharge are performed by the Contractor, its agent or designee, a detainee, visitors, or any third party.

If a spill(s) or release(s) of any substance into the environment occur, the Contractor shall immediately report the incident to the COR or ICE designated official. The liability for the spill or release of such substances rests solely with the Contractor and its agent.

A safety program shall be maintained in compliance with all applicable Federal, state and local laws, statutes, regulations and codes. The Contractor shall comply with the requirements of the *Occupational Safety and Health Act of 1970* and all codes and regulations associated with 29 CFR 1910 and 1926.

Fire Alarm Systems and Equipment - All fire detection, communication, alarm, annunciation, suppression and related equipment shall be operated, inspected, maintained and tested in accordance with the most current edition of the applicable NEC and Life Safety Codes.

The Contractor shall provide outside lighting sufficient to illuminate the entire facility and secure perimeter with at least 1.5 candlepower per square foot in all areas.

For new construction expansion or existing physical plant, final and completed, the Contractor prior to issuance of the NTP shall submit design/construction documents to the COR. For all new construction expansion, the construction schedule shall be updated to reflect current progress and submitted to the COR on a monthly basis. Government staff will make periodic visits during construction to verify Contractor progress and compliance with contract requirements. As-built drawings and current drawings of the buildings and site utilities shall be maintained in a secure location during construction and contract performance. These updates shall be provided to the COR within 30 days of any changes made. Site utilities include, but are not limited to: water and sewer lines; gas lines; tunnels; steam lines; chilled water lines; recording layouts; elevations; modifications; additions; etc. Two copies of the as-built drawings shall be provided to the COR in AUTOCAD release 14.0 on a CD-ROM no later than 90 days after issuance of the NTP.

Promptly after the occurrence of any physical damage to the facility (including disturbances), the Contractor shall report such damage to the COR or ICE designated official. It shall be the responsibility of the Contractor to repair such damage, to rebuild or restore the institution.

A number of Government staff will be on-site to monitor contract performance and manage other Government interests associated with operation of the facility. Government staff will have full access to all areas of the facility. Contractor access to Government required space must be pre-approved by the COR. In cases of emergency the Contractor shall notify the COR or ICE designated employee promptly.

The Contractor shall provide operational space for ICE, Office of Principal Legal Advisor (OPLA), and Executive Office for Immigration Review (EOIR) operations. All office and multiple use space shall be complete with appropriate electrical, communication, and phone connections.

1. **ICE Support Space**
   Refer to ICE Design Standards for specific office and workstation sizes and specific furnishing requirements for 1,575 beds. The Standards include but are not limited to the following:

   A total of 44 offices and 55 workstations as outlined below:

   - 1 Office - Assistant Field Office Director
   - 1 Office - Intelligence Officer
   - 1 Office – Detention Services Manager
   - 1 Office - Contracting Officer's Representative
   - 4 Offices - Supervisory Detention and Deportation Officers

GEO-TCC 005825

GEO-State 036910

**Exhibit 13, Page 9 of 9**
GEO_000111

*Office of Acquisition Management*
**U.S. Department of Homeland Security**
801 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

October 28, 2021

<u>Via Electronic Mail Only</u>

The GEO Group, Inc.
Amber D. Martin
Executive Vice President
4955 Technology Way
Boca Raton, FL 33431

Re:  UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA, individually and
on behalf of all those similarly situated ("Plaintiffs") v. THE GEO GROUP, INC., a Florida corporation
("GEO") (Case No. 3:17-cv-05769-RJB):

Dear Ms. Martin:

Thank you for your  letter dated October 27, 2021, requesting U.S. Immigration and Customs
Enforcement (ICE) suspend the Voluntary Work Program (VWP) at the Northwest ICE Processing
Center (NWIPC) pending the outcome of the appeal The GEO Group intends to file with the Ninth
Circuit Court of Appeals.

ICE has considered the request and determined to approve the immediate suspension of the VWP
program at NWIPC until the matter is resolved.

Should you have questions, please feel free to contact me at (949) 943-7166 or by email at
natasha.t.nguyen@ice.dhs.gov.

Thank you,

NATASHA T
NGUYEN

Digitally signed by
NATASHA T NGUYEN
Date: 2021.10.28
10:13:47 -07'00'

Natasha Nguyen
Contracting Officer

1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

9   STATE OF WASHINGTON,                    NO. 3:24-cv-05029
    DEPARTMENT OF HEALTH,
10
                              Plaintiff,     DECLARATION OF AMANDA
11                                           SOLEIL MARIA MUÑIZ
            v.
12
    THE GEO GROUP, INC.,
13
                              Defendant.
14

15      I, AMANDA SOLEIL MARIA MUÑIZ, hereby declare the following:

16      1.      I am over the age of 18, competent to testify as to the matters herein, and make this

17  declaration based on my personal knowledge. My legal name is AMANDA SOLEIL MARIA

18  MUÑIZ but I go by Soleil in my work.

19      2.      I am the Federal Complaint Enforcement Lead for the state of Washington

20  Department of Health (DOH or the Department) Office of the Assistant Secretary (OAS), which

21  is part of DOH's Environmental Public Health Program, where I have worked since August

22  2023. I have a Master's Degree in International Policy Studies, Human Security and

23  Development from the Middlebury Institute of International Studies at Monterey.

24      3.      I work with others to implement House Bill 1470, which sets minimum standards

25  for private detention facilities, and am the project manager that takes and investigates complaints

26  or concerns from the public or any persons detained at a private detention facility in Washington

DECLARATION OF AMANDA SOLEIL                 1           ATTORNEY GENERAL OF WASHINGTON
MARIA MUÑIZ                                                     Agriculture & Health Division
                                                                  7141 Cleanwater Drive SW
                                                                       PO Box 40109
                                                                   Olympia, WA 98504-0109
                                                                       (360) 586-6500

**Exhibit 15, Page 1 of 6**
GEO_000113

1    State. I assist in planning and implementing the complaint resolution team, determining

2    processes for complaints, assisting with rulemaking, seeking out opportunities for collaboration,

3    and carrying out investigations. I am part of the enforcement staff that DOH has hired for this

4    new project.

5          4.      HB 1470 emphasizes transparency with complaint findings. This will eventually

6    include posting complaint data trends and inspection results on a DOH website accessible to the

7    public. HB 1470 has been codified as RCW 70.395. It requires the Department to conduct routine

8    unannounced inspections and to investigate complaints at private detention facilities; the Northwest

9    ICE Processing Center is such a facility operated by The Geo Group, Inc.

10         5.      As part of my work to implement HB 1470 and RCW 70.395, I have received

11   complaints from detainees at the Northwest ICE Processing Center.

12         6.      The complaint resolution team has received 277 complaints from detainees inside

13   the Northwest ICE Processing Center from April 2023 through the last week of December 2023.

14   The complaints are generally about lack of attention to medical needs, contaminated food,

15   insufficient food, dirty clothes and bedding, mistreatment of detainees, and hunger strikes.

16         7.      Detainees have complained about lack of attention to medical needs. Medical

17   concerns reported include stroke, paralysis, heart conditions, internal bleeding, and asthma;

18   detainees say these complaints were not addressed by the GEO Group. One detainee asked to be

19   taken to the hospital, but was refused, another broke their arm and was given only Ibuprofen for

20   the pain and it took several days before the arm was placed in a cast.

21         8.      Detainees have complained that the food provided to them has contained foreign

22   objects including burned plastic, metal string, rope, and splinters. The food is of low-quality and

23   is typically soy-based meat substitutes made into tacos or served over pasta. A detainee on a

24   medically-prescribed diet to include fruits and vegetables was refused such a diet. Detainees

25   report the food tastes bad, smells bad, makes their stomach hurt, and they do not receive enough

26   to eat.

DECLARATION OF AMANDA SOLEIL                 2                ATTORNEY GENERAL OF WASHINGTON
MARIA MUÑIZ                                                        Agriculture & Health Division
                                                                     7141 Cleanwater Drive SW
                                                                          PO Box 40109
                                                                      Olympia, WA 98504-0109
                                                                          (360) 586-6500

9.      Detainees have complained they are unable to care for basic personal hygiene needs. They report their clothing, sheets, and blankets are rarely changed or laundered, and when laundered, are returned wet and dirtier than before. Clothing is not replaced; detainees have one change of clothes, and often that change of clothes has been previously worn by previous detainees and not washed in between. Sheets caused itching. A detainee with mental health issues had soiled their clothing but was refused clean clothing by one of the guards.

10.     Detainees have complained the facility is unsanitary; bathrooms are rarely cleaned, and the toilets are often blocked, floors go unswept, and the facility smells like a dirty bathroom.

11.     Detainees have also reported that solitary confinement is misused and they are being retaliated against by facility guards. A detainee was held in the medical unit in isolation for two weeks as punishment for failing to answer questions from the guards. Detainees have also reported guards retaliate against those who complain about conditions by making loud noises at night so that detainees cannot sleep.

12.     Due to the above-mentioned allegations of health and safety violations from the people detained there I have visited the facility on four separate occasions, including attempts at entering in order to conduct investigations as the Department is required to do by RCW 70.395.

13.     On November 14, 2023, I went with my supervisor Miko Nanto. We arrived at the front desk at 10:22 a.m. There was confusion at first as the front desk staff person thought we were the Tacoma-Pierce County Health Department and they started to process us to enter until Miko clarified we were with the Washington State Department of Health and not there as the health department for the kitchen. They were unaware of HB 1470 and did not seem to know anything about DOH coming to enter the facility based upon complaints.

14.     The front desk staff person then called a few people and a person named Mr. Scott came down and asked who we were and what we needed. Miko spoke to him and let him know we were at the facility due to the passing of HB 1470 that allows DOH to conduct investigations

DECLARATION OF AMANDA SOLEIL
MARIA MUÑIZ

3

ATTORNEY GENERAL OF WASHINGTON
Agriculture & Health Division
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-6500

and inspections regarding health and safety complaints. He then left. He came back and told us that due to active litigation we were not allowed to enter. Miko politely asked him if he was refusing entry and he agreed. We thanked him, and the front desk, and promptly left the building. We left at 10:33 a.m.

15.     The second attempted entry was November 27, 2023. Lauren Jenks, Miko Nanto, and I all went to the Detention Center and arrived at 10:24 am. A different guard greeted us and again mistook us for the Tacoma Pierce County Health Department, so Miko again clarified that we were with the Washington State Department of Health and were there to investigate complaints. Once again there seemed to be no knowledge of HB1470 and DOH investigating complaints. We asked to speak with Mr. Scott. He came and we all introduced ourselves, Lauren provided her business card. He asked what our visit was regarding, and Miko said to investigate complaints and he asked what kind/type of complaints we received. Miko told him that laundry services and health care were some of the topics. He then said they were not used to DOH coming to their facility and I talked a little about the passing of HB 1470. He said these types of inspections hadn't happened in previous years, and I explained that HB1470 was just recently passed this year and he said he needed to go upstairs and speak with the ICE representatives.

16.     He returned at 10:41 am and let us know we were being denied entry after discussing with the ICE representatives due to the ongoing litigation. Lauren asked for his business card, which he provided, and we thanked him and promptly left.

17.     The third time I visited the facility, was on December 21, 2024. Miko Nanto and I went to the NWIPC around 10 am to meet with Mr. Scott. He came down and met us while Miko provided him with brochures we have created for anyone who would like to file a complaint in both English and Spanish. Miko asked if we could drop them off with him. He stated that he would give them to ICE. We also provided him with information on how to get involved with our current rulemaking and let him know that both Geo Group and ICE could be as involved as they would like.

DECLARATION OF AMANDA SOLEIL
MARIA MUÑIZ

4

ATTORNEY GENERAL OF WASHINGTON
Agriculture & Health Division
7141 Cleanwater Drive SW
PO Box 40109
Olympia, WA 98504-0109
(360) 586-6500

**Exhibit 15, Page 4 of 6**
GEO_000116

1  18.      Miko let him know for full transparency we had been receiving complaints from

2  an individual who is deaf and claiming that his ADA rights were not being adhered to, so we

3  have sent his complaints to the Office of Immigration Detention Ombudsman and Health and

4  Human Services Office of Civil Rights. We also mentioned that we were receiving complaints

5  regarding the women's pods not being able to receive clean undergarments and allegations they

6  were unclean or used. Miko also let him know we were not sure if he was aware of this and

7  wanted to make sure he knew. Miko did let him know we were only there for informational

8  purposes that day and not trying to enter the facility.

9  19.      We both thanked him for his time and left.

10  20.      The fourth visit was with my colleague Kaye Eckmann on January 16, 2024.

11  21.      I chatted and laughed with a guard outside as we were passing and getting ready

12  to enter the building. Kaye and I entered the facility at approximately 10:15 AM. I told the guard

13  at the desk that we were from the DOH and asked if Mr. Scott was there and available to talk.

14  The guard allowed Kaye to enter through the metal detector and into the lobby so that she could

15  use the restroom located there while he was on the phone locating Mr. Scott. The guard who had

16  been outside came in and took position behind the desk, so we continued chatting- mostly about

17  his ability to withstand the cold given that he was in his shirtsleeves even though it was freezing

18  outside. Once Kaye came out of the restroom, we both sat in the lobby area and waited.

19  22.      Mr. Scott came to the lobby area with a person named Jeff, who was the Assistant

20  Field Manager. I asked whether there was some kind of security clearance or background check

21  we needed to undergo in order to enter the facility. Jeff said there is a criminal check done by

22  GEO. Jeff said that when the time comes that we can go in, GEO will give us an email address

23  where we will be able to send basic biometrics information and they will run the criminal check,

24  which takes about two weeks. Kaye asked for clarification on how to submit the necessary

25  information for these background checks, and asked which email address we should send the

26

DECLARATION OF AMANDA SOLEIL          5          ATTORNEY GENERAL OF WASHINGTON
MARIA MUÑIZ                                        Agriculture & Health Division
                                                   7141 Cleanwater Drive SW
                                                   PO Box 40109
                                                   Olympia, WA 98504-0109
                                                   (360) 586-6500

**Exhibit 15, Page 5 of 6**

GEO_000117

1   information to Jeff once again repeated that we would be given the email address once the time

2   came when we would be allowed to enter.

3          23.     I told Jeff and Mr. Scott there were complaints about the windows being painted

4   over and not allowing natural light into the area where detainees are held. I thought Jeff looked

5   confused when I mentioned the windows. I would characterize Mr. Scott as stoic during this

6   conversation.

7          24.     We left the facility at about 10:28. We were polite and respectful the entire time

8   we were at the facility.

9          22.     We have not been able to enter the facility to investigate the complaints about

10  violations of RCW 70.395 we have received from detainees.

11         23.     It is impossible for me to conduct thorough investigations, and do the job I was

12  hired to do, if we are not allowed to enter. I am concerned for the health and safety of detainees

13  as I believe there are violations of RCW 70.395 actively occurring.

14         I declare under the penalty of perjury under the laws of the United States and the State of

15  Washington that the foregoing is true and correct.

16         SIGNED this 18th day of January 2024, at Tumwater, Washington.

17

18

19                                         *Soleil Muñiz*
                                           _____
20                                         SOLEIL MUÑIZ
                                           Federal Complaint Enforcement Lead
21                                         Washington State Department of Health

22

23

24

25

26

DECLARATION OF AMANDA SOLEIL                          6          ATTORNEY GENERAL OF WASHINGTON
MARIA MUÑIZ                                                          Agriculture & Health Division
                                                                      7141 Cleanwater Drive SW
                                                                          PO Box 40109
                                                                      Olympia, WA 98504-0109
                                                                          (360) 586-6500

**Exhibit 15, Page 6 of 6**

1
2
3
4
5
6
7
8

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

9  DEPARTMENT OF LABOR AND
INDUSTRIES,

10                                    Plaintiff,

11  v.

12  GEO SECURE SERVICES, LLC,

13                                    Defendant.

14

NO. 24-2-05626-8

DECLARATION OF ELLIOTT
FURST

15      I, Elliott Furst, declare under the penalty of perjury under the laws of the United

16  States that the following is true and correct.

17    1.  I am over the age of eighteen and am otherwise competent to testify. I make these

18        statements on personal knowledge and belief.

19    2.  I represent the Department of Labor and Industries and am familiar with this matter.

20    3.  I learned that GEO Services, Inc. had filed a motion to quash the Department of Labor

21        and Industries' warrant for GEO's workplace at the Northwest ICE Processing Center.

22    4.  No declaration from United States Immigrations and Customs Enforcement (ICE) was

23        filed with the motion.

24    5.  I communicated with GEO's attorney, Harry Korrell, about the motion to quash; and I

25        requested GEO hold off in seeking to prosecute its motion to quash pending further

26        review by L&I. He agreed.

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000119

6.  An issue has come up with the lack of the docket number, as explained in the Declaration of Eric Smith.  I explained the problem to Mr. Korrell. It is my understanding that the clerk believed only a warrant number was needed to file the warrant, and the judicial assistant for the Presiding Judge indicated a docket number was needed.

Dated this 29th day of January 2024, in Seattle, WA by

Elliott Furst, WSBA No. 12026

DECLARATION OF ELLIOTT FURST

2

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7740

GEO_000120

1
2
3
4
5
6
7

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

8

9   DEPARTMENT OF LABOR AND
    INDUSTRIES OF THE STATE OF
10  WASHINGTON,

11                          Plaintiff,

12      v.

13  GEO SECURE SERVICES LLC,

14                          Defendant.

NO. 24-2-05626-8

DECLARATION OF CRAIG
BLACKWOOD

15      I, Craig Blackwood, declare under the penalty of perjury under the laws of the United
16  States that the following is true and correct.

17      1.  I am over the age of eighteen and am otherwise competent to testify. I make these
18          statements on personal knowledge and belief.

19      2.  I am the Assistant Director for the Division of Occupational Safety and Health (DOSH)
20          of the Washington State Department of Labor and Industries (L&I). DOSH is the
21          division responsible for implementing the Washington Industrial Safety and Health Act
22          (WISHA), RCW 49.17.

23      3.  I have worked for DOSH over 32 years, beginning in September 1991. I was appointed
24          as Deputy Assistant Director for DOSH in December 2014 and was appointed as
25          Acting Assistant Director in January 2021. In January of 2022 I was appointed as the
26

DECLARATION OF CRAIG                           1
BLACKWOOD

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7740

GEO_000121

1   permanent Assistant Director. In this capacity, I am the State of Washington Supervisor

2   of Industrial Safety and Health as defined under RCW 43.22.040 and oversee the

3   development, implementation, and enforcement of the occupational safety and health

4   laws and rules applicable to approximately 300,000 public and private sector

5   workplaces in Washington State. I also oversee L&I's DOSH consultation, risk

6   management, and outreach programs. I am responsible for all L&I DOSH operations

7   relating to the prevention of work-related fatalities, injuries, and illnesses for non-

8   federal Washington workplaces. As Deputy Assistant Director, my responsibilities

9   were nearly identical as I was delegated joint decision-making authority on ~~virtually~~ all

10  DOSH-related matters.

11  4.  I supervise approximately 400 technical professionals and support staff, including those

12      who perform workplace safety and health investigations in alignment with the federal

13      and state occupational safety and health statutes. I am familiar with jobsites across the

14      State of Washington and the types of hazards workers encounter.

15  5.  I am an occupational health professional (industrial hygienist) and a public safety and

16      health officer with over 36 years of experience visiting workplaces, evaluating job-

17      related hazards, conducting inspections, and developing occupational health training for

18      employers and workers. My experience includes creating and reviewing workplace

19      safety and health standards and policies in the industrial hygiene field, including those

20      relating to chemicals, hazardous materials and pesticides, respiratory protection

21      practices, confined spaces, and workplace noise. As-Assistant Director I am responsible

22      for all decisions concerning the policies and resource deployment necessary to fulfill

23      DOSH's mission of preventing workplace related fatalities, injuries, and illnesses.

24  6.  I graduated from California State University at Northridge in 1986 with a Bachelor of

25      Science Degree in Occupational & Environmental Safety and Health.

26

DECLARATION OF CRAIG
BLACKWOOD

2

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7740

GEO_000122

7. There are approximately 300,000 employers in Washington. DOSH inspects almost 5000 workplaces a year and issues citations under both the General Duty Clause and specific regulations each year. DOSH issues citations to noncompliant employers. Workplace injuries and illnesses cause physical and economic hardship for workers, they burden Washington's workers' compensation system, and they cause a loss of productivity and contribution for society in general.

8. The right to unannounced entry furthers important safety purposes. RCW 49.17.070(5); There is evidence that regulatory interventions can improve occupational health and safety outcomes.[1] The results of pooled analysis by researchers provide strong evidence that DOSH inspection activities make a significant contribution to reducing claims rates and costs in the period following the visit.

9. Unannounced visits show the real working conditions at a workplace.  If an employer has a warning about the inspection, they may create artificial conditions to hide misfeasance and then return to dangerous practices after the inspectors leave.

DATED this  _29_  day of January, 2024 in Tumwater, Washington by

Craig Blackwood
Assistant Director

---

[1] *See also* https://www.lni.wa.gov/safety-health/safety-research/ongoing-projects/effectiveness-of-compliance-activities

DECLARATION OF CRAIG BLACKWOOD

3

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7740

GEO_000123

1
2
3
4
5
6
7
8

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

9   DEPARTMENT OF LABOR AND
    INDUSTRIES OF THE STATE OF
10  WASHINGTON,

11                      Plaintiff,

12  v.

13  GEO SECURE SERVICES, LLC,

14                      Defendant.

NO. 24-2-05626-8

DECLARATION OF JOHN
KORZENKO

15
16      I, John Korzenko, declare under the penalty of perjury under the laws of the United

States that the following is true and correct.

17
18  1.  I am over the age of eighteen and am otherwise competent to testify. I make these

        statements on personal knowledge and belief.

19
20  2.  I am familiar with GEO Secure Services (called other names at various times). I am a

21      Compliance Manager for Region 3 with the Department of Labor and Industries. I have

22      worked for L&I since December 2007.  This includes acting as inspector, including

        inspecting GEO's workplace.  I familiar with L&I's investigations of GEO.

23
24  3.  A true and correct copy of a list of citations issued to GEO by L&I are found attached

25      to the Sandstrom declaration as exhibits Ex. 10, Ex. 11, and Ex. 12. Inspections were

        performed in 2009, 2010, 2014, twice in 2020, 2021, and 2022.

26

DECLARATION OF JOHN KORZENKO                1

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Ave., Ste. 2000
Seattle, WA 98104-3188
(206) 464-7740

GEO_000124

1

2    4.   They have been cited for violations of confined space, respirator program violations,

3         lack of an emergency eye wash, TB exposure and lack of an exposure plan.

4    5.   Based on previous inspections, I have learned that GEO's employees perform a wide

5         variety of tasks, including janitorial and security guard work.

6    6.   The December 27, 2023 inspection was because GEO's workplace is allowed to be

7         inspected according to RCW 49.17.070 and/or RCW 70.395.050 (4).

8    7.   GEO has represented that "L&I typically coordinates the timing and scope of

9         inspections undertaken at the NWIPC." Sandstrom Decl. Ex. 2 at 5. In fact, L&I has

10        had unannounced visits in the past, with entry not blocking until December 27, 2023

11        inspection. The Occupational Health and Safety Administration (OSHA) requires

12        inspectors to have the first visit unannounced.

13   8.   L&I arranges for background checks for its inspectors.

14        DATED this 30th  day of January, 2024 in Tacoma, Washington by

15

16                                                    *John Korzenko*

17                                                    John Korzenko

18

19

20

21

22

23

24

25

26

DECLARATION OF JOHN KORZENKO                 2          ATTORNEY GENERAL OF WASHINGTON
                                                        LABOR & INDUSTRIES DIVISION
                                                        800 Fifth Ave., Ste. 2000
                                                        Seattle, WA 98104-3188
                                                        (206) 464-7740

GEO_000125

1
2
3
4
5
6
7
8

**STATE OF WASHINGTON**
**PIERCE COUNTY SUPERIOR COURT**

9  DEPARTMENT OF LABOR AND
   INDUSTRIES OF THE STATE OF
10 WASHINGTON,

11                    Plaintiff,

12 v.

13 GEO SECURE SERVICES LLC,

14                    Defendant.

NO. 24-2-05626-8

DECLARATION OF ERIC SMITH

15
16      I, Eric Smith, declare under the penalty of perjury under the laws of the United States

17 that the following is true and correct.

18   1.  I am over the age of eighteen and am otherwise competent to testify. I make these

19       statements on personal knowledge and belief.

20   2.  I am a Region 3 Compliance Safety and Health Investigator with the Department of

21       Labor and Industries. I have worked for L&I since January 2020.  I am an industrial

22       hygienist.

23   3.  In May 2022, I inspected GEO's workplace. This was an unannounced inspection, and I

24       was allowed to inspect the facility.

25   4.  On December 29, 2023, I obtained a warrant to inspect GEO Secure Services LLC's

26       workplace at the Northwest ICE Process Center.

DECLARATION OF ERIC SMITH                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                                  LABOR & INDUSTRIES DIVISION
                                                                  800 Fifth Avenue, Suite 2000
                                                                  Seattle, WA 98104
                                                                  (206) 464-7740

GEO_000126

5.  Matt Williams and I arrived at the NWIPC and served the warrant to three individuals at GEO's workplace, including Michael Knight. He is the GEO Assistant Facility Administrator. Despite the warrant, Ryan Jennings, ICE Supervisory Detention and Deportation Officer, refused us entry. He wanted us to contact the ICE Field Office Director to schedule a formal tour of the facility.

6.  I have had a background check.

7.  On January 4, 2024, Matt Williams and I went to Pierce County Courthouse. We learned that the court decided to assign a search warrant number to this entry warrant. The clerk told us we did not need to file this warrant with the courthouse with a cause number because it now has a search warrant number. The clerk gave us a copy of the warrant with a warrant number (as attached to the Declaration of Anastasia Sandstrom, together with the application and declaration for the warrant).

DATED this __29__ day of January, 2024 in Tacoma, Washington by

*Eric Smith*

Eric Smith

DECLARATION OF ERIC SMITH                    2

ATTORNEY GENERAL OF WASHINGTON
LABOR & INDUSTRIES DIVISION
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7740

GEO_000127

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

January 31 2024 3:07 PM

CONSTANCE R. WHITE
COUNTY CLERK
NO: 24-2-05626-8

## SUPERIOR COURT OF WASHINGTON COUNTY OF PIERCE

| | |
|---|---|
| **DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE OF WASHINGTON**, | **DECLARATION OF SERVICE** |
| Plaintiff(s), | No. **24-2-05626-8** |
| vs. | |
| **GEO SECURE SERVICES, LLC**, | |
| Defendant(s), | |
| _____/ ss. | |

The undersigned, being first duly sworn on oath deposes and says: That he/she is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen years, not a party to or interested in the above entitled action and competent to be a witness therein.

That on the **31st** day of **January**, **2024 @ 01:13 PM**, at the address of **707 W MAIN AVE #B-1 , SPOKANE,** within **SPOKANE** County, **WA**, **99201** the undersigned duly served the following document(s): **SUMMONS; COMPLAINT; ORDER ASSIGNING CASE TO JUDICIAL DEPARTMENT AND SETTING REVIEW HEARING DATE; CASE COVER SHEET; DECLARATION OF ELLIOTT FURST; CERTIFICATE OF SERVICE; DECLARATION OF CRAIG BLACKWOOD; DECLARATION OF JOHN KORZENKO; MOTION FOR RULING ON CONTEMPT; NOTE FOR JUDGES MOTION DOCKET; PROPOSED ORDER ON FINDING OF CONTEMPT; DECLARATION OF ERIC SMITH; DECLARATION OF ANASTASIA SANDSTROM;** in the above entitled action upon **GEO SECURE SERVICES, LLC,** by then and there personally delivering ONE true and correct copy(ies) of the above documents into the hands of and leaving same with **TAI DURR, OPERATIONS MANAGER AT CORPORATE CREATIONS NETWORK INC., THE REGISTERED AGENT** .

### I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct:

Date: 01/31/2024
Service Fee:   $ **44.64**
Return Fee:   $
Mileage Fee:  $
Misc. Fee:    $ **55.00**
Total Fee:    $ **99.64**

862120

**JAYDEN THOMAS - Signed at Spokane, WA on 01/31/24**
Registered Process Server
License #: **1924**
PACIFIC NORTHWEST LEGAL SUPPORT, INC.
4505 PACIFIC HWY E SUITE C2
FIFE, WA 98424
206-223-9426

GEO_000128